UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| ─────────────────── x | |
| BELMONT HOLDINGS CORP., et al., : | Civil Action No. 1:09-cv-01185-WSD |
| Individually and on Behalf of All Others : | (**Consolidated**) |
| Similarly Situated, : | |
| : | <u>CLASS ACTION</u> |
| Plaintiffs, : | |
| : | CONSOLIDATED COMPLAINT FOR |
| vs. : | VIOLATION OF THE FEDERAL |
| : | SECURITIES LAWS |
| SUNTRUST BANKS, INC., et al., : | |
| : | |
| Defendants. : | |
| ─────────────────── x | <u>DEMAND FOR JURY TRIAL</u> |

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who acquired the SunTrust Capital IX 7.875% Trust Preferred Securities (the "Securities") of SunTrust Banks Inc. ("SunTrust" or the "Company") pursuant and/or traceable to a materially false and misleading registration statement and prospectus (the "Registration Statement") issued in connection with the Company's February 2008 initial public offering of the Securities (the "Offering").  This action asserts violations of the Securities Act of 1933 ("1933 Act") based on theories of strict liability and negligence – but not fraud – against SunTrust, certain of its subsidiaries, its senior insiders and directors, its auditors and the investment banks that underwrote the Offering (collectively, "defendants").

2.      The Securities at issue are hybrid securities that have characteristics of both equity and debt.  This type of security has been especially popular with bank holding companies, such as SunTrust, in recent years due to a 1996 Federal Reserve Board opinion allowing the proceeds of a trust preferred offering to be treated as precious "Tier I" capital by the bank.[1]  Under these federal guidelines, up to 25% of a

---

[1]      The Tier I capital ratio measures a bank's readily available capital as a percentage of assets that are potentially at risk of default (known as its "risk-weighted assets").

- 1 -

bank's Tier I capital may be derived from funds raised through trust preferred securities offerings such as the one at issue here.

3.      In anticipation of the Securities offering, SunTrust created a wholly-owned subsidiary that was organized as a trust – SunTrust Capital IX.  SunTrust issued debt to the trust and the trust in turn issued the Securities to investors through an initial public offering.  The proceeds of the Offering were immediately transferred from the trust to SunTrust, allowing the Company to treat the proceeds as Tier I capital on its balance sheet.  SunTrust consummated the Offering pursuant to the false and misleading Registration Statement and Prospectus, selling 27.6 million shares of the Securities at $25 per share for proceeds of $690 million.  The Registration Statement and Prospectus provided little information about the Company, and simply incorporated by reference SunTrust's Form 10-K for the year ended December 31, 2007, filed with the Securities and Exchange Commission ("SEC") on February 20, 2008 ("2007 Form 10-K").

## INTRODUCTION

**SunTrust Bets Heavily on Mortgages**

4.      In the years leading up to the Offering, SunTrust engaged in highly risky and imprudent lending practices in several real estate markets in the South, especially Florida and Georgia.  It didn't take long for these careless business decisions to come

back to haunt them.  In fact, the ongoing collapse in mortgage-related asset values would ultimately cost the Company billions of dollars of losses in 2007 and 2008, requiring the Company to take billions from taxpayers and jeopardizing its ability to function.

5.     SunTrust's high-risk loan portfolio included Alt-A First and Second mortgages, low documentation and no documentation loans ("liar loans"), adjustable rate mortgages ("ARMS"), interest-only loans and "piggy-back" or "combo" loans, which allowed a borrower to purchase a home and obtain a home equity line of credit with little or no money down.  The combination of a declining real estate market and a huge volume of these high-risk loans meant that many of these mortgages would soon default.  This problem was amplified at SunTrust because the Company had kept a significant portion of its high-risk loan portfolio on its own books rather than selling the loans to other investors.  And even in situations where SunTrust was fortunate enough to sell the high-risk loans to other entities, the Company remained contingently liable for fraud in the origination of the loans, for early borrower payment defaults, and for any breaches of its own and others' warranties and representations.

6.     Although significant, SunTrust's troubles were not limited to the high-risk loans they originated predominantly in the South.  During 2007 and 2008,

SunTrust also purchased from others tens of millions of dollars of residential real estate-secured loans. SunTrust acquired these loans by either purchasing the mortgage loans outright or purchasing securities in which such loans had been pooled, with certain real estate serving as the collateral backing the securities.

7.      Doubling down on the high-risk bet in the residential mortgage market, SunTrust also purchased over $2 billion of mortgage-related securities, including so-called structured investment vehicles ("SIVs"), from "fund sponsors" – entities affiliated with SunTrust. This transaction alone would ultimately require the Company to assume hundreds of millions of dollars in losses.

**The Mortgage Market Collapses**

8.      By late 2006, the real estate markets in the areas where the vast majority of SunTrust's business now focused – especially Florida – began a rapid descent. Real estate sales slowed, mortgage originations stalled, values began declining and foreclosures began accelerating. As the collapse gained momentum throughout 2007, foreclosures skyrocketed, loan originators began going bankrupt and the financial media publicly described the fallout from the lax mortgage requirements and salacious lending practices of the recent past.

9.      For instance, on April 2, 2007, New Century Financial, which had been the nation's second largest sub-prime lender, filed for bankruptcy. On June 12, 2007,

RealtyTrac announced U.S. foreclosure filings surged 90% year-over-year in May 2007, and had increased an incredible 19% month-to-month; that is, from April 2007 to May 2007. Then on August 6, 2007, American Home Mortgage, one of the largest home lenders in the country, also filed for bankruptcy due to the "weak housing market and a spike in payment defaults." And it only got worse from there.

10.    Things were especially bad in Florida. As reported in an April 17, 2007 *Sun-Sentinel.com* article entitled, "Residents Miss More Mortgage Payments; Foreclosure Rates Expected to Jump in South Florida":

> A deluge of South Floridians are falling behind on their monthly house payments, raising fears that many of the delinquent property owners will lose their homes to foreclosure this year and next.
>
> "*Who knows how bad it's going to get," said Richard French, a manager with SunTrust Mortgage and president of the Broward County chapter of the Mortgage Bankers Association. "It's a little scary to think about*."
>
> Escalating home values from 2000 to 2005 caused buyers to overextend themselves. Many took out short-term, adjustable-rate mortgages and are seeing their loan payments spike as interest rates rise. Higher property taxes and insurance premiums also are putting homeowners in peril.
>
> Broward had 1,168 property owners with late payments in March, a 331 percent increase over the 271 a year ago, according to *Realestat.com*, a Plantation-based firm that compiles local housing statistics. Palm Beach County's late payments climbed 288 percent, to 888, from 229 last March.

Late home loan payments in both counties increased in each of the first three months of 2007. The rise "bodes ill for actual foreclosures down the road," said Mike Larson, an analyst with Weiss Research in Jupiter.

Marc Thomashaw, a vice president for *Realestat.com*, was more blunt.

"*We're set for an explosion [of foreclosures] to happen between now and the next six months*," he said Monday.

\*        \*        \*

What's more, South Florida's slumping real estate market is holding down prices and preventing recent buyers from selling quickly to get out of financial trouble.

"A lot of these escape valves are now shut," Weiss' Larson said. "It's not a pretty sight."

\*        \*        \*

Mark Zandi, chief economist with Moody's *Economy.com*, a West Chester, Pa., research firm, agrees that short-term investors and others who bought within the past few years are most at risk of losing their homes. *Still, he said more mortgage delinquencies and foreclosures are inevitable due to a "noxious mix" of aggressive lending, falling home prices and borrowers facing large increases in their monthly payments*.[2]

11.    In the face of all of this, SunTrust inaccurately described its exposure to risky mortgage-related assets. As early as the second quarter of 2007, and

---

[2]    Here, as elsewhere, emphasis has been added unless otherwise noted.

increasingly thereafter, SunTrust began relying on so-called "Level 3" accounting for some of its mortgage-related loans, which effectively enabled SunTrust to subjectively select the level of reserve for loan losses. This self-serving use of "discretion" would later be questioned by the SEC in a comment letter (sent after the Offering) directed at the Company's 2007 Form 10-K and 2008 Form 10-Q's for the first three quarters of 2008.

12.    Compounding the problem, SunTrust's internal controls over its accounting for its mortgage-related assets were in disarray. Although SunTrust was attempting to fix its internal control problems during the period leading up to the Offering, SunTrust was simply incapable of accurately determining its true exposure to its high-risk mortgage-related assets, or the rate at which they were defaulting. Indeed, months before the Offering, SunTrust laid off many of those involved in trying to fix SunTrust's internal control problems.

13.    By the time of the Offering in 2008, the mortgage meltdown was wildly out of control and bleeding into all of the financial markets. Many banks (especially those with significant mortgage related holdings such as SunTrust) had become desperate to raise capital in order not to fall below minimum regulatory thresholds. One of the ways SunTrust raised capital was by issuing the "trust preferred securities" at issue here. But the Registration Statement and Prospectus defendants

used to issue the Securities was defective. While it provided information about the Securities themselves – how the trust worked, when interest payments would or would not be made, etc. – it negligently incorporated false and misleading information about the Company's capital and reserves, and its ability to manage and control risk.

14.    For one thing, the 2007 Form 10-K, incorporated by reference into the Registration Statement, vastly underestimated the Company's allowance for loan and lease loss reserves ("ALLL"), and misstated the Company's capital position. Unfortunately for investors, these defects went unnoticed and unquestioned in the Offering because the underwriters performed almost no due diligence. As a result, at the time of the Offering, the Company's most recent financial statement misrepresented the Company's true exposure to risky mortgage-related assets and understated SunTrust's loan and lease loss reserve *by hundreds of million of dollars*.

15.    Similarly, the Offering documents contained false and misleading statements concerning the Company's ability to remain "well-capitalized," and its ability to evaluate, manage and control its risk exposure.

16.    These misstatements and omissions allowed SunTrust to raise $690 million of precious "Tier 1" capital by selling the Securities to Lead Plaintiff and the Class. Defendants' false statements and omissions were material because the

Company's exposure to the rapidly declining real estate market posed a significant threat to the Company's capital adequacy and liquidity.

17.    Like its competitors, SunTrust's ability to maintain its liquidity and well-capitalized status was critical in 2008. SunTrust's 2007 Form 10-K emphasized that "[w]e expect the Tier 1 ratio to be restored to the targeted level via the potential issuance of enhanced trust preferred securities qualifying as regulatory capital . . . ." Accordingly, in the SEC filings incorporated by reference in the Offerings Materials, SunTrust repeatedly represented that it was "well capitalized."

18.    In fact, by the time of the Offering, SunTrust was not "well capitalized" at all. Rather, it was operating with a very high degree of leverage, holding a small amount of capital against a massive asset base. Because SunTrust had a razor-thin margin for error, losses in even a small portion of its risk-adjusted assets could destroy much of its capital base and liquidity, rendering the Company under-capitalized and subjecting it to regulatory action or, worse, causing investor flight. Thus, as the U.S. housing market collapsed, it was critical for defendants to disclose to investors in the Offering the risks of its mortgage-related exposures, and accurately account for losses in those assets and their impact on SunTrust's liquidity and capital adequacy. Defendants failed to do so.

19.    After the Offering, and as its capital position deteriorated further in 2008, SunTrust was required to seek government help.  In November 2008, SunTrust announced it would be bailed out by taxpayers, receiving $3.5 billion from the Troubled Asset Relief Program ("TARP"), and an additional $1.4 billion announced in December 2008.  But with the government bailout came increased scrutiny.  So in January 2009, SunTrust reported its first quarterly loss in more than two decades, cut its quarterly dividend from $0.54 to $0.10 per common share, and announced a significant increase in its provision for loan losses.

20.    Needless to say, investors were furious, analysts criticized management and the stock price declined dramatically.  As a further result, the ratings agencies reduced their ratings on the Company, drastically increasing the cost of raising capital for the Company.  According to the Company's 2008 Form 10-K, filed on March 2, 2009, defendants admitted the deteriorating real estate market was the cause of these huge losses (especially in Florida and Georgia), and that it had been a problem for the Company since at least 2007.  This lawsuit follows.

21.    As a result of the false and misleading statements contained in the Registration Statement and Prospectus, investors who purchased the SunTrust securities have been damaged.  On the date this lawsuit was filed, the securities

closed at a price of $17.19 per share, or $7.81 per share less than the $25 per share

offering price:



## JURISDICTION AND VENUE

22.   The claims asserted herein arise under and pursuant to §§11, 12(a)(2)

and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  In connection with the

acts complained of, defendants, directly or indirectly, used the means and

instrumentalities of interstate commerce, including, but not limited to, the mails,

interstate telephone communications and the facilities of the national securities

markets.

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

24.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because SunTrust and the Underwriter Defendants (defined below) conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

25.     Lead plaintiff Belmont Holdings Corp. ("Belmont") is a Pennsylvania corporation located in Bala Cynwyd, Pennsylvania.  Belmont acquired the Securities pursuant or traceable to the Offering as set forth in the Certification filed with the Court on July 14, 2009 (Doc. No. 62-5) and has been damaged thereby.  Belmont was appointed Lead Plaintiff by Order dated September 29, 2009 (Doc. No. 73).

26.     Defendant SunTrust is a financial holding corporation, providing a range of financial products and services to consumer and corporate customers in the United States and internationally.  The Company was incorporated in 1984 and is based in Atlanta, Georgia.  SunTrust is the Registrant for the securities at issue here.

27.     Defendant SunTrust Capital IX ("SunTrust Capital") is a Delaware statutory trust created by SunTrust for the sole purpose of issuing the securities, and is wholly owned by SunTrust.  The only assets of the SunTrust Capital are 7.875%

Junior Subordinated Notes due March 15, 2068 issued by SunTrust for the sole purpose of consummating the Offering. SunTrust Capital issued the securities that were then guaranteed by SunTrust.

28.    Defendant James M. Wells, III ("Well") has been Chairman of the Board of SunTrust since April 29, 2008 and Chief Executive Officer ("CEO") since January 1, 2007. From December 9, 2004 until December 31, 2006, Wells was President and Chief Operating Officer of SunTrust. Wells signed the materially false and misleading 2007 Form 10-K and the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications that accompanied those financial statements and were incorporated into the Registration Statement and Prospectus.

29.    Defendant Raymond D. Fortin ("Fortin") has been Corporate Executive Vice President since December 2004 and General Counsel. Fortin is responsible for legal affairs, serves as Corporate Secretary and has administrative responsibility for internal audit. Fortin signed the materially false and misleading Registration Statement.

30.    Defendant L. Phillip Humann ("Humann") was Chairman of the Board and CEO of SunTrust until he retired in April 2008. Humann signed the materially false and misleading Registration Statement.

31.    Defendant Mark A. Chancy ("Chancy") is Corporate Executive Vice President and Chief Financial Officer ("CFO") of SunTrust since 2004.  Chancy signed the materially false and misleading Registration Statement, the 2007 Form 10-K and the Sarbanes-Oxley certifications that accompanied those financial statements and were incorporated into the Registration Statement and Prospectus.

32.    Defendant Thomas Panther ("Panther") is Senior Vice President and Controller of SunTrust since December, 2004.  Panther signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

33.    Defendant Robert M. Beall, II ("Beall") is a director of SunTrust.  Beall is a member of the Audit and Governance & Nominating Committees at SunTrust.  Beall signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

34.    Defendant J. Hyatt Brown ("Brown") was a director of SunTrust.  Brown signed the materially false and misleading Registration Statement and the 2007 Form 10-K.  Brown's term as director ended on April 29, 2008.

35.    Defendant Alston D. Correll ("Correll") is a director of SunTrust.  Correll is the Chairman of the Compensation Committee and member of the Governance & Nominating Committee at SunTrust.  Correll signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

36.     Defendant Jeffrey C. Crowe ("Crowe") is a director of SunTrust since April, 2004.  Crowe is chairman of the Risk Committee and a member of the Executive Committee and Governance & Nominating Committees at SunTrust. Crowe signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

37.     Defendant Thomas C. Farnsworth, Jr. ("Farnsworth") was a director of SunTrust.  Farnsworth signed the materially false and misleading Registration Statement and the 2007 Form 10-K.  Farnsworth's term as director ended on April 29, 2008.

38.     Defendant Patricia C. Frist ("Frist") is a director of SunTrust.  Frist is a member of the Compensation Committee and Governance & Nominating Committee at SunTrust.  Frist signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

39.     Defendant Blake P. Garrett, Jr. ("Garrett") is a director of SunTrust since October, 2004.  Garrett is on the Risk Committee and Governance & Nominating Committee at SunTrust.  Garrett signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

40.     Defendant David H. Hughes ("Hughes") is a director of SunTrust. Hughes is a member of the Compensation Committee and Risk Committee at

SunTrust. Hughes signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

41.     Defendant E. Neville Isdell ("Isdell") was a director of SunTrust. Isdell signed the materially false and misleading Registration Statement. Isdell's term as director ended on April 19, 2008.

42.     Defendant M. Douglas Ivester ("Ivester") is a director of SunTrust. Ivester also is Chairman of the Audit Committee and a member of the Executive and Governance & Nominating Committees at SunTrust. Ivester signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

43.     Defendant J. Hicks Lanier ("Lanier") is a director of SunTrust. Lanier is a member of the Audit and Risk Committees of SunTrust. Lanier signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

44.     Defendant G. Gilmer Minor, III ("Minor") is a director of SunTrust. Minor is a member of the Compensation Committee and Executive Committee of SunTrust. Minor signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

45.     Defendant Larry L. Prince ("Prince") is a director of SunTrust. Prince is a member of the Governance & Nominating Committee and Risk Committee of

SunTrust.  Prince signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

46.     Defendant Frank S. Royal ("Royal") is a director of SunTrust.  Royal is a member of the Audit and Compensation Committees at SunTrust.  Royal signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

47.     Defendant Karen Hastie Williams ("Williams") is a director of SunTrust.  Williams is a member of the Audit and Governance & Nominating Committees at SunTrust.  Williams signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

48.     Defendant Phail Wynn, Jr. ("Wynn") is a director of SunTrust since 2004.  Wynn is a member of the Governance & Nominating Committee and Risk Committee at SunTrust.  Wynn signed the materially false and misleading Registration Statement and the 2007 Form 10-K.

49.     The defendants referenced above in ¶¶28-48 are referred to herein as the "Individual Defendants."

50.     Defendant CitiGroup Global Markets Inc. ("CitiGroup Global") is the brokerage and securities arm of CitiGroup.  CitiGroup Global acted as an underwriter for the Offering and obtained a fee for its services.

51.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services on a global basis.  Merrill Lynch acted as an underwriter for the Offering and obtained a fee for its services.

52.    Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals.  Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions.  Morgan Stanley acted as an underwriter for the Offering and obtained a fee for its services.

53.    Defendant UBS Securities LLC ("UBS") provides a range of financial products and services worldwide.  UBS acted as an underwriter for the Offering and obtained a fee for its services.

54.    Defendant SunTrust Robinson Humphrey Inc. ("SunTrust Robinson") provides a range of financial products and services worldwide.  SunTrust Robinson

has been a subsidiary of SunTrust since 2007.  SunTrust Robinson acted as an underwriter for the Offering and obtained a fee for its services.

55.    Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America.  Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions.  Banc of America acted as an underwriter for the Offering and obtained a fee for its services.

56.    Pursuant to the 1933 Act, the defendants referenced in ¶¶50-55 above are referred to herein as the "Underwriter Defendants."

57.    Pursuant to 15 U.S.C. §77k(a)(5), the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement.  In connection with the Offering, the Underwriter Defendants drafted and disseminated the Registration Statement and were paid substantial fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

58.    Defendant Ernst and Young LLP ("E&Y") is an audit, tax and advisory firm that served as SunTrust's auditor during 2007 and 2008 and, with its consent,

was named as having certified a portion of the Registration Statement as well as the financial results and internal controls in SunTrust's 2007 Form 10-K.

## SUBSTANTIVE ALLEGATIONS

### The Collapse of the Mortgage Market

59.     When housing prices began to stall and interest rates began to rise in mid-2005, homeowners who over-extended themselves by buying homes with no money down, or relying on teaser loans (which gave the mortgagee an artificially low interest rate for an introductory period of time) and those with poor credit and unstable income, began to default on their loans.  These default rates began to rise dramatically in 2006, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.

60.     Banks and mortgage industry insiders became increasingly concerned about financial institutions' exposure to mortgages and mortgage-backed securities. Specifically, the most egregious lending practices drew alarm, including "Hybrid ARMS" loans, "piggy-back" loans, "Stated Income" or "No Doc" loans, and "Interest-only" mortgages.  Industry executives recognized that a "reset problem" would lead to forced home sales which would diminish collateral values, which, in turn, would foster yet more delinquencies and forced sales.

61.    These problems grew worse in 2006, as borrowers continued to default in record numbers.  In May 2006, Ameriquest Mortgage, one of the largest wholesale subprime lenders in the U.S., announced the closing of each of its 229 retail offices and a reduction of 3,800 employees.

62.    A Standard & Poors report for the third quarter of 2006 noted that mortgage lenders were experiencing rising delinquencies and early payment defaults. An October 23, 2006 *Bloomberg* article reported that "'[d]elinquency trends and home prices' show a weakening real estate market."

63.    As illustrated in the chart below, by late-2006, and accelerating into 2007, the domestic housing market collapsed.  For a financial institution like SunTrust, with substantial exposure to the most troubled geographic housing markets, high loan-to-value loans and ARMS, this collapse immediately resulted in rising delinquency rates and impaired loans:



64.    On December 14, 2006, the Mortgage Bankers Association ("MBA") reported in its quarterly National Delinquency Survey that late payments and new foreclosures on U.S. homes rose in the third quarter and were likely to grow as a massive wave of ARMS reset at higher interest rates.  MBA also reported that delinquencies rose for all home loans, but most notably for adjustable loans to subprime borrowers who were already stretched before mortgage rates climbed ***and predicted that between $1.1 trillion and $1.5 trillion of mortgages face rate resets in 2007***.

65.    On December 22, 2006, the Center for Responsible Lending ("CRL") issued a study that revealed that 2.2 million American households are likely to lose their homes, resulting in as much as $164 billion in foreclosures.  CRL's research reported that risky lending practices have triggered the worst foreclosure crisis in the

modern mortgage market, projecting that one out of five (19.4%) subprime loans issued during 2005-2006 will fail.

66.    On December 28, 2006, Ownit Mortgage Solutions ("Ownit"), the 11th largest U.S. issuer of subprime mortgages, filed for bankruptcy. Earlier in the month, Ownit abruptly shut its doors and told its 800 workers not to return.

67.    In 2007, the real estate markets in which SunTrust was now so heavily invested got much worse, and a host of competing mortgage lenders continued to suffer from the enormous surge in loan defaults. In February 2007, two more prominent lenders filed for bankruptcy – ResMae Mortgage Corporation and Mortgage Lenders Network USA, Inc. Both companies specialized in originating and servicing non-conforming residential mortgages.

68.    Things were especially bad in SunTrust's principal markets – Florida and Georgia. As reported in an April 17, 2007 *Sun-Sentinel* article entitled, "Residents Miss More Mortgage Payments; Foreclosure Rates Expected to Jump in South Florida":

> A deluge of South Floridians are falling behind on their monthly house payments, raising fears that many of the delinquent property owners will lose their homes to foreclosure this year and next.
>
> "***Who knows how bad it's going to get,***" *said Richard French, a* ***manager with SunTrust Mortgage and president of the Broward County chapter of the Mortgage Bankers Association. "It's a little scary to think about***."

Escalating home values from 2000 to 2005 caused buyers to overextend themselves. Many took out short-term, adjustable-rate mortgages and are seeing their loan payments spike as interest rates rise. Higher property taxes and insurance premiums also are putting homeowners in peril.

Broward had 1,168 property owners with late payments in March, a 331 percent increase over the 271 a year ago, according to *Realestat.com*, a Plantation-based firm that compiles local housing statistics. Palm Beach County's late payments climbed 288 percent, to 888, from 229 last March.

Late home loan payments in both counties increased in each of the first three months of 2007. The rise "bodes ill for actual foreclosures down the road," said Mike Larson, an analyst with Weiss Research in Jupiter.

Marc Thomashaw, a vice president for *Realestat.com*, was more blunt.

***"We're set for an explosion [of foreclosures] to happen between now and the next six months***," he said Monday.

*       *       *

What's more, South Florida's slumping real estate market is holding down prices and preventing recent buyers from selling quickly to get out of financial trouble.

"A lot of these escape valves are now shut," Weiss' Larson said. "It's not a pretty sight."

*       *       *

Mark Zandi, chief economist with Moody's *Economy.com*, a West Chester, Pa., research firm, agrees that short-term investors and others who bought within the past few years are most at risk of losing their homes. ***Still, he said more mortgage delinquencies and foreclosures are inevitable due to a "noxious mix" of aggressive lending, falling***

- 24 -

*home prices and borrowers facing large increases in their monthly payments*.

**SunTrust's Exposure to the Crisis**

69.    Despite these numerous red flags, throughout 2007 SunTrust continued to rely heavily on nonprime and other ill-advised risky lending practices.  For example, at the end of 2006, SunTrust had $47.9 billion in residential real estate loans and home equity lines, of which 37% of these loans included features such as interest only, high loan to values, and low initial interest rates.  Also, SunTrust's business was focused in the Southeast – home to some of the areas hardest hit by problems in the housing and commercial real estate market.

70.    Prior to and continuing during 2007, the Company's business model included originating and retaining risky residential mortgage loan products such as "Alt-A" low documentation loans, interest only loans, high loan-to-value ("LTV") loans and low initial interest rate loans.

71.    SunTrust's loan portfolio included billions of dollars in residential real estate loans and home equity lines.  For example, as of December 31, 2006, SunTrust owned $47.9 billion in residential real estate loans, plus an additional $19 billion in commitments to extend credit on such loans, and $28.2 billion in mortgage loan commitments.  At year end 2007, SunTrust owned $47.7 billion in residential real estate loans and home equity loans (representing 39% of SunTrust's total loans), plus

- 25 -

an additional $20.4 billion in commitments to extend credit on home equity loans, and $12.9 billion in mortgage loan commitments.

72.    Hundreds of millions of these loans and credit commitments represented a major credit risk for SunTrust which included high risk features such as interest only loans, high loan to value loans and low initial interest rate loans.  As of December 31, 2007, the Company owned $16.4 billion of interest only loans and approximately $1.4 billion of those loans had combined loan to value ratios in excess of 80%.  Additionally, the Company owned approximately $2.3 billion of amortizing loans with combined loan to value ratios in excess of 80% with no mortgage insurance.  However, at the end of 2007, SunTrust's provision for loan losses was only $664.9 million and its allowance for loan and lease losses was only $1.28 billion. *As a result, SunTrust's provision for loan losses and related allowance for loan and lease losses was vastly understated by hundreds of millions of dollars to properly account for the Company's exposure to its high risk loans with loan-to-value ratios in excess of 80%.*  This understatement of its loan reserves caused a material overstatement of its net income, earnings per share ("EPS"), and Tier 1 Capital Ratio which was a ratio investors and analysts were intensely focused on and concerned about.

73.    SunTrust's business model also included selling or securitizing various asset classes, including student loans, residential mortgages, commercial loans, trust preferred securities, and asset-backed debt securities, that were either originated by the Company or purchased in the market and warehoused prior to the sale or securitization.  These securitization activities involved selling all or a portion of a pool of assets to Company-sponsored entities or third-parties.  SunTrust often warehoused assets prior to sale or securitization, retained interests in securitizations, and maintained a portfolio of loans that it traded in the secondary market.

74.    In spite of numerous signs of an impending collapse in U.S. real estate markets and mortgage-backed securities, SunTrust continued reporting financial growth for the interim quarters during fiscal 2007, and continued reporting that the Company was adequately positioned in the event of any further loan deterioration. Though the mortgage and credit crisis was severely affecting other lenders in 2007, SunTrust portrayed itself as a more conservative bank that had protected itself from such losses.

75.    For example, in a May 27, 2007 article in the *Atlanta Journal-Constitution*, defendant Wells made the following statements concerning SunTrust's purported "conservative" banking approach:

> It is a conservative loan-based organization historically. It's sort of in our culture. There are things that we have been doing recently in certain

segments of the business and certain geographies that would indicate that there are analytics that would imply we could get a better risk-return ratio analysis. And we may consider doing that. We've been experimenting with some things. I would say the answer to your question is we are a conservative lending institution and around the edges there are some things that we can do slightly differently and are.

76.    But throughout 2007 and 2008, SunTrust failed to disclose its true level of exposure to losses related to the problems in the mortgage and credit markets – particularly, exposure to mortgage loan losses and net valuation losses within the Company's portfolio.

77.    Throughout the summer of 2007, the mortgage and credit crisis continued.  Mortgage loan delinquencies had risen steadily, together with foreclosure rates.  Additionally, the market for mortgage-backed securities had taken a severe beating, creating illiquidity in a market that had once prospered.

78.    For example, on June 12, 2007, RealtyTrac announced U.S. foreclosure filings had surged 90% year-over-year in May 2007.  Foreclosure filings were also up 19% month-to-month – April to May 2007.  At this time, there was no sign this trend would slow down.  In fact, industry experts were predicting the devastating foreclosure trend could only get worse.

79.    On August 6, 2007, American Home Mortgage, one of the largest home lenders in the U.S., filed for bankruptcy.  According to the *New York Times*, on August 7, 2007, the Company's collapse resulted from "[a] weak housing market and

a spike in payment defaults [which] scared investors from mortgage debt, including bonds and other securities backed by home loans."

80.    A week later, on August 13, 2007, Aegis Mortgage Corp., another large U.S. mortgage lender, also filed for bankruptcy protection.

81.    And the rate of foreclosures continued to skyrocket.  On August 22, 2007, RealtyTrac announced that foreclosures were up 93% year-over-year for July 2007.  The national foreclosure rate in July was one filing for every 693 households.

82.    While SunTrust tried to tighten credit standards for some of its loans in 2007, this did not prevent the previously-made loans generated with inadequate credit standards from plaguing SunTrust throughout 2007 and thereafter.  For example, while SunTrust ceased originating 1st Lien Alt-A loans from its own portfolio in December 2006, and ceased originating 2nd Lien Alt-A1 loans in March 2007, the previously generated 1st Lien Alt-A loans and 2nd Lien Alt-A1 loans remained on SunTrust books as non-performing loans or as high-risk loans of questionable value.[3]  Further, by late 2007, SunTrust had packaged, or was in the

---

[3]    Alt-A1 loans are similar to subprime loans.  While subprime loans are issued to borrowers who have poor credit histories or a history of delinquency in mortgage payments, Alt-A mortgages generally fall loosely in between these subprime loans and

process of packaging these 1st Lien Alt-A loans and 2nd Lien Alt-A1 loans into mortgage-backed securities which SunTrust either continued to own or remained contingently liable with respect thereto.

83.    Then on August 20, 2007, SunTrust announced that it would eliminate approximately 2,400 employees, representing 7% of its workforce, in an effort to overhaul the bank and reduce cost.  However, the Company expressly denied any connection to problems arising from the declining mortgage and housing markets.  In fact, SunTrust spokesman Barry Koling assured *Forbes.com*, however, "that ***the bank's latest move had 'nothing to do with the current mortgage and credit market related issues*.'"

84.    On September 18, 2007, the mortgage crisis intensified as mega-lender Impac Mortgage Holdings Inc. stated it would suspend most lending activities indefinitely, while another large mortgage lender, Accredited Home Lenders Holding Co. posted a major quarterly loss and said its survival remained in doubt.

---

the traditional prime mortgage loans, typically being offered to borrowers with good credit scores but other negatives.  Features of Alt-A mortgages often include, among others, reduced documentation requirements, "no doc" loans, loans for second or vacation homes and high loan-to-value ratios.

85.    On November 15, 2007, in a slide presentation prepared for the Merrill Lynch Banking and Financial Services Conference held in New York City, SunTrust projected it would write-off a mere 0.4% to 0.5% of its loans at the middle of 2008. As noted in a *Forbes.com* article entitled, "SunTrust's Homely Projections," the Company downplayed its projected loan losses, convincing the market that its exposure to mortgage-related losses was relatively low.

86.    Compounding SunTrust's problems with residential real estate loans and home equity lines of credit, SunTrust's real estate lending was concentrated in two of the most devastated markets – Florida and Georgia. Florida and Georgia represented most of SunTrust's "geographic footprint," and SunTrust would belatedly acknowledge in its 2008 Form 10-K (at 8) that a "significant portion of [SunTrust's] residential mortgages and commercial real estate loan portfolios are composed of borrowers in the Southeastern Mid-Atlantic regions of the United States, in which certain markets have been particularly adversely affected by declines in real estate value, declines in home sales volumes, and declines in new home building."

87.    Then on December 20, 2007, SunTrust announced that it intended to purchase at amortized cost, plus accrued interest, approximately $1.4 billion of securities issued by SIVs from the STI Classic Prime Quality Money Market Fund and the STI Classic Institutional Cash Management Money Market Fund.

Ridgeworth Capital Management, Inc. (f/k/a Trusco Capital Management, Inc.), a wholly owned subsidiary of SunTrust, was the investment advisor to those funds.[4] As a consequence, SunTrust estimated that it would incur a pre-tax mark-to-market write-down of $225 million to $250 million in the fourth quarter of 2007.

88.    SunTrust was under no obligation to purchase the $1.4 billion of SIVs from its affiliated entities.  In choosing to purchase the SIVs and assuming the related losses (such SIVs constituting securities which were backed subprime liable and by real estate-related loans of questionable value), SunTrust bore losses which should have been borne by the funds, the funds' sponsors, and the funds' customers. This assumption of loss would continue to cause further damage to the Company's profitability throughout 2008.

89.    At the same time, the Company purchased an additional $725 million in asset-backed securities, from Three Pillars Funding LLC, a multi-seller commercial paper conduit sponsored by the Company.  Regarding these asset-backed securities, the Company stated in its 2007 Form 10-K that, "[d]uring the fourth quarter of 2007, the rapid deterioration in the performance of the underlying collateral, *some of which*

---

[4]    As noted above, effective March 31, 2008, SunTrust subsidiary, Trusco Capital Management, Inc., changed its name to Ridgeworth Capital Management, Inc. and the STI Classic Funds became Ridgeworth Funds.

*is comprised of sub-prime and Alt-A mortgages*, as well as market illiquidity began to materially decrease the market value of these securities; as a result, we recorded a market value loss of $144.8 million in the fourth quarter of 2007."

90.    Regarding the purchases from Ridgeworth Capital Management, Inc. and Three Pillars Funding LLC, the Company also noted in its 2007 Form 10-K, "[w]e did not have a contractual or implicit obligation to purchase these securities or provide additional support to the Funds or Three Pillars."

91.    On January 23, 2008, the Company announced its financial results for the full year 2007 and the fourth quarter ended December 31, 2007, which included net income of $3.3 million for the fourth quarter of 2007, down from $498.6 million in the fourth quarter of 2006, or a plunge of 99.3%.  SunTrust attributed the loss to the declining value of asset-backed securities, losses tied to residential real estate loans, mortgage delinquencies and falling home prices.

92.    At that time, the Company reported that it had increased its provision for loan losses from $115.8 million in the fourth quarter of 2006 to $356.8 million in the fourth quarter of 2007 and from $262.5 million for the full year 2006 to $664.9 million for the full year 2007.  In comparison to its exposure of over $16 billion in mortgage-related assets, (*see* ¶73) this marginal increase was woefully inadequate and not nearly enough to cover the Company's anticipated loan losses going forward.

93.   On February 20, 2008, SunTrust filed its 2007 Form 10-K with the SEC. The 2007 Form 10-K, incorporated by reference into the Registration Statement, reported provisions for loan losses of $664.9 million, net income of $1.604 billion, assets of $179.6 billion, Tier 1 capital ratio of 6.93%, stockholder's equity of $18 billion and total loans serviced by SunTrust Mortgage reaching $149.9 billion.

94.   In an effort to shore up its depleting capital base – which was now below the Company's "target" ratio of 7.5% – on or about February 27, 2008, SunTrust filed the Prospectus for the Offering with the SEC.   The Prospectus Supplement ("Prospectus") reported, that SunTrust, "with year-end 2007 assets of $179.6 billion, is one of the nation's largest financial services holding companies." The Prospectus offered no additional or updated financial information concerning the Company, but expressly incorporated by reference SunTrust's 2007 Form 10-K, including (with E&Y's consent) E&Y's clean audit opinion, and certain other disclosures filed with the SEC subsequent to the filing of the Shelf Registration Statement in October 2006.  Pursuant to this Prospectus, on or about February 27, 2008, SunTrust issued 27.6 million shares of the Securities to the public at $25 each, receiving gross proceeds of $690 million.   The Registration Statement and Prospectus contained material misstatements concerning the value of the Company's

real estate loan portfolio and mortgage-related assets, its loan and lease loss reserves, its capital resources and ability to manage and control these risks.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT AND PROSPECTUS

95.    On or about October 18, 2006, SunTrust filed with the SEC a Form S-3 Registration Statement and Prospectus using a "shelf" registration, or continuous offering process.   Under the shelf registration, SunTrust would sell securities described in various future prospectus supplements in one or more offerings.  The prospectus supplements would form part of the Registration Statement for each offering.  The securities were to be issued by SunTrust.  The Form S-3 stated:

> The SEC allows us to "incorporate by reference" into this prospectus the information we file with it, which means that we can disclose important information to you by referring you to those documents.  The information incorporated by reference is an important part of this prospectus and information that we subsequently file with the SEC will automatically update and super[c]ede information in this prospectus. . . .  We incorporate by reference . . . any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 . . . .

96.    On February 27, 2008, SunTrust filed its Prospectus, which formed part of the Registration Statement pursuant to which SunTrust sold 27.6 million shares of Securities to the public at $25 per share.   The Prospectus provided limited information, again stating:

- 35 -

The SEC allows us to incorporate by reference the information we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus supplement, and later information that we file with the SEC will automatically update and supersede this information. We incorporate by reference the following documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, or the "*Exchange Act*," until we or any of the underwriters sell all of the securities:

- Annual Report on Form 10-K for the year ended December 31, 2007; and

- Current Reports on Form 8-K dated February 16, 2007 (Form 8-K/A filed on January 7, 2008) and February 12, 2008 (except Item 7.01 and the related Exhibit 99.1 included in Item 9.01).

97.    The Prospectus reported that SunTrust, "with year-end 2007 assets of

$179.6 billion, is one of the nation's largest financial services holding companies."

With respect to specific financial data on SunTrust, the Prospectus provided no

updated information but included selected consolidated financial data, summary of

operations, financial ratios and other data emphasizing that the summary should be

read in conjunction with "the detailed information included in our 2007 Annual

Report on Form 10-K."

98.    SunTrust's 2007 Form 10-K, incorporated by reference into the

Registration Statement and Prospectus, reported provisions for loan losses of $664.9

million, net income of $1.604 billion, assets of $179.6 billion, Tier 1 capital ratio of

- 36 -

6.93%, stockholder's equity of $18 billion and total loans serviced by SunTrust

Mortgage reaching $149.9 billion.

99.    With respect to ALLL, the 2007 Form 10-K emphasized:

*We continuously monitor the quality of our loan portfolio and maintain an allowance for loan and lease losses ("ALLL") sufficient to absorb probable losses inherent in our loan portfolio. We are committed to the timely recognition of problem loans and maintaining an appropriate and adequate ALLL. At year-end 2007, the ALLL was $1,282.5 million, which represented 1.05% of period-end loans. This compares with an ALLL of $1,044.5 million, or 0.86% of loans as of December 31, 2006.*

\*        \*        \*

The ratio of the ALLL to total nonperforming loans decreased to 87.8% as of December 31, 2007 from 196.4% as of December 31, 2006. The decline in this ratio was due to a $928.5 million increase in nonperforming loans driven primarily by a $697.6 million increase in residential mortgage nonperforming loans. The increase in residential mortgage nonperforming loans was driven primarily by deteriorating economic conditions including increased mortgage delinquency rates and declining home values in most markets that we serve along with maturation of the portfolio.

100.    The Section entitled, "Notes to Consolidated Financial Statements" also

contained the following language regarding ALLL:

*The Company's allowance for loan and lease losses is the amount considered adequate to absorb probable losses within the portfolio based on management's evaluation of the size and current risk characteristics of the loan portfolio.* Such evaluation considers prior loss experience, the risk rating distribution of the portfolios, the impact of current internal and external influences on credit loss and the levels of nonperforming loans.

- 37 -

101.    Regarding provisions for loan losses, the 2007 Form 10-K stated:

*The provision for loan losses is the result of a detailed analysis estimating an appropriate and adequate ALLL. The analysis includes the evaluation of impaired loans as prescribed under SFAS No. 114 "Accounting by Creditors for Impairment of a Loan," and SFAS No. 118 "Accounting by Creditors for Impairment of a Loan – Income Recognition and Disclosures," and pooled loans and leases as prescribed under SFAS No. 5, "Accounting for Contingencies." For the year ended December 31, 2007, the provision for loan losses was $664.9 million*, an increase of $402.4 million, or 153%, from the year ended December 31, 2006.

The provision for loan losses was $242.1 million more than net charge-offs of $422.8 million during 2007, reflecting the downturn in the residential real estate markets and deteriorating credit conditions of the residential-mortgage and home equity portfolios.

Net charge-offs for the year ended December 31, 2007 increased $176.7 million from the $246.1 million of net charge-offs recorded in the prior year. The increase in net charge-offs was largely due to higher net charge-offs in the residential mortgage and home equity portfolios. A downturn in residential real estate prices has negatively affected the entire industry. Despite our avoidance of the subprime consumer real estate lending markets in our loan portfolio, the lower residential real estate valuations have affected even borrowers of higher credit quality.

102.    In elaborating on SunTrust's loan portfolio, defendants sought to assure investors that the Company was "well-capitalized" and that the risks posed by the deteriorating mortgage markets were under control. The 2007 Form 10-K stated:

Our portfolio is well diversified by product, client and geography throughout our footprint. We have relatively low exposure to credit card and other unsecured consumer loan products.

- 38 -

The commercial portfolio grew $1.3 billion, or 3.8%, in 2007 to $35.9 billion, or 29% of total loans, at December 31, 2007. The commercial real estate portfolio was $12.6 billion, or 10% of total loans, and the construction portfolio was $13.8 billion, or 11% of total loans, at December 31, 2007. The construction portfolio consists of $3.6 billion of residential construction to perm loans, $2.7 billion of residential construction loans, $3.3 billion of commercial construction loans, $2.9 billion of acquisition & development loans, and $1.3 billion of raw land loans. Commercial related construction loans continue to perform well. ***Performance of residential construction related loans has deteriorated; however, we have been proactive in our credit monitoring and management processes to provide "early warning" alerts for problem loans in the portfolio. For example, we use an expanded liquidity and contingency analysis to provide a thorough view of borrower capacity and their ability to service obligations in a steep market decline. We have strict limits and have exposure caps on specific projects and borrowers for risk diversification***.

Residential mortgages were $32.8 billion, or 27%, of the total loan portfolio as of December 31, 2007. Residential mortgages are comprised of core mortgages (prime first liens), prime second lien mortgages, home equity loans, lot loans, and Alt-A first and second mortgages. The core mortgage portfolio was $21.8 billion, or 18%, of the total loan portfolio as of December 31, 2007. There are minimal option adjustable rate mortgages ("ARMs") or negative amortizing loans and virtually no subprime loans in the core portfolio. The core mortgage loans are roughly half prime jumbo and half prime ARMs. Some of the ARMs in the core first mortgage portfolio are interest-only ARMs; however, the interest-only period is typically ten years, unlike many interest-only products in the market which have short interest-only periods with early reset dates. The weighted average combined loan to value ("LTV") at origination of the core portfolio was 76% and they have a current weighted average FICO score of 733. Prime second mortgages were $3.9 billion, or 3%, of total loans as of December 31, 2007 and are comprised of insured purchase money second liens or combo loans with a current weighted average FICO of 721. Home equity loans comprise $3.6 billion, or 3%, of the total loan portfolio as of December 31, 2007 and have a current weighted average FICO score of 722 and a 73%

- 39 -

weighted average combined LTV at origination. 40% of the home equity loans are in a first lien position. Lot loans were $1.7 billion, or approximately 1% of total loans, as of December 31, 2007 and have a current weighted average FICO score of 729. Alt-A loans were $1.7 billion, or approximately 1% of total loans, as of December 31, 2007. Of the Alt-A loans, $1.2 billion are first liens and well secured with a weighted average combined LTV of 77% at origination and a weighted average FICO score of 702. The remaining $0.5 billion of Alt-A loans are second lien loans with a weighted average combined LTV of 97% at origination and a current weighted average FICO score of 691.

103.    The 2007 Form 10-K, under Capital Resources, stated:

> *We are committed to remaining well capitalized and have set a Tier 1 target ratio for the Company of 7.5%.  This ratio declined during 2007 with much of the decrease taking place during the fourth quarter moving from 7.44% at September 30, 2007 to 6.93% at December 31, 2007.  We expect the Tier 1 ratio to be restored to the targeted level via the potential issuance of enhanced trust preferred securities qualifying as regulatory capital, and transactions we are currently evaluating with respect to our holdings of common stock in The Coca-Cola Company that would yield an increase in Tier 1 capital*.

104.    The "Enterprise Risk Management" section emphasized that SunTrust has established an enterprise risk governance process and formed the SunTrust Enterprise Risk Program to which in 2007, SunTrust "continued to make significant enhancements."

105.    The Section entitled "Credit Risk Management" also contained the following language regarding SunTrust's Enterprise Risk Management:

> We manage and monitor extensions of credit risk through initial underwriting processes and periodic reviews. We maintain underwriting standards in accordance with credit policies and procedures, and Credit

- 40 -

Risk Management conducts independent risk reviews to ensure active compliance with all policies and procedures. ***Credit Risk Management periodically reviews our lines of business to monitor asset quality trends and the appropriateness of credit policies. In particular, total borrower exposure limits are established and concentration risk is monitored***. We have made a major commitment to maintain and enhance comprehensive credit systems in order to be compliant with business requirements and evolving regulatory standards. As part of a continuous improvement process, SunTrust Credit Risk Management evaluates potential enhancements to our risk measurement and management tools, implementing them as appropriate along with amended credit policies and procedures.

106.    Regarding "Liquidity Risk", the 2007 Form 10-K stated:

Liquidity risk is the risk of being unable to meet obligations as they come due at a reasonable funding cost. SunTrust manages this risk by structuring its balance sheet prudently and by maintaining borrowing resources to fund potential cash needs. We assess liquidity needs in the form of increases in assets, maturing obligations, or deposit withdrawals, considering both operations in the normal course of business and in times of unusual events. In addition, we consider the off-balance sheet arrangements and commitments we have entered into, which could also affect our liquidity position.

*        *        *

We have a contingency funding plan that stresses the liquidity needs that may arise from certain events such as agency rating downgrades, rapid loan growth, or significant deposit runoff. The plan also provides for continual monitoring of net borrowed funds dependence and available sources of liquidity. ***Management believes the Company has the funding capacity to meet the liquidity needs arising from potential events***.

107.    The 2007 Form 10-K also contained the following false and misleading

Sarbanes-Oxley certifications, signed by defendants Wells and Chancy:

- 41 -

1.    I have reviewed this annual report on Form 10-K of SunTrust Banks, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

108. The 2007 Form 10-K also contained the following false and misleading

statement by SunTrust's auditor, E&Y:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF SUNTRUST BANKS, INC.

We have audited the accompanying consolidated balance sheet of SunTrust Banks Inc. and subsidiaries (the Company) as of December 31, 2007, and the related consolidated statements of income, shareholders'

equity, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of SunTrust Banks, Inc. and subsidiaries at December 31, 2007 and the consolidated results of their operations and their cash flows for the year ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.

\*    \*    \*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), SunTrust Banks, Inc.'s internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 19, 2008 expressed an unqualified opinion thereon.

Ernst & Young LLP
Atlanta, Georgia
February 19, 2008

- 44 -

109.   The 2007 Form 10-K also contained the following false and misleading statement by E&Y concerning the Company's internal controls:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF SUNTRUST BANKS, INC.

We have audited SunTrust Banks, Inc.'s internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO" criteria).   SunTrust Banks, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A.   Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).   Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.   Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances.   We believe that our audit provides a reasonable basis for our opinion.

*      *      *

In our opinion, SunTrust Banks, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the COSO criteria.

- 45 -

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of SunTrust Banks, Inc. and subsidiaries as of December 31, 2007, and the related consolidated statements of income, shareholders' equity, and cash flows for the year ended December 31, 2007 and our report dated February 19, 2008 expressed an unqualified opinion thereon.

Ernst & Young LLP
Atlanta, Georgia
February 19, 2008

110.    Pursuant to the materially false and misleading Registration Statement and Prospectus, on or about February 27, 2008, SunTrust sold 27.6 million shares of the Securities to the public at $25.00 per share, raising $690 million from investors.

111.    The Registration Statement and Prospectus contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading, and was not prepared in accordance with applicable SEC rules and regulations.

112.    As more fully described herein, the true facts that were negligently omitted from the Registration Statement and Prospectus were as follows:

(a)    SunTrust failed to adequately reserve for mortgage-related exposure (losses), causing its balance sheet and financial results to be grossly inflated;

- 46 -

(b)    SunTrust failed to accurately and timely increase its loan loss provision by hundreds of millions of dollars, or to raise its allowance for credit losses as prudent accounting required;

(c)    SunTrust's capital resources and mortgage-related assets were overstated and the Company was at risk of failure as an independent institution (as recognized by several analysts during 2008, and confirmed after the government's "stress test" results were released to the public in early 2009); and

(d)    SunTrust was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures by the Company, including improperly reporting its loan and lease loss reserves and capital resources.

113.    These misstatements and omissions allowed SunTrust to raise $690 million of precious "Tier 1" capital by selling the Securities to Lead Plaintiff and the Class. Defendants' false statements and omissions were material because the exposures noted above posed a significant threat to the Company's capital adequacy and liquidity.

114.    Maintaining its liquidity and well-capitalized status was critical to SunTrust in 2008. As noted above, SunTrust's 2007 Form 10-K emphasized that "[w]e expect the Tier 1 ratio to be restored to the targeted level via the potential issuance of enhanced trust preferred securities qualifying as regulatory capital . . . ."

- 47 -

Accordingly, in the SEC filings incorporated by reference in the Offerings Materials, SunTrust repeatedly represented that it was "well capitalized."

115.   In fact, by the time of the Offering, SunTrust was not "well capitalized" at all.  Rather, it was operating with a very high degree of leverage, holding a small and declining amount of capital against a massive asset base.  Because SunTrust had a razor-thin margin for error, losses in even a small portion of its risk-adjusted assets could destroy much of its capital base and liquidity, rendering the Company under-capitalized and subjecting it to regulatory action or, worse, causing investor flight. Thus, as the U.S. housing market collapsed, it was critical for defendants to disclose to investors in the Offering the risks of its mortgage-related exposures, and accurately account for losses in those assets and their impact on SunTrust's liquidity and capital adequacy.  Defendants failed to do so.

116.   In truth, due to the lack of internal controls and processes at SunTrust, defendants could not accurately determine the Company's exposure to these risks and defendants could not reasonably or accurately calculate appropriate loan loss reserves.

117.   The "dysfunctional" state of the Company's internal controls were described by a former Vice President of Credit Risk Management, who was employed by SunTrust in Atlanta Georgia from 2005 through September, 2007.

According to this witness, throughout his tenure at the Company, SunTrust was trying to centralize the credit risk management function.  One important part of that process was the development of an enterprise data warehouse ("EDW").  But this was a work in progress, and according to this witness "there was not a lot of confidence in the numbers being pulled" from the systems that fed into the EDW, or the numbers in the EDW itself.  At the time of his departure, "there was a lot of confusion" with this system and "the numbers were off all the time."

118.   Loans were graded according to their recorded risk characteristics and placed in "buckets" depending on their risk rating.  Following the parameters set forth by FAS 114, each loan in the portfolio was assigned to a risk "bucket."  For instance, performing loans were placed in a "good bucket," while defaulted or non-accruing assets were placed in a "default bucket."  Loan loss reserves were set by taking a percentage of the exposure from the "good bucket" and 100 percent of the exposure from the "default bucket."  However, because SunTrust experienced substantial problems with the accuracy of the underlying data, there was little confidence in whether the loans were assigned appropriate risk ratings, being placed into the correct "bucket," and whether SunTrust was accurately reserving for loan losses as a result.

119.    The "data integrity issues" identified by this witness are confirmed by a former Senior Vice President of Enterprise Delivery Services.  This witness, who was employed at SunTrust from May 2005 through September, 2007 in Atlanta, Georgia, was responsible for the management and support of the document management systems and processes for the mortgage business line operating in Richmond, VA.  According to this witness, there were "significant data quality issues" at SunTrust during his tenure.  One of the reasons for the development of the EDW was to improve data integrity.  Given the amount of work required to further develop the EDW, though, he was confident that data integrity did not improve ***at any time during his tenure***.

120.    According to this witness, as a result of the issues with the residential mortgage document management systems and practices at SunTrust, investors regularly rejected loans originated by SunTrust or its correspondent lenders. SunTrust was unable to satisfy the documentation requirements of investors such as Freddie Mac ("Freddie") because the Company was "behind significantly" in terms of its mortgage documentation processes.  Another consequence of the issues with the residential mortgage document management practices was that the loans "sat on the books for an extended period of time."  Even before investors had the chance to evaluate and reject loans submitted to them by SunTrust, SunTrust had to scan the

documents into the FileNet system.  Given the issues with the document management systems, the process of scanning the mortgage documents to create an electronic file for each mortgage often took a significant amount of time.  For instance, the scanning-related issues resulted in problems such as the dates of mortgage documents "not adding up."  These types of issues had to be resolved before SunTrust could even submit a loan to an investor for evaluation.  And, the more time that SunTrust was forced to retain a loan, the greater the risk of default for the Company.

121.    These problems were elaborated upon by a former First Vice President of Credit Risk Management, who was employed at SunTrust in Atlanta, Georgia from 2005 through January, 2007.  According to this witness, she was hired by SunTrust in 2005 to assist with the implementation of information technology tools to improve the credit risk management function.  SunTrust was trying to implement a data warehouse and Cognos reporting tool to improve credit risk management, but neither the warehouse nor the tool ever worked as intended.

122.    According to this witness, throughout her tenure, the residential real estate mortgage portfolio data was "inaccurate."  Given the amount of time and work that she believed was necessary to pinpoint and remediate the inaccuracies in the residential real estate mortgage portfolio, she believes it was unlikely that the issues

she described were resolved by the time of the Offering in February 2008. One of the most significant concerns about the credit risk management function at SunTrust pertained to a lack of data integrity and what she described as "duplication" in the residential real estate mortgage portfolio.

123. "Duplication" referred to the fact that SunTrust had exposure in the residential real estate mortgage portfolio created by more than one loan being issued on a single piece of property (*i.e.*, the same underlying collateral), but the Company was unable to effectively identify the extent of this exposure. For this reason, SunTrust's mortgage related data was "inaccurate" and did not provide a reliable basis for setting reserves because the level of duplication was unknown and, therefore, unaccounted for in reserves. Given the importance of the residential mortgage business line to SunTrust, this witness was alarmed by the fact that the Company could not adequately or reliably identify the "duplication" in the mortgage portfolio, and they could not identify mortgages for which credit risk was not being appropriately managed.

124. The causes of the "duplication" in the residential real estate portfolio included acquisitions of other banks with large mortgage portfolios, and purchases of mortgages that SunTrust made. As part of the acquisition due diligence process, the mortgage portfolios of the company being acquired or details of mortgages being

procured should have been evaluated in relation to SunTrust's mortgage portfolio to identify the existing overlap, but were not.

125. Another cause of the "duplication" in the residential real estate mortgage portfolio was fraud. SunTrust had experienced a number of issues with fraudulent loans, so that some loans had been issued based on completely fraudulent borrower information. This witness emphasized that fraud was a particular concern because it was nearly impossible to manage credit risk in circumstances of fraud. In essence, the true credit worthiness of the loan and required capital to cover losses could not be accurately assessed when loans were issued based on fraudulent information.

126. Based on this witnesses' participation in a project to identify the "duplication" in the residential real estate mortgage portfolio, she estimated that there was at least 25 percent "duplication" in the portfolio – meaning that at least 25 percent of the time, SunTrust had over 100 percent exposure on one piece of collateral. In some instances, SunTrust had as much as 200 percent exposure to one piece of underlying collateral – meaning that SunTrust might have issued or acquired loans in the amount of two times the value of the property, including via primary and secondary mortgages or lines of equity on the property. In a declining real estate market, these exposures were increasing.

127.    As evidence of the problems identified above, in 2005 SunTrust restated its earnings for the first and second quarters of 2004 due to errors in its allowance calculation which resulted from mistakes in the calculation including data, model, and formulaic errors.  Furthermore, the Company's internal controls relating to the Allowance Framework were deemed ineffective in the first, second, and third quarters of 2004.  SunTrust also reported a material weakness over the valuation of its ALLL and was slapped with an adverse opinion by its auditor for the year ending December 31, 2004.

128.    Although SunTrust was attempting to address these issues, it is clear that these problems in estimating the allowance continued throughout the period leading up to the Offering, and were likely increasing.  Indeed, as the Company announced in August 2007, they laid off many employees charged with remedying these problems just months before the Offering.

129.    On April 21, 2008, SunTrust released results for its first quarter 2008 performance and revealed that its loan losses and net valuation losses had climbed.  Specifically, the Company revealed that its quarterly profit fell by 44% to $283.6 million from $513.9 million a year earlier.  Additionally, net income for the Company dropped to $283.6 million, or 81 cents per share, from $513.9 million, or

$1.44, a year earlier; and net interest income dropped to $1.14 billion from $1.16 billion a year earlier.

130.   According to the Company, in the first quarter of fiscal 2008, SunTrust also experienced an increase in mortgage loan delinquencies.  Gross charge-offs in real estate loans as a percent of real estate loans increased to 0.31% in the first quarter of 2008 from 0.04% during the prior year period, with the most significant increases recorded in home equity lines, real estate construction and residential mortgages.

131.   But, notably, defendant Wells sought to assure investors the Company was not at significant risk – publicly defending the Company and its processes. Although he acknowledged "'growth in credit costs associated with the residential real estate correction,'" he assured investors that, "SunTrust is financially strong, with ample liquidity, adequate capital, and a solid balance sheet, and we are effectively managing through this difficult environment."   Unfortunately for investors, this was not the case.

**Defendants False and Misleading Accounting**

132.   During the period leading up to and immediately following the Offering, SunTrust's purported valuations of its assets suffered from additional valuation problems.  For example, in the second quarter of 2007, the Company began recording

- 55 -

at "fair value" certain newly-originated mortgage loans held for sale based upon defined product criteria. As the Company has acknowledged:

> SunTrust used significant **unobservable inputs** (Level 3) to fair value certain trading assets, securities available for sale, portfolio loans accounted for at the fair value, loans held for sale, other assets and other liabilities as of March 31, 2008. The need to use unobservable inputs generally results from the lack of market liquidity for certain types of loans and securities, which has resulted in diminished observability of both actual trades and assumptions that would otherwise be available to value these instruments. More specifically, the asset-backed securities market and certain residential loan markets have experienced significant dislocation and illiquidity in both new issues and the levels of secondary trading.

SunTrust Form 10-Q, filed with the SEC on May 8, 2008.

133. Essentially, according to the three-level hierarchy for measuring the fair value of assets and liabilities set forth in Financial Accounting Standards Board (FASB) Statement No. 157, "***Level 3" fair values are measured using "unobservable inputs***." While using Level 3 accounting, even though SunTrust could not actually see changes in the fair values of their assets and liabilities, they were allowed to book them through earnings anyway, based upon their own subjective assumptions. This is problematic insofar as investors are unable to ascertain for themselves a Company's true value.

134. SunTrust engaged in such creative valuation with a number of different assets. The Company's "Level 3" trading assets included: residual interests retained

from Company-sponsored securitizations of commercial loans, structured asset sales participations, SIVs, and investments in other asset-backed securities for which little or no market activity exists or whose value of the underlying collateral is not market observable.

135.   According to the Company's 10-Q, during the first quarter of 2008, SunTrust transferred $424.3 million of trading and available for sale securities into "Level 3" due to the illiquidity of these securities and lack of market observable information to value these securities.  Additionally, during the first quarter of 2008, based on illiquidity in the secondary markets, the Company transferred $158 million of mortgage loans held for sale, including $40.7 million of commercial real estate loans, into "Level 3."

136.   In other words, as the markets deteriorated and certain loans were not actively trading as either whole loans or as securities, the Company increasingly began employing alternative, and entirely speculative and unreliable valuation methodologies to determine the "fair value" of the loans.

137.   Such speculative valuation methodologies, coupled with the Company's understated loan loss reserves, contributed to SunTrust's "improved" Tier 1 capital ratio in the first quarter of 2008 "from 6.93% at December 31, 2007 to 7.23% at March 31, 2008," and allowed the Company to falsely report that "the financial

impact of the Level 3 financial assets did not have a significant impact on our liquidity or capital."

138.   In an announcement on July 22, 2008, discussing the Company's 2Q08 results, SunTrust continued to downplay its credit risk and lending problems and disagreed with those who questioned the reliability of the Company's loan loss reserve and earnings figures.  In the July 22, 2008 announcement, defendant Wells referred to certain transactions by SunTrust in connection with its ownership of shares of Coca Cola Corp., and stated that these transaction made "'SunTrust even better prepared to address the challenges of the current environment, as well as strengthen our position for the long term.'"  Defendant Wells further stated:

> "Against a backdrop of economic weakness, deteriorating market conditions, and industry-wide volatility, our second quarter results reflect the Company's intense focus on managing our core business, balance sheet, and credit risk through this difficult cycle."

139.   On August 25, 2008, a Citigroup analyst issued a "sell" rating on SunTrust common stock, noting in a report that SunTrust in recent years expanded into higher-risk real estate lending and packaging of real estate loans "'that has been a source of sizable mark-to-market losses.'"

140.   On September 7, 2008, the U.S. government rescued Fannie Mae ("Fannie") and Freddie from bankruptcy, effectively nationalizing them.  At the time, Fannie and Freddie owned or guaranteed about half of the U.S.'s $12 trillion

mortgage market.  Fannie and Freddie's insolvency caused extreme distress in the financial markets because almost every home mortgage lender and Wall Street bank relied on them to facilitate the mortgage market, and investors worldwide owned $5.2 trillion of debt securities backed by them.

141.  On September 10, 2008, at the Lehman Brothers Global Finance Services Conference, defendant Chancy made the following statements:

> **We believe that we have a very diversified franchise with a solid capital and liquidity position that provides downside protection**.
>
> \*       \*       \*
>
> There's a lot of focus on capital, as there should be in today's environment.  And one of the things that we mentioned is that at the end of the second quarter we are continuing to evaluate our capital position. **We believe that we have adequate capital, given our current views on the credit environment**.
>
> \*       \*       \*
>
> Provision on a quarter-over-quarter basis declined.  It was $448 million in the second quarter, down from $560 million in the first quarter.  The reserve itself moved up to 1.46%.
>
> \*       \*       \*
>
> As it relates to the fourth quarter, we continue to believe that charge-offs will not be dramatically higher or lower, again, as you have both an increasing level of charge-offs in certain categories that I will talk about in a minute, as well as some that we anticipate will decline.
>
> And as it relates to the allowance, while we believe that it will continue to grow over the next few quarters, we believe it will grow at a

more modest level than it has in the past couple of quarters. So we are trying to give you some information to develop a view both on charge-offs, as well as provision expense and the allowance percentage.

We believe overall we're taking the right actions to mitigate our risk on these various portfolios, and as we add new production to mitigate our risk on the new levels of loans that we're bring [sic] into the balance sheet.

142.   On September 11, 2008, the *Wall Street Journal* noted that, "[a]nalysts have been hammering SunTrust lately because of its problem real estate loans – three more [analysts (Morgan Keegan, Portales Partners and Keefe, Bruyette & Woods)] downgraded the stock this week – ***but bank officials speaking at a Wall Street investor's conference Wednesday made their case that the company's outlook is strong***." The article quotes defendant Chancy as stating, "[w]e believe that SunTrust is very well-positioned to weather the current storm."

143.   Shortly thereafter on September 14, 2008, Merrill Lynch was sold overnight to Bank of America amidst fears of a liquidity crisis. The next day, Lehman Brothers, one the oldest investment banks on Wall Street, filed for bankruptcy protection.

144.   Another large United States bank, Washington Mutual, was seized by the Federal Deposit Insurance Corporation ("FDIC") on September 25, 2008, and its banking assets were quickly sold to J.P. Morgan for $1.9 billion.

145.    On October 23, 2008, SunTrust released its earnings for the Third Quarter ended September 30, 2008, in which it reported EPS of $0.88 for the third quarter, emphasizing that it has "maintained our track record of profitability." In the release, defendant Wells emphasized:

> "SunTrust's "continued profitability and **improved capital position** not only underscore our resiliency in a quarter marked by unprecedented industry turmoil, but also serve as a realistic basis for our confidence that we will continue to manage successfully – albeit not unscathed – through the challenges that our industry clearly will face in the period ahead. . . . We also believe that there will be attractive growth opportunities for SunTrust in the near future. With that in mind, we will continue to take the steps necessary for us to be able to capitalize on those opportunities."
>
> *         *         *
>
> "We are managing our credit risk profile very carefully to minimize the impact of further deterioration in the economy," said Mr. Wells. "However, we have all seen how quickly things can change in this environment. As a result, we do not believe it prudent or responsible to try to predict the ultimate path of the economy and the resulting impact on asset quality and earnings." **Mr. Wells noted that the Company's Board of Directors has authorized an application for the sale of preferred stock to the U.S. Treasury under the TARP program, and also that the Company continues to evaluate its capital structure and dividend policy**. Mr. Wells said he expects the evaluation to be completed "in short order" with any decisions communicated promptly.

**Defendants Finally Admit SunTrust's Capital Crisis**

146.    On October 27, 2008, the Company issued a press release entitled "SunTrust Plans Sale of $3.5 Billion in Preferred Stock to U.S. Treasury; Company

- 61 -

Separately Announces 30% Dividend Reduction."  The release stated in part that the Company had received preliminary approval to sell the U.S. Treasury $3.5 billion in preferred stock and related warrants as part of TARP.

147.    TARP allows the United States Department of the Treasury to purchase or insure up to $700 billion of "troubled" assets.  "Troubled assets" are defined as:

> (A) residential or commercial mortgages and any securities, obligations, or other instruments that are based on or related to such mortgages, that in each case was originated or issued on or before March 14, 2008, the purchase of which the Secretary determines promotes financial market stability; and (B) any other financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress.

*See A Congressional Budget Office Report: The Troubled Asset Relief Program: Report on Transactions Through June 17, 2009*, at 1.

148.    However, the impression created by SunTrust by taking less than the maximum TARP money available to SunTrust – that SunTrust was doing better than other banks and didn't really need the government's money – was a mistaken impression, as shown by subsequent events, because SunTrust changed its decision and accessed the full amount of TARP capital available to it.

149.    On November 13, 2008, at the Merrill Lynch Banking & Financial Services Conference, defendant Chancy made the following statements:

As many of you know, we announced our intent and were ultimately approved to participate in the capital purchase program. We applied for and received approval for $3.5 billion worth of preferred stock, which is a little bit more than the 2% allocation. That is the level that we requested.

*We went through, as you might expect, a pretty thorough review, looking at our own capital position as we exited the third quarter. We did some sensitivity analysis around our credit metrics and our capital position, which we feel very good about*. We felt that the incremental capital would allow us to work ourselves through the current credit environment, and further extend certain loan categories, and grow our loan book in a prudent fashion.

\*      \*      \*

So, we believe that we have taken, as outlined here on the right-hand side of the page, significant actions to mitigate our ongoing risk and manage the risk that we have it [sic]. This is approximately 12% of our overall loan portfolio. As noted about $15 billion in total outstanding. These are the areas that we will continue to focus on as we move into 2009.

150. Then on December 9, 2008, the Company issued a press release entitled, "SunTrust Approved to Sell Remaining Allotment of Preferred Stock Under Treasury Program; 'Prudent Step' Bolsters Capital in Increasingly Uncertain Economy." The release stated in part:

SunTrust Banks, Inc. said today it has received preliminary approval to sell to the U.S. Treasury the remaining $1.4 billion of preferred securities available to it under Treasury's Capital Purchase Program. As previously announced, SunTrust has already received an initial $3.5 billion under the program. *This additional amount brings the combined total to approximately $4.9 billion*, or the full 3% of risk weighted assets for which SunTrust was eligible.

- 63 -

"As we now know from the most recent data, the economic situation is decidedly bleaker than was the case when we announced our initial, partial regulatory capital transaction under the Treasury program," said James M. Wells III, SunTrust Chairman and Chief Executive Officer. "Given the increasingly uncertain economic outlook, we have concluded that further augmenting our capital at this point is a prudent step, especially if the current recession proves to be longer and more severe than previously expected."

151.   On January 22, 2009, the Company issued a press release entitled,

"SunTrust Reports 2008 Profit of $2.13 Per Share," which stated in part that:

SunTrust Banks, Inc. reported net income available to common shareholders of $746.9 million, or $2.13 per average common diluted share, for 2008 compared to $1,603.7 million, or $4.55 per average common diluted share in 2007.   Net income available to common shareholders in the fourth quarter was a loss of $379.2 million, or $1.08 per average common diluted share, compared to $3.3 million, or $0.01 per average common diluted share, in the fourth quarter of 2007.   The Company's 2008 and fourth quarter results were adversely impacted by credit-related charges that reflect the dramatic deterioration in the economy, especially during the fourth quarter.

*      *      *

Mr. Wells said the significant increase in the fourth quarter provision for loan losses from the prior quarter covered current loan charge-offs and also strengthened the Company's allowance for loan losses.   He noted that the Company concluded 2008 "in a very strong regulatory capital position and with excellent liquidity."   Mr. Wells further noted that, "despite our strong capital position, given the strain on earnings from increased credit costs and the challenging revenue environment, SunTrust's Board of Directors has decided to reduce the quarterly dividend to $0.10 per common share outstanding until the economic environment and earnings outlook improve."

*      *      *

The Company recorded provision for loan losses of $962.5 million, or $410.0 million in excess of net charge-offs, increasing the allowance for loan losses to 1.86% of total loans during the fourth quarter. Additionally, during the fourth quarter, the Company recorded $236.1 million in operating losses, which were primarily related to losses stemming from borrower misrepresentations and insurance claim denials, and $100.0 million related to mortgage reinsurance reserves.

*    *    *

Asset Quality

Nonaccrual loans, as of December 31, 2008, totals $3,940.0 million compared to $3,289.5 million as of September 30, 2008 and $1,430.4 million as of December 31, 2007. Residential mortgage and construction loans were 47% and 32%, respectively, of total nonaccrual loans as of December 31, 2008. Net charge-offs for the fourth quarter were $552.5 million compared to $168.0 million for the fourth quarter in 2007. Annualized net charge-offs to average loans for the quarter ended December 31, 2008 was 1.72% compared to 1.24% for the quarter ended September 30, 2008 and 0.55% for the quarter ended December 31, 2007. The increase in net charge-offs was primarily related to consumer and residential real estate loans, as well as commercial related loans. Other real estate owned increased to $500.5 million, up 29.3% over September 30, 2008, as the Company foreclosed on the collateral securing nonperforming loans.

*For the fourth quarter, the provision for loan losses exceeded net charge-offs by $410.0 million as the overall impact of the housing market and increased delinquencies impacted the allowance for loan losses, which totaled $2.351.0 million as of December 31, 2008 and was 1.86% of total loans. The allowance for loan losses was 1.05% of total loans as of December 31, 2007*.

152.    During 2008, SunTrust's loan charge-off procedure provided that once a loan was delinquent 120 days, it was classified as non-performing and an appraisal

- 65 -

was commissioned to determine the then-current value of the property. Once a loan became 180 days delinquent, the difference between the loan amount and some proportion of the appraised value was charged off. Accordingly, ***the loans that SunTrust wrote down in October 2008 and January 2009 had become delinquent at least six months earlier***. As these delinquencies aged, getting closer and closer to the 180-day limit, it should have become obvious to defendants that they would have to be written off. Indeed, several months before the October 2008 and January 2009 write-downs, SunTrust had appraised all of the properties at issue pursuant to its own procedures.

153. Remarkably, even as the housing market and economy continued its sharp decline in the second and third quarters of 2008, SunTrust's provision for loan losses and provision as a percentage of average loans inconceivably ***decreased*** during this time period. For example, in the second quarter of 2008 the provision for loan losses decreased by almost $112 million and 20% from first quarter 2008. Additionally, SunTrust's provision for loan losses (annualized) as a percentage of average loans actually decreased down to 1.44% in the second quarter of 2008 from 1.83% in the first quarter of 2008. Specifically, SunTrust maintained a provision of $560 million in the first quarter of 2008, but this was lowered to $448 million in the second quarter of fiscal 2008. In the third quarter of 2008, which saw the bankruptcy

of Lehman Brothers and other banks, SunTrust's provision for loan losses was only $503.7 million, still less than it had been in the first quarter of the year. Furthermore, the provision for loan losses (annualized) as a percentage of average loans was 1.59% still below the first quarter percentage of 1.83%.

154.   It was only after SunTrust had raised $4.9 billion from TARP and another $2.75 billion from the Temporary Liquidity Guarantee Program that SunTrust raised its provision for loan losses a whopping 91% to $962.5 million in the fourth quarter of 2008. Similarly, the provision for loan losses (annualized) as a percentage of average loans increased 93% to 3.07% in the fourth quarter of 2008. This belated increase in the Company's provision and risk ratios only came after the increased scrutiny of its risky real estate loan portfolio as a result of receiving government money. But the internal and external red flags that warranted an increase in the Company's provision and risk ratios were visible and apparent at the time the Company executed its Offering in February 2008.

155.   Had the Company properly increased its loan loss provisions to this level prior to the Offering (in its 2007 Form 10-K) as it should have, SunTrust's capital resources would have been deemed insufficient for purposes of regulatory sufficiency and the bank would have been at risk of failure. This is precisely the type of information investors would have considered material prior to participating in the

Offering. Unfortunately for investors, this information was not contained in the Offering materials.

156. By the end of 2007 and during 2008, the residential and commercial and industrial lending problems at SunTrust were so severe that the Company was at risk of failure. Indeed, after and partly as a result of the government-run "stress test" on 19 banks in 2009, including SunTrust, business analysts specifically identified SunTrust as being "at risk of failure." *See*, *e.g*., U.S. News & World Report, April 28, 2009 ("We consider eight institutions . . . to be at risk of failure. They are JPMorgan Chase, Citibank, Wells Fargo, *SunTrust*, Goldman Sachs, HSBC America, National City and Countrywide Bank."); May 5, 2009 Marketwire (providing Weiss Research, Inc. Evaluation of 19 Institutions Subject to Federal Stress Test, and listing SunTrust as at being at "risk of failure"); May 7, 2009, the Associated Press ("5 regional banks must raise $8.2B after tests"). Indeed, the May 7, 2009 Associated Press article gets right to the heart of SunTrust's fundamental business problems during 2007 and 2008 while the Company was (and remains as of the date of this Complaint) at risk of failure. The article states in relevant part:

> Five of the nation's largest regional banks are vulnerable to a worsening recession and need to raise a total $8.2 billion in new capital based on results of government "stress tests" released Thursday.

The two regional banks based in the Southeast, Regions Financial Corp. and SunTrust Banks Inc., got bigger capital-raising mandates than the three based in the Midwest [,] Fifth Third Bancorp, KeyCorp and PNC Financial Services Group Inc. Minneapolis-based U.S. Bancorp and BB&T Corp. in Winston-Salem, N.C., do not need to raise additional money. . . .

Regional banks can be bellwethers of the health of their local economies, making loans to businesses and industries in the region, financing development projects and employing thousands of people.

Many regional banks hold concentrations of commercial real estate loans, a hot spot of potential trouble that make them vulnerable to weakness in their geographic areas.  If the recession deepened, defaults on the high-risk loans could soar.  Companies already have shut down and vacated shopping malls and office buildings that were financed by the loans.

The government tests found that Birmingham, Ala.-based Regions Financial Corp. needs to raise $2.5 billion; Atlanta-based SunTrust needs $2.2 billion; Cleveland's KeyCorp needs $1.8 billion; Fifth Third in Cincinnati needs $1.1 billion; and Pittsburgh-based PNC need $600 million.

*     *     *

Analysts and investors have been eager to see how the seven regional banks fared on the government's tests of their financial conditions.

*     *     *

The most vulnerable banks are those with large loan holdings in areas with the highest unemployment and the most severe fallout from the subprime mortgage crisis, like Michigan, Ohio, California and *Florida*, said Joe Gladue, an analyst who follows smaller regional banks at investment bank B. Riley & Co. in Philadelphia.

*SunTrust is strongly concentrated in Florida, where conditions for both residential and commercial real estate have been especially bleak*.  And Regions Financial and Fifth Third also have been notably stung by losses on commercial real estate loans in that state.

157.   Indeed, SunTrust's financial woes continue to this day.  As reported by The Atlanta Journal-Constitution on October 22, 2009 in an article entitled, "SunTrust, Synovus post big losses as real estate woes continue," SunTrust's losses more than doubled from the previous quarter as the company wrote off soured loans. The Company's total for loan losses is now more than $1.1 billion.

158.   As the article details, SunTrust veered away from its "historically conservative" approach and "bet heavily on home mortgages and residential home building during the real estate boom."  Following the burst of the housing bubble, however, "SunTrust has now ended four straight quarters in the red, recording $1.8 billion in losses over that stretch."

159.   Throughout 2007 and 2008, the Individual Defendants subjected SunTrust to improper loan review processes, over-valued its loan portfolio and mortgage-related assets, and failed to maintain adequate loan and lease loss reserves which inflated SunTrust's operating results and capital position.  By failing to report the true facts concerning the Company's grossly inflated loan portfolio and mortgage-related assets, the Registration Statement and publicly incorporated financial reports defendants caused and/or permitted SunTrust to issue and file with

the SEC failed to provide investors with the basic information necessary to understand SunTrust's financial results and omitted material information, rendering them materially false and misleading.

160.   The true facts that were negligently omitted from the Registration Statement and Prospectus were as follows:

(a)   SunTrust failed to adequately reserve for mortgage-related exposure (losses), causing its balance sheet and financial results to be grossly inflated;

(b)   SunTrust failed to accurately and timely increase its loan loss provision by hundreds of millions of dollars, or to raise its allowance for credit losses as prudent accounting required;

(c)   SunTrust's capital resources and  mortgage-related assets were overstated and the Company was at risk of failure as an independent institution (as recognized by several analysts during 2008, and confirmed after the government's "stress test" results were released to the public in early 2009); and

(d)   SunTrust was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures by the Company, including improperly reporting its loan and lease loss reserves and capital resources.

## DEFENDANTS' FALSE FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS

**SunTrust Recorded Materially Understated Loan Loss Reserves in Violation of Applicable Accounting Principles**

161.   The American Institute of Certified Public Accountants ("AICPA")

Audit and Accounting Guide states:

> *Finance receivables normally are the most significant portion of a finance company's total assets. . . .  A finance company should maintain a reasonable allowance for credit losses. . . . The allowance for loan losses reduces the carrying amount of loans receivable to the amount that is estimated to be collectible*.

162.   During a November 2000 speech at the AICPA National Conference for

Banks and Savings Institutions, the Deputy Chief Accountant of the SEC stated the

following:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio. *As credit quality deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred*.

163.   Under Generally Accepted Accounting Principles ("GAAP"), SunTrust

was required to have adequate reserves for: (1) estimated credit losses for loans

specifically identified as being impaired; (2) estimated credit losses for loans or

groups of loans with specific characteristics that indicate probable losses; and

(3) estimated credit losses inherent in the remainder of the portfolio based on current economic events and circumstances.

164.    The SEC also provides explicit guidance on the proper accounting for loan losses that defendants were required to follow, but did not.  Staff Accounting Bulletin ("SAB") No. 102 states in pertinent part:

> It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a ***disciplined and consistently applied process***. . . .  A registrant's loan loss allowance methodology generally should . . . ***[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] [b]e based on current and reliable data*** . . . .

> SAB No. 102 also provides:

> Factors that should be considered in developing loss measurements includ[ing] . . . [l]evels of and trends in delinquencies and impaired loans . . . [and] [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices . . . .

> The SEC further states that:

> For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.  Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses.

165.    SunTrust's ALLL reserves from the first quarter of 2007 through the first three quarters of 2008 were materially inadequate and did not reflect the high

risk of loss inherent in its real estate portfolio, which included Alt-A first and second lien loans, low documentation and no documentation loans, ARMS, interest-only loans, and "piggy-back" or "combo" loans. The Company's reserves therefore violated GAAP and SEC rules. Further, the Company's understated reserves resulted in overstatements of net income, retained earnings, total assets and total shareholders equity, as set forth on SunTrust's financial statements. Because some of those overstated financial statement items were components of the Company's Tier 1 capital ratio, that capital ratio was also overstated from at least the fourth quarter of 2007 through the first three quarters of 2008 for this reason alone, and others described herein.

**Defendants Failed to Record Impairments on Certain High-Risk Loans**

166. From at least the fourth quarter of 2007 through the first three quarters of 2008, SunTrust failed to take adequate specific reserves related to the impairment of its real estate loan portfolio, which included a significant concentration of loans in the troubled Florida and Georgia housing market. For example, over 45% of SunTrust's residential loan portfolio was dispersed in the states of Florida and Georgia at the end of 2008. These shares had seen a run up in housing prices in past and were at high risk for defaults and foreclosures by the end of 2007. Statement of Financial Accounting Standards ("SFAS") No. 114, *Accounting by Creditors for*

*Impairment of a Loan* and Emerging Issues Task Force ("EITF") Topic No. D-80,

*Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio* clearly

describe that an evaluation of loan impairment must be made in context of current

information and events.  For example, SFAS No. 114, ¶8 states:

> *A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement.* As used in this Statement and in Statement 5, as amended, *all amounts due according to the contractual terms* means that both the contractual interest payments and the contractual principal payments of a loan will be collected as scheduled in the loan agreement.

167.   SFAS No. 114, ¶10 states:

> The conditions for accrual . . . are not inconsistent with the accounting concept of conservatism.  *Those conditions are not intended to be so rigid that they require virtual certainty before a loss is accrued.* They require only that it be *probable* that an asset has been impaired or a liability has been incurred and that the amount of loss be *reasonably* estimable.

168.   As of at least 4Q07, it was probable that a significantly greater portion

of the loan portfolio containing the Florida and Georgia real estate loans (which

included high-risk exotic mortgage loans) were impaired and as a result, defendants

were required, under GAAP, to estimate the loss exposure and set up appropriate

reserves (in the form of a valuation allowance) at that time.  SFAS No. 114, ¶13

states:

. . . [if] the present value of expected future cash flows . . . is less than the recorded investment in the loan (including accrued interest, net deferred loan fees or costs, and unamortized premium or discount), *a creditor shall recognize an impairment by creating a valuation allowance with a corresponding charge to bad-debt expense*.

169.    To calculate the Company's loss exposure, SunTrust was required under GAAP, to evaluate the likelihood of future cash flows (in the form of repayments of principal and interest).  SFAS No. 114, ¶13 states:

> When a loan is impaired . . . *a creditor shall measure impairment based on the present value of expected future cash flows* discounted at the loan's effective interest rate . . . .

170.    During 2007 and 2008, SunTrust had significant exposure to the Florida (and Georgia) real estate lending market.  This factor, along with SunTrust's lack of experience in lending and servicing high-risk exotic loans required the Company to record and expense hundreds of millions more in impaired loans by the end of 2007.  By failing to accrue properly for hundreds of millions in additional impaired loans, defendants' reported financial results incorporated into its Registration Statement (including the Prospectus Supplement dated February 26, 2008) for the Offering were materially false and misleading violating GAAP and SEC rules.

**SunTrust Failed to Reserve Adequately for Groups of Loans with Characteristics that Indicated Probable Losses**

171.  Even where loans were not delinquent and impaired under GAAP, defendants were required to set reserves to reflect the risks associated with loans with similar characteristics to those that were impaired.  EITF Topic No. D-80 states:

- ***Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP***.  The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.

- . . . some loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have ***specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics***.  Loans in the first category must be accounted for under FAS 114 and ***loans in the second category should be accounted for under FAS 5***.  Under FAS 5, ***a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan***.  [fn]  Moreover, current GAAP . . . emphasize that ***the loss does not have to be virtually certain in order to be recognized***.

172.  Similarly, SFAS No. 5, Accounting for Contingencies, ¶22 states that "***accrual shall be made even though the particular receivables that are uncollectible may not be identifiable***."

173.  SunTrust violated GAAP by ignoring the probable loss characteristics in groups of very high risk mortgage loans on the distressed Florida and Georgia markets that were increasingly suffering from delinquencies and foreclosures.  It was

- 77 -

not until year end 2008, well after the housing market had already collapsed, that SunTrust significantly increased its write-offs and provision for ALLL. At the time of the Offering, the Company had taken much smaller write-offs and reserves for these mortgage loans with high risk characteristics, ignoring red flags and experience that these types of loans were suffering high delinquency and default rates. As a result, SunTrust's financial results incorporated into its Registration Statement understated the loan and lease loss reserves by hundreds of millions of dollars.

**Defendants Also Violated GAAP and SEC Disclosure Requirements**

174.    SunTrust's financial statements also violated GAAP as a result of defendants' failure to adequately disclose the material loss contingencies and significant concentrations of risk related to the loans that had imploded due to the housing downturns in the Florida and Georgia real estate markets.

175.    Under GAAP, a loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss. *See* SFAS No. 5, ¶1. The collectability of mortgage loans is an example of a loss contingency. GAAP requires that an estimated loss from a loss contingency "be accrued by a charge to income . . . if both of the following conditions are met: (a) *[i]nformation available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial*

*statement*"; and "*(b) [t]he amount of loss can be reasonably estimated*." *See* SFAS No. 5, ¶8.

176. Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "*reasonable possibility*" that a loss or an additional loss may have been incurred.[5] SFAS No. 5, ¶10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. *See* SFAS No. 5, ¶10.

177. SFAS No. 107, *Disclosures about Fair Value of Financial Instruments*, required SunTrust to disclose "all significant concentrations of credit risk arising from *all* financial instruments, whether from an individual counterparty or groups of counterparties." Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other

---

[5] GAAP defines "[r]easonably possible" as "[t]he chance of the future event or events occurring is *more than remote but less than likely*." SFAS No. 5, ¶3.

conditions.  As alleged herein, SunTrust's mortgage loans from the afflicted Florida and Georgia markets clearly represented a significant concentration of credit risk.

178.   If a significant concentration of risk represents a material contingency, the risk must be disclosed in the Company's interim financial statements in accordance with Accounting Principles Board Opinion (APB") No. 28, *Interim Financial Reporting*.  The purpose behind these GAAP provisions is to warn investors about  concentrations  of risk that *may* result in losses under changed conditions – not to wait until those losses become substantial (which they already were by the end of 2007) – and then disclose the concentration of risk *after* the losses have already harmed investors.

179.   Similarly, AICPA Statement of Position ("SOP") No. 94-6, *Disclosure of Certain Risks and Uncertaintie*s, requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations.  SOP 94-6 defines a "severe impact" as a "significant financial disruptive effect on the normal functioning of the entity."  For SunTrust, the Florida and Georgia mortgage loans presented a group concentration of credit risk that threatened to, and ultimately did, severely impact the Company's financial position and financial results.

**Defendants' Provision for Loan Losses and Net Charge-Offs of Loans Were Understated Until Year End 2008**

180.    Ultimately, after year end 2008, SunTrust finally announced dramatic increases in its write-offs and in its provision for loan and lease losses. For FY 2008, SunTrust's net charge-offs totaled $1.56 billion or 1.24% of average loans in 2008 versus only $422.8 million or 0.35% of average loans in 2007. The increase in net charge-offs in 2008 compared to 2007 was an increase of approximately 270%. SunTrust's provision for loan losses increased to $2.47 billion in 2008 versus $665 million in 2007. This increase in the 2008 provision for loan losses compared to 2007 was also a giant increase of approximately 272%. In addition, loans with delinquent balances based on 90 days or more past due, increased from $2 billion to $5 billion between 2007 and 2008 resulting in a significant percentage increase of 144%.

181.    Even though SunTrust's total loan balance increased significantly (over $10 billion) between 2007 and 2008, the Company's corresponding provision for loan losses and net charge-offs combined for all of 2007 did not cover even 1% of the total loan balance at the end of 2007. It wasn't until the fourth quarter of 2008 that SunTrust belatedly increased its provision for loan losses and net charge-offs well after the housing market had already collapsed.

**Defendants' Loan Loss Allowance as a Percentage of Total Nonperforming Loans Decreased Significantly**

182.   SunTrust failed to increase its ALLL to adequately reserve for the fast rising spike in its nonperforming loans from at least the fourth quarter of 2007 through the end of 2008 as the housing market and economy collapsed.  For example, SunTrust reported its allowance as a percentage of total nonperforming loans in its quarterly and annual SEC filings.  At the end of 2006, the allowance represented 196.4% as a percentage of the total nonperforming loans outstanding.  ***However, by the end of 2007 the allowance as a percentage of total nonperforming loans had rapidly decreased to only 87.8%.***  By the end of 2008 the allowance as a percentage of total nonperforming loans was only 61.7%.  In an economic recession, a bank's loan loss allowance generally would be ***rising*** as a percentage of nonperforming assets.  However, SunTrust inappropriately bucked this trend by decreasing its percentage by over 134% from the beginning of the first quarter 2007 through the end of 2008.  The SEC also questioned this unusual trend at SunTrust and sent a comment letter to the Company on December 18, 2008 after its review of the Company's 2007 year-end and first three quarters 2008 SEC filings.  The table and illustration below demonstrates that while SunTrust's nonperforming loans increased by over $3.4 billion between fiscal years 2007 and 2008, the Company's allowance for loan and lease losses failed to keep pace increasing only a little over $1 billion

over the same time period. As a result, the allowance as a percentage of nonperforming loans inappropriately decreased significantly over this period when a greater majority of SunTrust's high risk loans in troubled geographic markets were defaulting.

| SunTrust Bank | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dollars in Thousand | **Q1 2007** | | **Q2 2007** | | **Q3 2007** | | **Q4 2007** |
| Allowance for Loan Losses | $ | 1,034,939 | $ | 1,050,400 | $ | 1,093,700 | $ 1,282,504 |
| Nonperforming Loans | $ | 665,100 | $ | 764,600 | $ | 1,003,800 | $ 1,460,300 |
| Allowance as a percentage of total nonperforming loans | | 155.5% | | 137.4% | | 109.0% | 87.8% |
| | **Q1 2008** | | **Q2 2008** | | **Q3 2008** | | **Q4 2008** |
| Allowance for Loan Losses | $ | 1,545,300 | $ | 1,829,400 | $ | 1,941,000 | $ 2,351,100 |
| Nonperforming Loans | $ | 2,068,800 | $ | 2,788,700 | $ | 3,289,500 | $ 3,940,000 |
| Allowance as a percentage of total nonperforming loans | | 74.7% | | 72.0% | | 62.1% | 61.7% |



- 83 -

**SunTrust's Failure to Maintain Adequate Controls Over Its Financial Reporting and Disclosures Violated Applicable Accounting Principles and SEC Regulations**

183.   The SEC defines "disclosure controls and procedures" as follows, in

relevant part,

> controls and procedures . . . of an issuer that are designed to ensure that ***information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms***.

17 C.F.R. §240.13a-15(e).

184.   "Internal control over financial reporting" is defined by the SEC:

> [A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and ***the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*** and includes those policies and procedures that:
>
> (1)    Pertain to the maintenance of records that, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (2)    Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

- 84 -

(3)    Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

17 C.F.R. §240.13a-15(f).

185.    Securities Exchange Act of 1934 Rule 13a-15 requires the Company's principal executive officer and principal financial officer to annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures, and provide management's assessment of the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's internal controls over financial reporting, as of the end of each fiscal year.  17 C.F.R. §240.13a-15(b)(1) and (c).

186.    In the Company's 2007 Form 10-K, defendants misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting, insofar as they negligently misrepresented that the Company's disclosure controls and procedures, and internal controls over financial reporting were effective when they were not, for the reasons set forth above.

187.    In addition, the Company's 2007 Form 10-K contained the Sarbanes-Oxley certifications, signed by defendant Wells and Chancy.  As alleged in detail

above, the statements made in the certifications were each materially false and/or misleading when the certifications were signed on February 19, 2008.

### E&Y'S PARTICIPATION IN THE ISSUANCE OF FALSE FINANCIALS

188.   E&Y, a firm of certified public accountants, was engaged by SunTrust to provide independent auditing and accounting services at all times relevant to this action.  SunTrust, who is a large client of E&Y's Atlanta office, has retained E&Y as its outside auditor since the beginning of FY 2007.  E&Y was engaged to examine and report on SunTrust's financial statements for FY 2007 and FY 2008.  E&Y was also engaged to perform review services on SunTrust's interim results for FY 2007 and FY 2008.   E&Y further provided SunTrust with other services including accounting consultations, internal control Sarbanes-Oxley audit testing and tax related services.  For FY 2007-FY 2008, SunTrust paid E&Y nearly $15 million for its services.  As a result of the financial statement and internal control audit services provided by E&Y, E&Y personnel should have been intimately familiar with SunTrust's business, including SunTrust's accounting for its loan and lease loss reserves.

### E&Y's Erroneous Statements as to SunTrust's FY 2007 Financial Statements

189.   E&Y incorrectly represented that SunTrust's financial results for FY 2007 were presented in accordance with GAAP and that E&Y's audits and reviews

for 2007 of SunTrust's financial statements had been performed in accordance with GAAS.  Furthermore, E&Y incorrectly represented that SunTrust maintained, in all material respects, effective internal controls over financial reporting, based on the COSO criteria.  E&Y consented to the incorporation of its negligently false reports on SunTrust's financial statements and effective internal controls in SunTrust's Form 10-K for FY 2007, which was filed with the SEC.  E&Y also consented to the incorporation of this same report into SunTrust's Registration Statement and related Prospectus Supplement.

190.   In the context of an offering such as this one, the independent auditor serves a gate keeping function.  A company that sells new securities to the public is required to file a registration statement with the SEC, and the 1933 Act requires that the registration statement contain financial statements audited by an independent auditor.  Section 11 of the 1933 Act imposes significant responsibilities on every auditor who has with his or her consent been named as having certified any part of the registration statement.  Because of the significance of these responsibilities and their difference from the auditor's responsibilities in ordinary circumstances, professional standards contain (*i.e.* GAAS) a separate discussion of these additional responsibilities in AU §711, *Filings Under Federal Securities Statutes*.

191.    GAAS, as approved and adopted by the AICPA, relates to the conduct of individual audit engagements.  Statements on Auditing Standards (codified and referred to as AU §___) are recognized by the AICPA as the interpretation of GAAS.

192.    When an independent auditor's report is included in a registration statement, the nature and extent of this responsibility are specified in some detail in the federal securities statutes and in the related rules and regulations.  AU §711.02 states that §11(a) imposes responsibility for false or misleading statements in an effective registration statement, or for omissions that render statements made in such a document misleading *on every auditor who consents to be named as having certified any part of the registration statement, or as having prepared any report used in connection with the registration statement, with respect to the statement or reporting in the registration statement that purports to have been prepared or certified by him*.

193.    AU §711.03 explains that §11(b) states, in part, that no person whose report is included in the registration statement on his authority as an expert shall be liable as provided therein if that person sustains the burden of proof that, as regards the part of the registration statement purporting to be made on his authority as an expert, or purporting to be a copy from a report of himself as an expert, "'he had, after reasonable investigation, reasonable ground to believe and did believe, at the

time such part of the registration statement became effective, that the statements

therein were true and that there was no omission to state a material fact required to be

stated therein or necessary to make the statements therein not misleading.'"

194.    AU §711.03 also states:

>   Section 11 further provides that, in determining what constitutes
>   reasonable investigation and reasonable ground to believe, "the standard
>   of reasonableness shall be that required of a prudent man in the
>   management of his own property."

Thus, this reasonableness requirement goes beyond the requirement of due

professional care imposed by the auditing standards.

195.    One of the unique responsibilities related to the auditor's consent to the

inclusion of an audit report in a registration statement is that the decision to consent

should be made in light of the circumstances at the effective date.    AU §711.05

states:

>   Because a registration statement under the Securities Act of 1933
>   speaks as of its effective date, the independent accountant whose report
>   is included in such a registration statement has a statutory responsibility
>   that is determined in light of the circumstances on that date.  This aspect
>   of responsibility is peculiar to reports used for this purpose (see
>   paragraphs .10 through .12).

196.    This means that the auditor should view the continuing validity of the

opinion expressed at an earlier date from the perspective of the circumstances known

at the effective date.

197.    AU §711.10 describes the auditor's responsibility to keep informed of relevant circumstances through the effective date as follows:

> To sustain the burden of proof that he has made a "reasonable investigation" (see paragraph .03) as required under the Securities Act of 1933, an auditor should extend his procedures with respect to subsequent events from the date of his audit report up to the effective date or as close thereto as is reasonable and practical in the circumstances.

198.    AU §711.10 describes the procedures that should be applied as including the normal subsequent events review procedures as described in AU §560, *Subsequent Events*, plus reading the entire prospectus and other pertinent portions of the registration statement and inquiring of and obtaining written representations from management responsible for financial and accounting matters.  Naturally, the auditor is also responsible for any knowledge he or she has obtained in providing professional services to the company since the audit through the effective date.

199.    AU §711.12 describes the auditor's responsibilities if the auditor discovers or becomes aware of information that affects the audited financial statements included in the registration statement or the audit report thereon as follows:

> If, subsequent to the date of his report on audited financial statements, the auditor . . . (a) discovers, in performing the procedures described in paragraphs .10 and .11 above, subsequent events that require adjustment or disclosure in the financial statements, or (b) becomes aware that facts may have existed at the date of his report

> that might have affected his report had he then been aware of those facts,
> he should follow the guidance in sections 560 and 561.

AU §§560 and 561 relate to seeing that the proper adjustments or disclosures are made

or withdrawing a previously issued audit report.

200.   AU §711.13 imposes a similar responsibility for any unaudited financial

statements or unaudited interim financial information presented or incorporated by

reference in a registration statement that are not in conformity with GAAP.

201.   Under both AU §§711.12 and .13 if the financial statements or financial

information is not appropriately revised, the auditor should modify his or her audit

report for the GAAP departure and consider withholding the consent to the use of his

or her report on the audited financial statements in the registration statement.

202.   E&Y consented to the inclusion of its audit report for the 2007 Form

10-K in the February 2008 Prospectus.  E&Y should not have consented to the

inclusion of its audit report in SunTrust's February 2008 Prospectus Supplement

because of the Company's improper accounting for its loan and lease loss reserves.

*See* ¶¶161-182.

203.   E&Y should have evaluated whether to reissue its audit report on

SunTrust's FY 2007 financial statements in light of the circumstances (*i.e.*

overstatement of net income, EPS and Tier 1 Capital) that existed on February 27,

2008.

204.    If E&Y had reasonably considered these matters, E&Y would not have consented to the inclusion of its audit report on the FY 2007 financial statements in the Prospectus Supplement.

205.    Thus, E&Y violated professional standards by consenting to the inclusion of its audit report for the fiscal year ended December 31, 2007, in the Prospectus on February 27, 2008.  By including its consent in the Prospectus, E&Y was required to make a "reasonable investigation" with respect to events at SunTrust subsequent to the date of the audit report up to the date of the Prospectus Supplement.  AU §711.10.  E&Y was responsible for any knowledge it obtained in providing professional services through the date of the Prospectus Supplement, in addition to reading the entire Prospectus Supplement and other pertinent portions of the Registration Statement.

206.    E&Y's reports and approval of the financial results were false and misleading due to its negligent failure to comply with Generally Accepted Auditing Standards ("GAAS") and specifically AU §711 because SunTrust's financial statements were not prepared in conformity with GAAP so that issuing the reports or approving SunTrust's financial results was in violation of GAAS and SEC rules. E&Y knew its reports and approval of the financial statements would be relied upon

by the Company as well as by present and potential investors in SunTrust's securities.

### E&Y Ignored the Audit Evidence It Gathered

207.   GAAS, as set forth in AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved.  The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation.  In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.  In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements.  To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

208.   E&Y's duty, as SunTrust's independent auditor, was to obtain "sufficient appropriate audit evidence . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they

- 93 -

present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§150.02, 110.01.

209.   In violation of GAAS, and contrary to the representations in its report on SunTrust's financial statements, E&Y negligently failed to obtain sufficient, competent evidential matter to support SunTrust's assertions regarding its accounting for its loan and lease loss reserves.

**E&Y Failed to Design Its Audit to Identify the Alleged Improprieties**

210.   As one of the largest audit firms in the world, E&Y was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit. Also, E&Y knew or should have known of the audit risks inherent at SunTrust and in the industries in which SunTrust operated because of the comprehensive services it provided to SunTrust and its experience with many other clients.  In connection with SunTrust's operations, E&Y had virtually limitless access to information concerning the Company's true operations as:

- E&Y representatives were present at SunTrust's headquarters and divisions frequently;

- E&Y had frequent conversations with SunTrust management and employees about the Company's operations and financial statements;

- E&Y audited and reviewed SunTrust's financial statements at all relevant times and knew or should have known that SunTrust's financial statements were not accurate or prepared in compliance with GAAP; and

- E&Y provided SunTrust with accounting consultations, internal control Sarbanes-Oxley Audit testing and tax services.

211.   E&Y failed in its role as independent auditor by ignoring red flags of improper accounting, including unreasonable assumptions regarding SunTrust's ALLL reserves.  E&Y reasonably should have, but did not, insist upon adjustments to SunTrust's audited financial statements.  Pursuant to GAAS, E&Y reasonably should have but did not issue a qualified or adverse report, or it should have insisted that SunTrust comply with GAAP.

**E&Y Failed to Identify Material Weaknesses in Internal Controls**

212.   E&Y, as SunTrust's auditors, were obligated to assess SunTrust's internal disclosure, financial and accounting controls and whether such controls had been placed in operation, were effective and complied with Sarbanes-Oxley, including controls to provide assurance about the safeguarding of assets, financial reporting and compliance with regulations.  E&Y was required to evaluate whether poor controls might lead to or contribute to false and misleading financial disclosures.

213.   Internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance

on the reliability of financial reporting, the effectiveness and efficiency of operations and compliance with applicable laws and regulations. AU §319.06. Under AU §319.02:

> In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation.

214. If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee. AU §325. Further, the auditor should identify any limitations related to the internal control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

215. With respect to SunTrust's internal controls for FY 2007, E&Y negligently represented that in its opinion the Company had maintained effective internal controls, when it had not. E&Y consented to a "clean" audit opinion over the effectiveness of SunTrust's internal controls over financial reporting when the loan and lease loss reserves were significantly understated and the internal controls over that accounting process were ineffective at the end of 2007.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

216.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.

217.    First, none of the statements complained of herein was a forward-looking statement. Rather they were historical statements or statements of purportedly current facts and conditions at the time the statements were made. Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

218.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted defendants' statements regarding the Company's business and financial condition and its purported compliance with GAAP.

## CLASS ACTION ALLEGATIONS

219.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired the Securities pursuant or traceable to the Company's false and

misleading Registration Statement issued in connection with the Company's Offering and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

220. The members of the Class are so numerous that joinder of all members is impracticable. The Securities were traded on the New York Stock Exchange. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SunTrust or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

221. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

222. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

- 98 -

223.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether the 1933 Act was violated by defendants' acts as alleged herein; whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and management of SunTrust; and to what extent the members of the Class have sustained damages and the proper measure of damages.

224.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

225.    Plaintiff repeats and realleges each and every allegation contained above.

- 99 -

226.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on theories of strict liability and negligence under the 1933 Act.

227.    The Registration Statement and February 2008 Prospectus were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

228.    SunTrust was the Registrant for the Offering, and created SunTrust Capital IX for the sole purpose of issuing the Securities and obtaining the proceeds there from.  As issuers of the Securities, SunTrust and SunTrust Capital IX are strictly liable to plaintiff and the Class for the misstatements and omissions.

229.    The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement and/or the documents incorporated by reference therein.

230.    The Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

231.    E&Y acted as SunTrust's auditor and was named by consent as having certified a part of the Registration Statement.

232.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

233.    By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

234.    Plaintiff acquired the Securities pursuant and/or traceable to the Registration Statement.

235.    Plaintiff and the Class have sustained damages.  At the time of their purchases of the Securities, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed between the time that the Securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants SunTrust, SunTrust Capital IX and
### the Underwriter Defendants

236.    Plaintiff repeats and realleges each and every allegation contained above.

237.    Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on theories of strict liability and negligence under the 1933 Act.

238.    By means of the defective February 2008 Prospectus, the defendants named herein sold and/or assisted in the sale of the Securities to plaintiff and other members of the Class.

239.    The February 2008 Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The defendants named in this Count owed plaintiff and the other members of the Class who purchased the Securities pursuant to the February 2008 Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the February 2008 Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of

- 102 -

reasonable care, should have known of the misstatements and omissions contained in the February 2008 Prospectus as set forth above.

240.   Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the February 2008 Prospectus at the time plaintiff acquired the Securities.

241.   By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act.   As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Securities pursuant to the February 2008 Prospectus sustained substantial damages in connection with their purchases of the Securities.   Accordingly, plaintiff and the other members of the Class who hold such Securities have the right to rescind and recover the consideration paid for their Securities, and hereby tender their Securities to the defendants sued herein.   Class members who have sold their Securities seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants and SunTrust

242.   Plaintiff repeats and realleges each and every allegation contained above.

243.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants and SunTrust.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

244.    Each of the Individual Defendants was a control person of SunTrust and SunTrust Capital IX, by virtue of his or her position as a director, senior officer and/or major shareholders of SunTrust which allowed each of these defendants to exercise control over SunTrust and its operations.  SunTrust was a controlling owner of SunTrust Capital IX by virtue of its ownership of the subsidiary and its ability to appoint directors.

245.    Each of the Individual Defendants and SunTrust was a culpable participant in the violations of §§11 and 12(a)(2) of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and Prospectus and having otherwise participated in the process which allowed the Offering to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as a Class representative;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 30, 2009              COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
                                       ANDREW J. BROWN
                                       LUCAS F. OLTS
                                       ERIC I. NIEHAUS


                                       _____
                                           s/ ANDREW J. BROWN
                                         ANDREW J. BROWN

- 105 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN C. HERMAN
Georgia Bar No. 348370
Monarch Centre, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)

LAW OFFICES OF BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\SunTrust\CPT Consolidated SunTrust.doc

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 30, 2009.

s/ ANDREW J. BROWN
ANDREW J. BROWN

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        AndrewB@csgrr.com

# Mailing Information for a Case 1:09-cv-01185-WSD

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David Andrew Bain**
  dbain@bain-law.com

- **Thomas B. Bosch**
  tom.bosch@troutmansanders.com,amanda.aievoli@troutmansanders.com,laura.wilson@troutmansanders.com

- **Thomas C. Bright**
  tbright@gbcslaw.com

- **Andrew J. Brown**
  andrewb@csgrr.com

- **Solomon B. Cera**
  scera@gbcslaw.com,keg@gbcslaw.com

- **John A. Chandler**
  jchandler@kslaw.com,madams@kslaw.com

- **John J. Clarke , Jr**
  john.clarke@dlapiper.com

- **Mark Edwin Grantham**
  Mark.Grantham@dlapiper.com,john.clarke@dlapiper.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **Cheri A. Grosvenor**
  cgrosvenor@kslaw.com,gogun@kslaw.com

- **John C. Herman**
  jherman@csgrr.com,hectorm@csgrr.com,garmstrong@csgrr.com,e_file_sd@csgrr.com

- **Robert Ware Killorin**
  rkillorin@chitwoodlaw.com

- **J. Timothy Mast**
  tim.mast@troutmansanders.com,amanda.aievoli@troutmansanders.com,laura.wilson@troutmansanders.com

- **Paul Monnin**
  paul.monnin@dlapiper.com,lloyd.dotson@dlapiper.com,jennifer.edgar@dlapiper.com

- **Eric I. Niehaus**
  ericn@csgrr.com

- **Lucas F. Olts**

lolts@csgrr.com

- **Jack Reise**
  jreise@csgrr.com,e_file_fl@csgrr.com

- **David Ashcraft Terry**
  David.Terry@DLApiper.com,jennifer.edgar@dlapiper.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Matthew P. Montgomery
Coughlin Stoia Geller Rudman & Robbins, LLP-SD
655 W. Broadway
Suite 1900
San Diego, CA 92101

Casey M. Preston
Berger & Montague
1622 Locust Street
Philadelphia, PA 19103-6365

Darren J. Robbins
Coughlin Stoia Geller Rudman & Robbins, LLP-SD
655 W. Broadway
Suite 1900
San Diego, CA 92101
```