IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| BELMONT HOLDINGS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| v. | ) | 1:09-CV-01185-WSD |
| | ) | |
| SUNTRUST BANKS, INC. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE
SUNTRUST DEFENDANTS' MOTION TO DISMISS**

J. TIMOTHY MAST
Georgia Bar No. 476199
THOMAS B. BOSCH
Georgia Bar No. 068740
TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3900 (facsimile)

Attorneys for the SunTrust Defendants

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS ....................................................................5

    I.    SUNTRUST'S 2007 FINANCIAL PERFORMANCE ......................5

    II.    THE FEBRUARY 27, 2008 OFFERING ...........................................8

    III.    POST-OFFERING EVENTS ............................................................10

ARGUMENT AND CITATION OF AUTHORITY ...........................................12

    I.    PLAINTIFF FAILS TO MEET THE APPLICABLE PLEADING STANDARDS. ..............................................................12

        A.    Plaintiff's Claims Sound in Fraud. ...........................................12

        B.    The Complaint Does Not Satisfy Rule 8(a). ...........................14

    II.    PLAINTIFF'S ALLL AND PROVISION CLAIM IS NOT ACTIONABLE UNLESS IT ALLEGES FRAUD. ..........................16

    III.    PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION. .................................................18

        A.    Much of Plaintiff's Complaint Relates to Statements That, As a Matter of Law, Are Not Actionable Under the Securities Act. .......................................................................18

        B.    SunTrust's Truthful Disclosures Are Not Actionable. ...........19

        C.    Plaintiff Has Not Alleged Any Actionable False and Misleading Statement with Respect to the ALLL or the Provision. ...............................................................................19

            1.    Plaintiff's ALLL and Provision Allegations Are Based on Hindsight and Fail To State a Claim. ............20

2.  2006 and 2007 Events in the Subprime Market Do Not Support Plaintiff's ALLL and Provision Claim..............................................................23

3.  Plaintiff's ALLL and Provision Allegations Are Based on Non-Actionable Corporate Mismanagement...............................................24

4.  Plaintiff's Allegations of Non-Compliance with GAAP Do Not Salvage Plaintiff's ALLL and Provision Claim. .......................................25

    a.  Merely Citing GAAP Standards and Claiming Violations Are Insufficient..................25

    b.  Setting the ALLL and the Provision Under GAAP Is a Matter of Judgment. ..........................27

    c.  Plaintiff's Allegations Contradict the Requirements of FAS 5 and FAS 114.................28

    d.  SunTrust's Correspondence with the SEC Does Not Support Plaintiff's Claim That SunTrust Violated GAAP.....................................31

D.  Plaintiff Fails To State a Claim That SunTrust Was "Undercapitalized" and "At Risk of Failure" in February 2008.......................................................................32

E.  Plaintiff's Internal Control Allegations Fail To State a Claim. ....................................................................33

    1.  Inadequate Internal Controls Do Not Give Rise to a Cause of Action Under the Securities Laws. ..............33

    2.  The Confidential Informants Add Nothing to Plaintiff's Claim. ..........................................................34

IV.   ANY MISSTATEMENT IN OR OMISSION FROM THE
      OFFERING DOCUMENTS WAS IMMATERIAL AS A
      MATTER OF LAW. ..........................................................................38

      A.   Based on the Total Mix of Information Available at the
           Time, Plaintiff Could Not Have Been Misled. ......................38

      B.   The Alleged Misstatements and Omissions Are Protected
           by the Bespeaks Caution Doctrine and the PSLRA's Safe
           Harbor. .................................................................................41

V.    PLAINTIFF'S SECTION 12(a)(2) CLAIM FAILS TO STATE
      A CLAIM AGAINST THE SUNTRUST DEFENDANTS...............43

VI.    PLAINTIFF'S SECTION 15 CLAIM MUST BE DISMISSED......44

**CONCLUSION**...............................................................................................**45**

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 129 S. Ct. 1938 (2009) .......................................................... 14, 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................... 14

*Belodoff v. Netlist, Inc.,* No. SA CV 07-00677 DOC (MLGx), 2008 WL
2356699 (C.D. Cal. May 30, 2008) ....................................................................... 15

*Blackmoss Invs., Inc. v. Aca Capital Holdings, Inc.*, No. 07 Civ. 10528,
2010 U.S. Dist. LEXIS 2899 (S.D.N.Y. Jan. 12, 2010) ................................. 30, 31

*Bryant v. Avado Brands, Inc.,* 187 F.3d 1271 (11th Cir. 1999) ............................... 15

*Ciresi v. Citicorp.,* 782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd,* 956 F.2d 1161
(2d Cir. 1992) ....................................................................................................... 25

*Coronel v. Quanta Capital Holdings Ltd.,* No. 07 Civ. 1405(RPP),
2009 U.S. Dist. LEXIS 6633 (S.D.N.Y. Jan. 23, 2009) ................................. 20, 34

*Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628 (3d Cir. 1989) ........................... 33

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) ....................................................... 22

*First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89 (S.D.N.Y.
1993), *aff'd,* 27 F.3d 763 (2d Cir. 1994) ............................................................. 27

*Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317 (D. Conn. 2001),
*aff'd,* 34 Fed. Appx. 408 (2d Cir. 2002) ............................................................... 18

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999) ................................. 26

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999) .............................................. 41

*Hinerfeld v. United Auto Group,* No. 97-CIV-3533(RPP), 1998 WL 397852
(S.D.N.Y. July 15, 1998) ................................................................................. 16, 24

*In re 2007 Novastar Fin. Inc., Sec. Litig.*, No. 070139CV-W-ODS,
2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ............................... 25, 32

*In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899 (8th Cir. 2005)......................28

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004) ............................23

*In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603(RWS), 2004 U.S. Dist.
    LEXIS 11466 (S.D.N.Y. June 23, 2004)............................................................22

*In re AirGate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360
    (N.D. Ga. 2005) ........................................................... 18, 25, 43, 44

*In re Alliance Pharm. Corp. Sec. Litig.,* 279 F. Supp. 2d 171
    (S.D.N.Y. 2003)......................................................................21

*In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005) ....... 33, 39

*In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004)........ passim

*In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044
    (C.D. Cal. 2008) ....................................................................29

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993).............. 33, 41

*In re Downey Sec. Litig.,* No. CV 08-3261-JFW(RZx), 2009 WL 2767670
    (C.D. Cal. Aug. 21, 2009) .......................................................32

*In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003) ..........26

*In re FBR Inc. Sec. Litig.,* 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ..........................33

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429
    (S.D.N.Y. 2005)......................................................................39

*In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345
    (N.D. Ga. 2005) ........................................................... 13, 19, 44

*In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541 (9th Cir. 1994) ................................21

*In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) ...................17

*In re Mirant Corp. Sec. Litig.*, 1:02-CV-1467-RWS,
    2009 U.S. Dist. LEXIS 789 (N.D. Ga. Jan. 7, 2009) ........................ 15, 20, 26, 34

*In re National Auto Credit Inc. Sec. Litig.*, No. 1:98CV0264,
   1999 WL 33919791 (N.D. Ohio Oct. 12, 1999) .................................................26

*In re Serologicals SEC Litig.*, No. 1:00-CV-1025-CAP,
   2003 U.S. Dist. LEXIS 27465 (N.D. Ga. Feb. 20, 2003 ......................................22

*Landmen Partners, Inc. v. The Blackstone Group, L.P.*, No. 08-
   CV03601(HB), 2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009) ...........................30

*Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ......12

*Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230 (11th Cir. 2008)...............................34

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).......................................................20

*Olkey v. Hyperion,* 98 F.3d 2 (2d Cir. 1996), *cert. denied,* 520 U.S. 1264
   (1997).................................................................................................................39

*Oxford Asset Mgmt. v. Jaharis,* 297 F.3d 1182 (11th Cir. 2002) ...........................15

*Panther Partners, Inc. v. Ikanos Commc'ns Inc.*, 538 F. Supp. 2d 662
   (S.D.N.Y. 2008).............................................................................................. 15, 21

*Pinter v. Dahl*, 486 U.S. 622 (1988) .......................................................................43

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
   638 F. Supp. 2d 120 (D. Mass. 2009)..................................................................35

*Ryder Int'l Corp. v. First Amer. Nat'l Bank,* 943 F.2d 1521 (11th Cir. 1991).......43

*Saltzberg v. TM Sterling/Austin Assocs., Ltd.,* 45 F.3d 399 (11th Cir. 1995) .........41

*Scibelli v. Roth*, No. 7228, 2000 U.S. Dist. LEXIS 790
   (S.D.N.Y. Jan. 31, 2000) ............................................................................. 20, 39

*Shapiro v. UJB Fin. Corp,* 964 F.2d 272 (3d Cir. 1992).................................. 17, 20

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...................................44

*Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2d Cir. 1994)...........................22

*TAAM Assocs. v. Housecall Med. Res., Inc.*, No. 1:96-CV-2214A-JEC, 1998 U.S. Dist. LEXIS 22372 (N.D. Ga. Mar. 30, 1998) ............................ 13, 14

*Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083 (1991) ........................ 17, 33

*Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273 (11th Cir. 2006)...............13

**Statutes**

15 U.S.C. § 77k ................................................................................................. 1, 12

15 U.S.C. § 77*l*................................................................................................. 1, 12

15 U.S.C. § 77o ....................................................................................................1

15 U.S.C. § 77z-2................................................................................................41

**Accounting Authorities**

Statement of Financial Accounting Standards No. 5 ............................ 25, 27, 28, 29

Statement of Financial Accounting Standards No. 114 .................. 25, 27, 28, 29, 36

Statement of Financial Accounting Standards No. 157 ...........................................19

Emerging Issues Task Force Topic No. D-80A (revised Sept. 2001) .............. 28, 29

## PRELIMINARY STATEMENT

Despite having nearly seven months from the filing of the original complaint to craft its allegations, Plaintiff's Consolidated Complaint (the "**Complaint**") alleges nothing more than non-actionable "fraud by hindsight," seeking to hold the "**SunTrust Defendants**"[1] liable for failing to predict at the end of 2007 the unprecedented worldwide economic collapse in the second half of 2008.

Plaintiff brings this purported class action under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "**Securities Act**") (15 U.S.C. §§ 77k, 77*l*, and 77o), relating to the issuance of SunTrust Capital IX's 7.875% Trust Preferred Securities (the "**Securities**").  The Securities were issued pursuant to an October 18, 2006 Registration Statement, as amended by a February 27, 2008 Prospectus

---

[1] The "SunTrust Defendants" are SunTrust Banks, Inc. ("**SunTrust**"); SunTrust Capital IX; James M. Wells, III; William H. Rogers, Jr.; Raymond D. Fortin; L. Phillip Humann; Mark A. Chancy; Thomas E. Panther; Robert M. Beall, II; J. Hyatt Brown; Alston D. Correll; Jefferey C. Crowe; Thomas C. Farnsworth, Jr.; Patricia C. Frist; Blake P. Garrett, Jr.; David H. Hughes; E. Neville Isdell; M. Douglas Ivester; J. Hicks Lanier; G. Gilmer Minor, III; Larry L. Prince; Frank S. Royal; Karen Hastie Williams; and Phail Wynn, Jr.

Supplement (collectively, the "**RS/P"**),[2] which incorporated by reference

SunTrust's 2007 Form 10-K (the "**2007 10-K"**).[3]

Though Plaintiff quotes extensively from SunTrust's SEC filings—many of

which post-date the RS/P and, as a matter of law, are irrelevant to Plaintiff's

claims—the Complaint offers nothing more than conclusory allegations that the

RS/P was false and misleading because:

- SunTrust failed to reserve adequately for mortgage related exposure in setting its allowance for loan and lease loss reserves (the "**ALLL**") and provision for loan losses (the "**Provision**"), causing its financial results to be overstated;

- SunTrust failed to accurately and timely increase the ALLL or the Provision;

- SunTrust's capital resources and mortgage-related assets were overstated, and the Company was at risk of failure; and

- SunTrust's internal controls were inadequate, resulting in inaccurate and misleading financial disclosures.

(¶ 112.)[4]

Plaintiff's Complaint must be dismissed for several reasons.  The Complaint

does nothing more than second-guess the timing of SunTrust's increases in the

---

[2] A copy of the Prospectus Supplement is attached as Exhibit E to Defendants' Joint Appendix of Exhibits ("**JA**"), filed contemporaneously herewith.  Citations to specific page numbers of the RS/P refer to the Prospectus Supplement.

[3] A true and correct copy of the 2007 10-K is attached to the JA as Exhibit D.

[4] All references to the paragraphs in the Complaint will be in the format "(¶ ___)."

ALLL and the Provision.  Plaintiff acknowledges—as it must—the catastrophic financial events that occurred during late 2008, which caused SunTrust and virtually every other lending institution in the United States to increase substantially the allowances for loan and other credit losses during late 2008 and early 2009.  (¶¶ 140-144.)  Remarkably, however, Plaintiff relies on the fact that SunTrust increased the ALLL and the Provision after these unprecedented events in its 2008 Form 10-K (the "**2008 10-K**"),[5] to claim that the RS/P was "false and misleading" in February 2008.  The Complaint, however, provides no plausible basis to conclude that the SunTrust Defendants can be held liable for failing to predict one of the greatest economic crises in history.

The Complaint's conclusory allegations regarding GAAP violations and inadequate internal controls do not salvage Plaintiff's claims.  Contrary to Plaintiff's assertions, GAAP expressly prohibits setting allowances based on speculation about future events.  GAAP requires that a company estimate its loan loss allowance based upon losses that are inherent in the portfolio *at the time the financial statement is issued*.  Further, Plaintiff does not allege any specific misstatement regarding GAAP or that SunTrust did not adhere to the methodology described in the 2007 10-K in establishing the appropriate level of the ALLL and

---

[5] A true and correct copy of the 2008 10-K is attached to the JA as Exhibit L.

the Provision. Thus, Plaintiff's unsupported conclusion that the ALLL and the Provision must have been understated at the end of 2007 because of increases to the ALLL and the Provision after the economic meltdown in late 2008 is contrary to GAAP and unsupported by well-pleaded facts.

Likewise, Plaintiff's "internal control" allegations do not state a claim. Insufficient internal controls do not give rise to a claim under the federal securities laws. Moreover, the three confidential witnesses offered by Plaintiff—who all left SunTrust between 6 and 13 months prior to the offering—do nothing to bolster Plaintiff's claims that the ALLL and the Provision were understated at the offering's effective date.

Finally, Plaintiff's Complaint wholly ignores the total mix of information that was available to Plaintiff at the time of the offering, including the extensive fact and risk disclosures made by SunTrust in the 2007 10-K regarding the ALLL, the Provision, and the potential further erosion of the financial markets. (2007 10-K at 5-6, 9, 16-17, 29-35, 59-60, 65, 68, 126.) Even if Plaintiff could identify a purportedly false statement or omission, SunTrust's comprehensive disclosures would render such a statement or omission immaterial as a matter of law. Therefore, and as described in more detail below, Plaintiff's Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

### I.    SUNTRUST'S 2007 FINANCIAL PERFORMANCE

On February 20, 2008, SunTrust filed its 2007 10-K reporting its financial results for 2007 (¶ 93), reflecting that SunTrust had total assets of approximately $180 billion as of year-end 2007, including $122.3 billion in loans.  (2007 10-K at 14.)  In its 2007 10-K, SunTrust made specific disclosures that it had been adversely affected by weakness in the economy, in general, and in the residential mortgage market in the Southeastern and Mid-Atlantic regions of the United States, in particular.  (*Id.* at 5-6, 9, 16-17, 29-35, 59-60, 65, 68, 126.)[6]

SunTrust also disclosed that it had suffered from "[d]eclining real estate prices and higher interest rates," which "caused higher delinquencies and losses on certain mortgage loans, particularly Alt-A mortgages and home equity lines of credit and mortgage loans sourced from brokers that are outside our branch bank network."  (*Id.* at 5.)  SunTrust further informed the market that:

> We have experienced a downturn in credit performance, particularly in the third and fourth quarters of 2007, and we expect credit conditions and the performance of our loan portfolio to continue to deteriorate in the near term.  ***This deterioration has resulted in an***

---

[6] Plaintiff's allegation that SunTrust "belatedly acknowledged" problems associated with the geographic footprint of many of its borrowers (¶ 86) simply is false.  The exact language that Plaintiff cites from the 2008 10-K as accurately describing SunTrust's borrower base appears in SunTrust's 2007 10-K as well.  (2007 10-K at 5.)

> ***increase in our loan loss reserves throughout 2007, which increases were driven primarily by residential real estate and home equity portfolios.   Additional increases in loan loss reserves may be necessary in the future***.   Deterioration in the quality of our credit portfolio can have a material adverse effect on our capital, financial condition and results of operations.

(*Id.* at 8 (emphasis added).)  And SunTrust provided detailed disclosures regarding the risks to its loan portfolio associated with continued economic deterioration. (*Id.* at 5-9.)  For example, SunTrust noted the potential for "deterioration in credit quality or a reduced demand for credit, including a resultant effect on our loan portfolio and [ALLL]."  (*Id.* at 5.)

SunTrust also described in detail its methodology for determining the ALLL and the Provision.  (2007 10-K at 30-35, 40-41.)  With respect to the ALLL, SunTrust made clear that:

- "ALLL represents our estimate of probable losses ***inherent in the existing loan portfolio***. . . ."

- "The ALLL Committee estimates probable losses by evaluating several factors: historical loss experience, current internal risk ratings based on our internal risk rating system, internal portfolio trends such as increasing or decreasing levels of delinquencies, concentrations, and external influences such as changes in economic or industry conditions."

- "This process involves our analysis of complex internal and external variables, and it requires that we exercise judgment to estimate an appropriate ALLL."

- "As a result of the uncertainty associated with this subjectivity, we cannot assure the precision of the amount reserved, should it experience sizeable loan or lease losses in any particular period. *For example, changes in the financial condition of individual borrowers, economic conditions, or the condition of various markets in which collateral may be sold could require us to significantly decrease or increase the level of the ALLL.* Such an adjustment could materially affect net income as a result of the change in provision for loan losses."

- "During 2007, we experienced an increase in delinquency and net charge-offs in residential real estate loans due to the deterioration of the housing market. The ALLL considered these market conditions in deriving the estimated ALLL; *however, given the continued economic uncertainty the ultimate amount of loss could vary from that estimate.*"

(*Id.* at 40-41 (emphasis added).) In its disclosures, SunTrust emphasized that decisions with respect to its ALLL "require our judgment about matters that are highly uncertain" and that "different estimates that could be reasonably applied would result in materially different assessments with respect to ascertaining the valuation of assets, liabilities, commitments and contingencies." (*Id.* at 40.)

As a result of the adverse economic conditions and their effect on its loan portfolio, SunTrust increased its Provision at year-end 2007 to $664.9 million, a more than 150% increase from the Provision of $262.5 million at year-end 2006. (*Id.* at 33.) $356.8 million of the increase to the Provision came in Q4 2007.[7] (*Id.*

---

[7] References to financial quarters will be in the format "Q_." SunTrust's fiscal year follows the calendar year.

at 59.)  SunTrust also increased the ALLL from $1.0445 billion at year-end 2006 (representing .86% of period end loans in the portfolio) to $1.2825 billion at year-end 2007 (representing 1.05% of period end loans).  (*Id.* at 33.)  Almost the entirety of this increase—$221.5 million—was in the "real estate" sector (*id.* at 31),[8] and $188.8 million of the increase came in Q4 2007 (*id.* at 60).[9]

## II.     THE FEBRUARY 27, 2008 OFFERING

On October 18, 2006, SunTrust filed with the SEC a Form 3 Registration Statement and Prospectus using a "shelf" registration, which allowed SunTrust to sell securities described in future offerings.  (¶ 95.)  On February 27, 2008, as part of its plan to restore its Tier 1 capital ratio to targeted levels (¶ 103), SunTrust filed the RS/P, pursuant to which SunTrust Capital IX issued 27.6 million shares of the Securities to the public at $25 per share.  (¶ 96.)  The RS/P incorporated by reference the 2007 10-K.[10]  (¶ 96.)  Consequently, the offering materials for the Securities were limited to the information contained in the RS/P and the 2007 10-K.  Like the 2007 10-K, the RS/P disclosed numerous risk factors, including:

---

[8] "Real estate" consists of "home equity lines," "construction," "residential mortgages," and "commercial real estate."  (2007 10-K at 33.)

[9] For any measured time period, the ALLL is increased from the prior period by the Provision and reduced by loans charged off, net of recoveries.

[10] The RS/P also incorporated Current Reports on Form 8-K dated February 16, 2007 (Form 8-K/A filed on January 7, 2008) and February 12, 2008, neither of which is at issue in this litigation.  (RS/P at S-iii.)

- "weakness in the economy and in the real estate market, including specific weakness within our geographic footprint, has adversely affected us and may continue to adversely affect us";

- "weakness in the real estate market, including the secondary residential mortgage loan markets, has adversely affected us and may continue to adversely affect us";

- "recently declining values of residential real estate may increase our credit losses, which would negatively affect our financial results";

- "deteriorating credit quality, particularly in real estate loans, has adversely impacted us and may continue to adversely impact us"; and

- "our accounting policies and methods are key to how we report our financial condition and results of operations, and may require management to make estimates about matters that are uncertain."

(RS/P at S-iv to -v.)

Plaintiff purports to have purchased 200,000 shares of the Securities on March 4, 2008. (¶ 25.)[11] Plaintiff made this purchase armed with: (1) SunTrust's 2007 financial results, including abundant disclosures regarding deterioration in the economy and real estate markets; (2) SunTrust's disclosures regarding its loan portfolio, including the types of loans held by SunTrust; (3) SunTrust's disclosures regarding its methodology for arriving at the appropriate ALLL and Provision; (4) SunTrust's disclosures regarding increases in the ALLL and the Provision;

---

[11] Plaintiff does not allege to have purchased the Securities from any of the Defendants, but generally alleges that it acquired its shares on March 4, 2008, "pursuant or traceable to the offering." (¶ 25.)

(5) specific disclosures by SunTrust regarding the risks going forward, including risks that the economy and real estate markets could continue to deteriorate, which could result in further increases to the ALLL and the Provision; and (6) the 2006 and 2007 articles and analyst reports cited in the Complaint regarding the condition of the financial and real estate markets at the time.

## III.    POST-OFFERING EVENTS[12]

Following the offering, the precise risks that SunTrust warned about in the offering documents materialized.  As the economy and the markets continued to deteriorate, SunTrust experienced additional losses with respect to its loan portfolio and continued to increase the ALLL and to adjust the Provision.[13]  For example, for Q1 through Q3 2008, SunTrust increased its ALLL to $1.5453 billion, $1.8294 billion, and $1.9410 billion, respectively.[14]

---

[12] As a matter of law, events occurring after the offering are irrelevant to Plaintiff's claims because SunTrust's disclosures must be evaluated based on information available as of February 27, 2008.  *See infra* Parts III.A & III.C.1.  Because Plaintiff dedicates much of its Complaint to these events, however, they are summarized briefly here.

[13] *See, e.g.,* SunTrust's Form 10-Q for Q1 2008 (the "**Q1 2008 10-Q**") at 44-47 [attached to the JA as Exhibit F]; Form 10-Q for Q2 2008 (the "**Q2 2008 10-Q**") at 38, 59-60 [attached to the JA as Exhibit G]; Form 10-Q for Q3 2008 (the "**Q3 2008 10-Q**") at 42, 66-67 [attached to the JA as Exhibit H].

[14] *See* Q1 2008 10-Q at 45; Q2 2008 10-Q at 59; Q3 2008 10-Q at 66.

Then, in late 2008, the United States' economy in general—and the financial markets in particular—took a drastic turn for the worse, as evidenced by the failure of a number of the largest financial institutions in the country.  For example, on September 7, 2008—more than six months *after* the offering—the U.S. government rescued Fannie Mae and Freddie Mac, "***caus[ing] extreme distress in the financial markets because almost every home mortgage lender and Wall Street bank relied on them to facilitate the mortgage market, and investors worldwide owned $5.2 trillion of debt securities backed by them***." (¶ 140 (emphasis added).)  Soon thereafter, on September 14, 2008, "Merrill Lynch was sold overnight to Bank of America amidst fears of a liquidity crisis."  (¶ 143.)  The following day, September 15, 2008, brought the failure of Lehman Brothers, "one [of] the oldest investment banks on Wall Street."  (¶ 143.)  On September 25, 2008, Washington Mutual was seized by the Federal Deposit Insurance Corporation and its assets were sold to J.P. Morgan for $1.9 billion.  (¶ 144.)

Though the economy already was faltering, these and other failures sent the economy into a complete tailspin.  In response to these unprecedented economic conditions, on October 3, 2008—nearly 8 months *after* the offering—Congress passed the Emergency Economic Stabilization Act of 2008, which, among other things, established the Troubled Asset Relief Program ("**TARP**").

As it had made clear in the offering documents, SunTrust was not immune from the global economic crisis. Accordingly, SunTrust further increased its ALLL, Provision, and charge-offs in Q4 2008. (2008 10-K at 32-36.) As a result, SunTrust's 2008 year-end results included an ALLL of $2.3511 billion against total loans of over $126 billion. (*Id.* at 29, 32.) Viewed against the backdrop of economic decline throughout 2008 and the unprecedented collapse at the end of Q3 and throughout Q4 2008, SunTrust's adjustments were necessary to respond to the further deterioration in its loan portfolio during that time.

## ARGUMENT AND CITATION OF AUTHORITY

I. **PLAINTIFF FAILS TO MEET THE APPLICABLE PLEADING STANDARDS.**

   A. **Plaintiff's Claims Sound in Fraud.**

Sections 11 and 12(a)(2) of the Securities Act cover false or misleading statements and omissions that are part of a "registration statement" (Section 11) or a "prospectus" (Section 12).[15] 15 U.S.C. §§ 77k & 77*l*. Although fraud ordinarily is not necessary to establish Section 11 or 12 liability, when claims under these sections sound in fraud, they must meet the more stringent pleading requirements

---

[15] Claims under Sections 11 and 12 are evaluated together, because if a plaintiff fails to plead a cognizable Section 11 claim, the Section 12 claim generally will fail as well. *E.g., Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (citations omitted).

of Federal Rule of Civil Procedure 9(b).  *See, e.g., Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277-78 (11th Cir. 2006); *TAAM Assocs. v. Housecall Med. Res., Inc.*, No. 1:96-CV-2214A-JEC, 1998 U.S. Dist. LEXIS 22372, at *39 (N.D. Ga. Mar. 30, 1998).   Even when a plaintiff expressly disavows fraud as a basis for its claims, Rule 9(b) still applies to claims which "sound in fraud."  *E.g., In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1357-58 (N.D. Ga. 2005).

Though Plaintiff disavows fraud (¶¶ 226, 237), Plaintiff's claims sound in fraud and are subject to Rule 9(b).  In effect, Plaintiff alleges that SunTrust hid its true financial condition from investors in order to raise additional capital through, among other things, the offering at issue in this litigation.  (*See* ¶¶ 114-15.) Plaintiff alleges that "as the markets deteriorated and certain loans were not actively trading . . . [SunTrust] increasingly began employing alternative," "creative," "speculative," and "self-serving," "so-called 'Level 3' accounting . . . which effectively enabled SunTrust to subjectively select the level of reserve for loan losses." (¶¶ 11, 136.)  Plaintiff further alleges that although "defendant Wells sought to assure investors that Company was not at significant risk … [u]nfortunately for investors, that was not the case."  (¶ 131.)  And Plaintiff claims that, in October 2008, SunTrust took less than the maximum available TARP funds to create the appearance that "SunTrust was doing better than other banks and

didn't really need the government's money." (¶ 148.)  Moreover, Plaintiff alleges

that "Defendants [f]inally [a]dmit[ted]  SunTrust's [c]apital [c]risis," "only after

SunTrust had raised $4.9 billion from TARP."  (Heading preceding ¶ 146; ¶ 154.)

"Such allegations are the stuff of fraud," and Plaintiff's claims should be dismissed

for failure to meet Rule 9(b).  *See TAAM*, 1998 U.S. Dist. LEXIS 22372, at *56.

### B.    The Complaint Does Not Satisfy Rule 8(a).

Even if the Court holds that the Complaint does not sound in fraud,

Plaintiff's claims also fail to meet Rule 8(a)'s pleading requirements.  Under Rule

8(a), a complaint must include ***factual*** allegations that "state a claim to relief that is

plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1938, 1949 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In determining whether

Plaintiff has met this standard, the Court must reject conclusions and "'naked

assertions' devoid of 'further factual enhancement.'"  (*Id.*)  Even well-pleaded

facts that are "merely consistent with" a defendant's liability fall "short of the line

between possibility and plausibility of 'entitlement to relief'" and are insufficient

to state a claim.  (*Id.*)

In the context of a Securities Act claim, this means that a plaintiff must, at a

minimum, plead ***facts*** sufficient to establish falsity ***at the time of the offering***, as

well as the ***materiality*** of any alleged misstatement.  *E.g.*, *In re Mirant Corp. Sec.*

*Litig.*, 1:02-CV-1467-RWS, 2009 U.S. Dist. LEXIS 789, at *74 (N.D. Ga. Jan. 7, 2009).  When a claim under the Securities Act alleges a material omission, a plaintiff also must properly allege that the omitted information existed ***at the time the prospectus became effective***.  *E.g.*, *Oxford Asset Mgmt. v. Jaharis,* 297 F.3d 1182, 1189 (11th Cir. 2002).  Courts have not hesitated to dismiss Section 11 and 12 claims that fail to meet this standard.  *See, e.g., Belodoff v. Netlist, Inc.,* No. SA CV 07-00677 DOC (MLGx), 2008 WL 2356699, at *12-13 (C.D. Cal. May 30, 2008) (dismissing Section 11 claims for, among other things, failure to meet the *Twombly* standard); *Panther Partners, Inc. v. Ikanos Commc'ns Inc.*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008) (dismissing Section 11 claims under *Twombly* because the allegations "lack[ed] the specificity and detail needed to rise above the 'speculative' level and into the realm of a 'plausible' pleading").

    In assessing whether Plaintiff's pleading satisfies these standards, the Court may consider documents upon which the Complaint is based, as well as documents required by and publicly filed with the SEC.  *Bryant v. Avado Brands*, *Inc.,* 187 F.3d 1271, 1276, 1280 (11th Cir. 1999).  As demonstrated below, regardless of the pleading standard applied, Plaintiff's Complaint fails to state a claim against the SunTrust Defendants.

## II.    PLAINTIFF'S ALLL AND PROVISION CLAIM IS NOT ACTIONABLE UNLESS IT ALLEGES FRAUD.

Separate and apart from the applicable pleading standard, and regardless of whether the Court determines that the Complaint otherwise sounds in fraud, any alleged misstatements or omissions by the SunTrust Defendants regarding the ALLL and the Provision are actionable only if they were fraudulently made—*i.e.,* if the SunTrust Defendants did not believe the statements at the time of the offering.  *See e.g., In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004) (dismissing Section 11 claims, holding that "[a]lthough these misstatements [regarding adequacy of loan loss reserves] may be actionable under the theory that defendants did not actually believe them to be true or had no reasonable basis for such a conclusion, they would not be actionable under the securities laws if they simply represented a failure on the part of defendants to correctly gauge the adequacy of the loan loss reserves") (citations omitted); *Hinerfeld v. United Auto Group,* No. 97-CIV-3533(RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (granting motions to dismiss, holding that "[t]he failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws," and noting that "failure to take an adequate accounting reserve *may* constitute an actionable omission when there is an affirmative and intentional misrepresentation about the

adequacy of the reserves in question"); *see also Shapiro v. UJB Fin. Corp,* 964 F.2d 272, 281 (3d Cir. 1992) (analyzing claims under Section 10(b) of the Securities Exchange Act and holding that the "mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws," and that such statements are actionable only when "a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans [and] failing to provide adequate reserves . . .").

These cases are consistent with other cases holding that misstatements regarding matters of judgment and opinion generally are actionable under the securities laws only if the defendants knew they were false when made. *See, e.g., Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1090, 1096 (1991) (holding that statements of "reasons, opinions or beliefs" are not actionable under the securities laws unless the statements are false and the speaker "did not hold the beliefs or opinions expressed"); *see also In re Int'l Bus. Mach. Corp. Sec. Litig.,* 163 F.3d 102, 109 (2d Cir. 1998) (noting that an opinion may be actionable under the securities laws only "if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact").

Here, by attempting to plead around Rule 9(b)'s particularity requirements, Plaintiff has pled itself out of a claim. Indeed, Plaintiff "expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct" with respect to the statements made in the RS/P, including statements regarding the ALLL and the Provision. (¶¶ 226, 237.) Plaintiff's Complaint should be dismissed on this basis alone.

## III.    PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION.

### A.    Much of Plaintiff's Complaint Relates to Statements That, As a Matter of Law, Are Not Actionable Under the Securities Act.

The vast majority of Plaintiff's Complaint relates to allegations of events, facts, and disclosures that are unrelated to, and most of which occurred long after, the February 27, 2008 effective date of the RS/P. (*See, e.g., ¶¶* 19-20, 75, 83, 85, 87-92, 117-158.) It is well-settled, however, that Sections 11 and 12 of the Securities Act do not reach statements that are not contained or expressly incorporated by reference in a registration statement or prospectus. *See, e.g., In re AirGate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1368 (N.D. Ga. 2005) ("Sections 11 and 12(a)(2) allow liability for false and misleading statements that *are part of* "a registration statement or prospectus"); *Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 334 (D. Conn. 2001), *aff'd,* 34 Fed. Appx. 408 (2d Cir.

2002).  Thus, statements made after, or otherwise outside of, the RS/P cannot form the basis of Plaintiff's claims.

   **B.    SunTrust's Truthful Disclosures Are Not Actionable.**

   Plaintiff's Complaint is replete with allegations second-guessing SunTrust's business, lending, and accounting practices.  (*E.g.*, ¶¶ 4-7, 11, 69-73, 86-90.)  For example, Plaintiff makes numerous allegations regarding SunTrust's lending and investment practices in 2006 and 2007, including its investment in and losses related to certain special investment vehicles in late 2007 and its employment of "Level 3" fair value accounting under Statement of Financial Accounting Standards ("**FAS**") No. 157 for certain assets.  (¶¶ 7, 11, 86-90, 132-137.)  Plaintiff, however, does not claim that SunTrust made any material misstatement or omission with respect to these business, lending, and accounting practices.  Accordingly, these allegations are irrelevant to Plaintiff's claims and are not actionable.  *See, e.g.*, *In re Friedman's*, 385 F. Supp. 2d at 1356 (holding that a Securities Act claim must be based on "material misrepresentation or omission").

   **C.    Plaintiff Has Not Alleged Any Actionable False and Misleading Statement with Respect to the ALLL or the Provision.**

   At its core, the Complaint alleges that SunTrust failed to timely increase its ALLL and Provision, thus hiding SunTrust's true financial condition in the 2007 10-K by understating the ALLL and the Provision and overstating SunTrust's

capital related resources.  (¶ 112.)  But the Complaint fails to identify specifically any false and misleading statement or omission in the offering documents related to the ALLL and the Provision.

### 1. Plaintiff's ALLL and Provision Allegations Are Based on Hindsight and Fail To State a Claim.

It is well-established that claims based on hindsight—*i.e.,* pointing to later events and disclosures as evidence that a company should have acted or made disclosures earlier—are not actionable under federal securities laws. As stated by the Second Circuit in *Novak v. Kasaks*:

> Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.

216 F.3d 300, 309 (2d Cir. 2000) (internal citations omitted); *see In re Mirant*, 2009 U.S. Dist. LEXIS 789, at *74 ("Allegations of fraud by hindsight are insufficient to sustain a Securities Act claim.").[16]

---

[16] *See also Shapiro*, 964 F.2d at 283 (affirming dismissal of claims based on allegations that "charge[d] defendants with essentially failing to predict the future"); *Coronel v. Quanta Capital Holdings Ltd.,* No. 07 Civ. 1405(RPP), 2009 U.S. Dist. LEXIS 6633, at *42 (S.D.N.Y. Jan. 23, 2009) (dismissing Securities Act claims under Rule 8(a) that "relied on disclosures made after the registration statement was issued to suggest that the disclosure in the registration statement was false at the time it was made"); *Scibelli v. Roth*, No. 7228, 2000 U.S. Dist. LEXIS 790, at *10 (S.D.N.Y. Jan. 31, 2000) (holding that "to *infer* that [defendant]

Courts repeatedly have dismissed claims under the Securities Act which rely on hindsight and post-offering events, including general economic declines and business reversals, to attempt to show a "misstatement" at the time of the offering.[17]   Dismissal on these grounds is appropriate because:

> Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed . . . . Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product . . . . When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.

*In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548-49 (9th Cir. 1994).

Courts faced with allegations similar to those at issue here regarding misstatements and omissions with respect to loan loss reserves have dismissed Section 11 and 12 claims at the pleading stage.  *E.g., In re CIT Group,* 349 F. Supp. 2d at 690-91 ("That defendants later decided to revise the amount of loan

---

*possessed* . . . information on July 24 because [defendant] *announced* such information on September 29 is not a reasonable inference"; "[i]t is not even necessary to determine whether the defendants were even *required* to disclose such information") (emphasis in original).

[17] *See Panther Partners,* 538 F. Supp. 2d at 669-70 (dismissing complaint based on "reverse-engineered" allegations that were "craftily drafted to imply that what only became clear due to subsequent events was somehow known to [defendants] far earlier in time"); *In re Alliance Pharm. Corp. Sec. Litig.,* 279 F. Supp. 2d 171, 183 (S.D.N.Y. 2003) ("[W]hen subsequent events make an effective registration statement misleading, section 11 does not apply.") (citations omitted).

loss reserves that [they] deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate ***at the time the registration statement and prospectus became effective***.") (emphasis added); *see generally, In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603(RWS), 2004 U.S. Dist. LEXIS 11466, at *21-23 (S.D.N.Y. June 23, 2004) (collecting cases dismissing claims where loan loss reserves proved inadequate during the commercial real estate market collapse of the late 1980s).[18]

Plaintiff relies almost entirely on events and disclosures made after February 27, 2008 to support its claim. Plaintiff points primarily to: increases in the ALLL

---

[18] This result is not limited to Securities Act claims. This Court, and others, have reached similar conclusions when addressing Section 10(b) claims under the Securities Exchange Act. *See, e.g., In re Serologicals SEC Litig.*, No. 1:00-CV-1025-CAP, 2003 U.S. Dist. LEXIS 27465, at *33-34 (N.D. Ga. Feb. 20, 2003) ("'[M]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud' . . . . Rather, '[t]he standard is whether the need to write-down . . . was 'so apparent' to [the defendants] before the announcement . . . that a failure to take an earlier write-down amounts to fraud.'") (citations omitted); *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of claims related to alleged understatement of loan loss reserves because the plaintiffs had failed to allege facts establishing that "the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made"); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of various claims, including underreserving for loan losses, and holding that "the complaint is an example of alleging fraud by hindsight" because the plaintiff "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones").

and the Provision for Q4 2008, which occurred as the financial and real estate markets significantly deteriorated, including the "extreme distress" in the financial markets in the latter half of 2008 (¶¶ 139-140, 154); SunTrust's sale of preferred stock to the U.S. Treasury in late 2008 and early 2009 (¶¶ 146-150); analyst reports from the second half of 2008 and 2009 (*e.g.*, ¶ 142); and the results of the government's 2009 stress test (¶ 156). These post-offering events and disclosures would not support a Securities Act claim under any circumstance; they certainly do not establish that the earlier statements regarding the ALLL and the Provision were false at the time they were made. As Plaintiff admits, the world was very different at the end of 2008 than at the end of 2007 (¶¶ 139-140), and the Securities Act did not require SunTrust to predict the future at the time of the offering.

**2.  2006 and 2007 Events in the Subprime Market Do Not Support Plaintiff's ALLL and Provision Claim.**

Plaintiff's reliance on pre-offering press releases and articles, relating primarily to the failure of subprime lenders and problems in the subprime market, also is misguided. (¶¶ 8-10, 54-68.) Initially, Plaintiff improperly seeks to ascribe greater significance to these pre-offering reports by viewing them with the perfect hindsight provided by the broad and sharp economic declines in 2008 and 2009. Plaintiff also fails to tie any of these events to SunTrust's financial performance. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 278-79 (3d Cir. 2004)

(holding that securities claims must be based on information related specifically to the company and not on industry-wide trends).  Finally, Plaintiff does not allege any *facts* that establish that SunTrust did not consider all known factors relevant to its portfolio, as of the date of the financial statement, when calculating its ALLL and Provision for 2007.  Indeed, SunTrust's 2007 10-K expressly disclosed the downturn in residential real estate, including: the conditions of the markets in the Southeast; that SunTrust's loan portfolio had been adversely affected by the residential real estate downturn; and that SunTrust had accounted for these circumstances as they applied to SunTrust.  (*E.g.*, 2007 10-K at 5-6, 16-17, 30-35, 40-41, 60, 65, 126.)

### 3.   Plaintiff's ALLL and Provision Allegations Are Based on Non-Actionable Corporate Mismanagement.

Setting aside Plaintiff's improper allegations based on hindsight and analyzing SunTrust's ALLL and Provision based on information available in February 2008 leaves nothing more than Plaintiff's allegations regarding simple mismanagement on the part of the SunTrust Defendants with respect to setting the ALLL and the Provision.  Unsupported conclusions, however, cannot withstand a motion to dismiss.  *See Iqbal*, 129 S. Ct. at 1949.  In any event, mismanagement is not actionable under federal securities laws.  *See, e.g., Hinerfeld,* 1998 WL 397852, at *7 ("The failure to anticipate the extent of necessary reserves, even if it

-24-

amounts to mismanagement, is not actionable under federal securities laws."); *Ciresi v. Citicorp.,* 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (dismissing Securities Act claims with prejudice where plaintiffs "allege[d] that defendants improperly managed [the company], primarily by failing to establish adequate reserves for loan losses") aff'd, 956 F.2d 1161 (2d Cir. 1992).[19]  Consequently, Plaintiff's claims should be dismissed.

### 4.    Plaintiff's Allegations of Non-Compliance with GAAP Do Not Salvage Plaintiff's ALLL and Provision Claim.

#### a.    *Merely Citing GAAP Standards and Claiming Violations Are Insufficient.*

Plaintiff's general allegations regarding FAS 5, FAS 114, and some interpretations thereof do not save Plaintiff's ALLL and Provision claim.  Merely citing to GAAP policies and requirements without showing precisely how each was violated is insufficient to show that the offering documents were false and misleading.  *See In re AirGate*, 389 F. Supp. 2d at 1377 (dismissing Section 11 and 12 claims and holding that "the mere assertion that the [allowance for doubtful

---

[19] *See also In re CIT Group*, 349 F. Supp. 2d at 689 (dismissing Securities Act claim because allegations of inadequate loan loss reserves were "nothing more than an assertion that [the company] was incorrect or unskillful in determining exactly what amount of reserves would be adequate"); *In re 2007 Novastar Fin. Inc., Sec. Litig.*, No. 070139CV-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *11 (W.D. Mo. June 4, 2008) ("The Company may have incorrectly believed it had adequate reserves, but the mere fact that those reserves eventually proved to be inadequate does not mean a false statement was made.").

accounts] calculations violated a financial accounting rule without explanation is akin to pleading a legal conclusion") (citations omitted); *TAAM*, 1998 U.S. Dist. LEXIS 22372, at *58 (dismissing Section 11 and 12 claims under Rule 9(b) where "[p]laintiffs . . . did no more than state that defendants violated GAAP and set forth a list of very general concepts allegedly violated").[20]

Here, Plaintiff merely cites a series of GAAP provisions and interpretations and concludes, without alleging facts, that SunTrust purportedly violated GAAP when it established the ALLL and the Provision at the end of 2007. Plaintiff's bald, boilerplate, and conclusory allegations regarding GAAP are derivative of and fail for the same reasons that Plaintiff's allegations regarding the ALLL and the Provision fail. *See, e.g., In re Mirant*, 2009 U.S. Dist. LEXIS 789, at *76

---

[20] *In re Mirant*, 2009 U.S. Dist. LEXIS 789, at *78 (dismissing Securities Act claim alleging that GAAP required an impairment of an asset where the "Complaint, though it alleges that [the company] did not conduct an impairment test, does not allege facts establishing that FAS 121 required [the impairment claimed by plaintiffs]"); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999) (finding it impossible to infer GAAP violation absent factual context); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (dismissing Securities Act claim where the complaint did "not specify any respect in which defendants' . . . accounting practices (which plaintiffs concede were disclosed to the public) were improper"); *In re National Auto Credit Inc. Sec. Litig.*, No. 1:98CV0264, 1999 WL 33919791, at *13 (N.D. Ohio Oct. 12, 1999) (in Section 10(b) case, dismissing complaint in part because although plaintiffs "cite[d], paraphrase[d], and quote[d] a variety of SEC rules and regulations in their complaint . . . [t]hey fail to say explicitly and specifically . . . how plaintiffs violated any of them").

(dismissing claim based on alleged violation of GAAP related to impairment test where plaintiffs failed to "allege how an impairment test should have been conducted and why the results would have necessarily required Mirant to recognize the impairment").

### b. Setting the ALLL and the Provision Under GAAP Is a Matter of Judgment.

Plaintiff acknowledges that under FAS 5 and FAS 114, SunTrust was required to reserve for: (1) estimated credit losses for loans specifically identified as being impaired; (2) estimated credit losses for loans or groups of loans with specific characteristics that indicate probable losses; and (3) estimated credit losses inherent in the remainder of the portfolio based on current economic events and circumstances. (¶ 163.) "Measuring impairment of a loan requires judgment and estimates, and the eventual outcomes may differ from those estimates." FAS 114, at ¶ 11; *see, e.g., First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y. 1993) ("[T]he taking of loan loss reserves is based on managerial guesswork about the future."), *aff'd*, 27 F.3d 763 (2d Cir. 1994).

SunTrust's 2007 10-K included detailed disclosures regarding the judgments that SunTrust was required to make in setting the ALLL and the Provision in accordance with GAAP. (2007 10-K at 10, 32-33.) SunTrust also disclosed the methodology utilized in setting the ALLL and the Provision and warned that the

application of different methodologies could yield materially different results.

(*Id.*)  Plaintiff does not challenge SunTrust's adherence to this methodology.

Rather, with the benefit of hindsight, Plaintiff merely concludes that SunTrust's

subsequent increases in the ALLL and the Provision somehow demonstrate that the

numbers in the 2007 10-K were false.  These allegations do not state a claim.  *See*

*supra* Part III.C.1.

### c.    *Plaintiff's Allegations Contradict the Requirements of FAS 5 and FAS 114.*

As recognized by the interpretations relied upon by Plaintiff, under FAS 5

and 114, "a loss should be recognized only if [1] it is probable that the loss has

been incurred at the date of the financial statements and [2] the amount of the loss

can be reasonably estimated."  Emerging Issues Task Force ("EITF") Topic No.

D-80A (revised Sept. 2001) at Q.10.[21]  The EITF further provided:

> Losses should not be recognized before it is probable that they have
> been incurred, even though it may be probable based on past
> experience that losses will be incurred in the future.    It is
> inappropriate to consider possible or expected future trends that may
> lead to additional losses.

---

[21] *See also In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005)
(holding that to make out a claim under FAS 5, plaintiffs must plead facts
demonstrating that defendants had knowledge of losses prior to the issuance of the
financial statements).

*Id.* at "Overview of [GAAP] for Loan Impairment."  The determination as to whether a loss has been incurred should be "based on past events and conditions existing at the date of the financial statements."  *Id.*

Plaintiff alleges no facts even suggesting that SunTrust had actually incurred losses at fiscal year-end 2007 that it failed to include in its ALLL and Provision. Instead, contrary to GAAP, the Complaint rests upon a fundamentally flawed interpretation of GAAP—*i.e.,* that SunTrust should have reserved in 2007 not only for loans that its models indicated were impaired at the time it issued its financial statements but also for loans that were not impaired but that might become impaired in the future.  (*E.g.*, ¶ 152 (asserting that SunTrust should have earlier— presumably in 2007—reserved for loans that did not become delinquent until months after the offering).)  Had SunTrust adopted Plaintiff's suggested approach and established an allowance against future losses not already inherent in the portfolio at the time of the 2007 10-K, it clearly would have been inconsistent with GAAP.[22]

---

[22] *See generally In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1070 (C.D. Cal. 2008) (holding that the plaintiffs' failure to address FAS 5's requirement that "losses 'should not be recognized before it is probable that they have been incurred,'" rendered the complaint fatally flawed because plaintiffs had not "adequately ple[d] that the losses were 'probable' at the time of reporting, or that the magnitude of the loss could be reasonably estimated").

Plaintiff's allegations that SunTrust should have disclosed in the RS/P risks related to the potential for additional losses to its loan portfolio do not alter the analysis. (¶¶ 174-179.) First, Plaintiff has not alleged any facts showing that the accounting standards cited by it are applicable here. Second, Plaintiff does not allege the existence of any trends or conditions known to SunTrust at the time of the offering that were likely to have a material impact on SunTrust's real estate portfolio, as opposed to the allegations regarding the real estate market in general. *See Landmen Partners, Inc. v. The Blackstone Group, L.P.*, No. 08-CV03601(HB), 2009 WL 3029002, at *9 (S.D.N.Y. Sept. 22, 2009) (dismissing Section 11 and 12 claims and holding that "generalized allegations that problems brewing in the market at large made it 'foreseeable' that a particular set of investments would sour are insufficient").[23] Third, according to the Complaint, the existing risks that should have been disclosed in February 2008 were actually publicly available at the time of the offering (¶¶ 8-10, 59-68 (citing press reports from 2006 and 2007).) Although SunTrust had no duty to disclose these risks, *see Landmen Partners,* 2009 WL 3029002, at *9, SunTrust did, in fact, disclose precisely the risks that

---

[23] *See also Blackmoss Invs., Inc. v. Aca Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 U.S. Dist. LEXIS 2899, at *24 (S.D.N.Y. Jan. 12, 2010) (dismissing Section 11 and 12 claims and holding that the plaintiff must plead "with some specificity, facts establishing that the defendant had actual knowledge of the purported trend").

Plaintiff now claims were omitted from the RS/P, including a concentration of

credit risk in residential mortgages, home equity lines, and related products in the

Southeastern and Mid-Atlantic regions (*e.g.*, 2007 10-K at 126). *See Blackmoss*

*Invs.,* 2010 U.S. Dist. LEXIS 2899, at *22 (holding that disclosure of risks upon

which a complaint is based renders the complaint insufficient as a matter of law).

> **d.    SunTrust's Correspondence with the SEC Does Not Support Plaintiff's Claim That SunTrust Violated GAAP.**

Plaintiff's reliance on a December 18, 2008 letter from the SEC to SunTrust

also is misguided.  (¶ 182.)  In the letter, the SEC asked SunTrust to provide

additional information regarding the calculation of the ALLL for the 2007 10-K.

Although omitted from the Complaint, SunTrust responded to the letter on January

5, 2009, providing a detailed explanation of SunTrust's calculations.  Shortly

thereafter, on February 26, 2009, the SEC informed SunTrust that it had

"completed [its] review of [SunTrust's] Form 10-K and related filings and ha[d] no

further comments at this time."[24]  The SEC did not indicate that SunTrust may

have been in violation of GAAP, did not question SunTrust's internal controls, did

---

[24] Copies of the SEC's December 18, 2008 letter, SunTrust's January 5, 2009 letter, and the SEC's February 26, 2009 letter, are attached to the JA as Exhibits I, J, and K, respectively.

not request that SunTrust restate the ALLL reflected in the 2007 10-K (or any other filing), and did not request that SunTrust change anything going forward. *See In re Novastar*, 2008 U.S. Dist. LEXIS 44166, at *12 (finding it "noteworthy that nobody—the SEC, Novastar's auditors, or anyone else—has suggested Novastar should or must restate its financial reports").  Simply put, the SEC's letter provides no support for Plaintiff's claims.

### D.    Plaintiff Fails To State a Claim That SunTrust Was "Undercapitalized" and "At Risk of Failure" in February 2008.

Plaintiff's allegations that SunTrust failed to disclose that it was undercapitalized and "at risk of failure as an independent institution" (¶ 112), are merely a repackaged version of Plaintiff's claims related to SunTrust's ALLL and Provision and rest entirely on the unsupported premise that SunTrust misstated the ALLL and the Provision.  Because Plaintiff has failed to state a claim with respect to the ALLL and the Provision, this bootstrapped claim fails as well.  *See, e.g., In re Downey Sec. Litig.,* No. CV 08-3261-JFW(RZx), 2009 WL 2767670, at *5 (C.D. Cal. Aug. 21, 2009) (dismissing allegations concerning company's capital levels, which were premised upon plaintiff's other "plainly insufficient" allegations concerning loan loss reserves).  Moreover, as with its ALLL and Provision claim, none of Plaintiff's allegations show that the RS/P was false or misleading when issued.  Finally, any statements in the offering materials

regarding the adequacy of SunTrust's level of capitalization were statements of opinion not actionable unless knowingly false when made. *See, e.g., Virginia Bankshares,* 501 U.S. at 1090, 1096; *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368-69 (3d Cir. 1993) (holding that opinions are actionable only if the defendant does not genuinely and reasonably believe them).

### E.    Plaintiff's Internal Control Allegations Fail To State a Claim.

#### 1.    Inadequate Internal Controls Do Not Give Rise to a Cause of Action Under the Securities Laws.

Inadequate internal controls do not give rise to liability under the securities laws. *See, e.g., In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1373 (N.D. Ga. 2005) (stating that allegations that a company's internal controls permitted misconduct "are nothing more than criticism of [the company's] management structure and management decisions, and cannot form the basis for a securities violation").[25]  Moreover, where alleged internal control problems do not result in a restatement of previously disclosed loss estimates, there is no basis to claim that the internal control problems rendered the estimates false when made.

---

[25] *See also Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 640 (3d Cir. 1989) (dismissing Securities Act claims because "the concerns underlying the securities acts are not implicated simply because management has failed to characterize . . . its financial reporting and accounting controls as inadequate and ineffective"); *In re FBR Inc. Sec. Litig.,* 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) ("[I]t is not a violation of the securities laws to simply fail to . . . provide sufficient internal controls.").

*Coronel*, 2009 U.S. Dist. LEXIS 6633, at *44. Therefore, Plaintiff's allegations that SunTrust's internal controls were deficient do not state a claim under the securities laws.

### 2. The Confidential Informants Add Nothing to Plaintiff's Claim.

Plaintiff has not alleged any facts supporting its claim that SunTrust's internal controls related to the ALLL and the Provision were inadequate in February 2008. The only allegations Plaintiff offers for its internal control claim are the statements from three purported "confidential informants" ("**CIs**") and SunTrust's prior restatement, in 2005, of certain 2004 financials.

With respect to the allegations based on statements of confidential witnesses, the Eleventh Circuit recently held that:

> the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.

*Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1240 (11th Cir. 2008); *see In re Mirant*, 2009 U.S. Dist. LEXIS 789, at *91-92 (discrediting a confidential witness because the informant merely gave a "laundry list" of improper conduct, but the

statements did not demonstrate proximity, direct relationships to, or knowledge of the alleged fraud allegations); *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 127-28 (D. Mass. 2009) (finding that the confidential witnesses' statements were merely anecdotes, lacking specificity or meaningful context).

The CIs relied upon by Plaintiff add nothing to Plaintiff's other conclusory allegations.  Indeed, the confidential witnesses:

- profess no knowledge regarding the internal controls regarding or the adequacy of SunTrust's ALLL and Provision at the time of the offering in February 2008 (or at any other time)—one of the CIs left SunTrust in January 2007, 13 months prior to the offering, and the other two left SunTrust six months before the offering (¶¶ 121, 117, 119);

- do not claim any knowledge of the components, data inputs, or methodology for SunTrust's calculation of the ALLL or the Provision;

- do not allege to have been involved—in any manner—with SunTrust's financial reporting;

- do not allege that SunTrust disseminated any false or misleading information—with respect to internal controls or otherwise—in the offering documents, including the 2007 10-K; and

- do not claim that SunTrust possessed any material information that was not reflected in SunTrust's calculation of the ALLL and the Provision.

What little information the CIs do provide is vague, conclusory, and speculative about what might have happened after they left SunTrust.  These assertions are

completely devoid of the indicia of reliability required for the statements to be afforded any weight.

For example, CI-1, who left SunTrust in September 2007, offers unsupported conclusions that SunTrust's internal controls were "dysfunctional" and that the numbers for SunTrust's enterprise data warehouse ("**EDW**") were "off all the time." (¶ 117.)  CI-1, however, does not provide any detail regarding these statements, or even any information regarding the numbers involved.  In short, CI-1 offers no facts in support of the conclusion that SunTrust "experienced substantial problems with the accuracy of [its] data." (¶ 118.)

CI-1 also fails to describe how the data from the EDW system was used by management, if at all, for the purpose of calculating the ALLL and the Provision in the 2007 10-K, or whether other systems were in place to provide reliable data.  CI-1 also demonstrates a fundamental lack of understanding regarding the application of FAS 114. (¶ 118.)  FAS 114 applies only to loans already determined to be impaired, not to loans placed into different risk "buckets."  FAS 114, at ¶¶ 6, 8 (specifically excluding "large groups of smaller balance homogenous loans that are collectively evaluated for impairment [1] . . . [including] residential mortgage . . . loans"); 2007 10-K at 33.

CI-2, who also left SunTrust in September 2007, offers statements that have nothing to do with financial reporting, let alone the calculation of the ALLL and the Provision. CI-2's statements relate to purported issues affecting the underlying documentation for loans, not the data regarding the post-funding performance of loans or the information used in calculating the ALLL and the Provision. (¶¶ 119-120.) Moreover, CI-2's statements relate to loans held for sale to investors, which were accounted for separately from the ALLL and the Provision and have no relevance to Plaintiff's allegations. (2007 10-K at 30, 83.)

CI-3, who left SunTrust in January 2007, more than a year prior to the offering, provides nothing more than anecdotes regarding her participation in a "project"—for which no time frame or scope is provided—to identify "duplication"[26] within some part of SunTrust's residential real estate mortgage portfolio. (¶ 126.) Based on this "project," CI-3 speculates that certain unspecified "issues" and "inaccuracies" must have persisted for more than 13 months after she left SunTrust. (¶ 122.)

---

[26] The term "duplication" here is a misnomer. It appears that CI-3 is referring to a circumstance in which SunTrust holds a first and second position on the same property—*e.g.*, a first and second mortgage or a mortgage and a home equity line. This practice is common in the mortgage industry and was disclosed by SunTrust in the 2007 10-K. (*Compare* ¶¶ 123-24 *with* 2007 10-K at 30-31.)

Plaintiff's only attempt to tie any of the conclusions offered by the CIs to SunTrust's financial reporting is Plaintiff's reference to SunTrust's restatement in 2005 related to errors in its earnings for Q1 and Q2 of 2004 and a material weakness in the ALLL for the year-ending December 31, 2004.  (¶ 128.)  Initially, the 2004 restatement is wholly irrelevant to SunTrust's calculation of the ALLL and the Provision at the time of the offering in February 2008.  SunTrust has not restated its 2007 financial results and did not receive an adverse opinion by its auditor for 2007.  Further, SunTrust's restatement of earnings for 2004 resulted in a *decrease* in the allowance and an increase in earnings (*i.e.*, the allowance was initially overstated, rather than understated as alleged here).  (*See* Nov. 12, 2004 Form 10-Q/A, at Note 11; Dec. 9, 2005 SEC Comment Letter; Dec. 22, 2005 SunTrust Response to SEC Comment Letter [attached to the JA as Exhibits A, B, and C, respectively].)

## IV.  ANY MISSTATEMENT IN OR OMISSION FROM THE OFFERING DOCUMENTS WAS IMMATERIAL AS A MATTER OF LAW.

### A.  Based on the Total Mix of Information Available at the Time, Plaintiff Could Not Have Been Misled.

In examining claims under Sections 11 and 12, the offering documents must be read "as a whole," and the central inquiry is "whether the defendants' representations, *taken together and in context,* would have misled a reasonable

investor about the nature of the [securities]").  *Scibelli*, 2000 U.S. Dist. LEXIS

790, at *8 (dismissing Section 11, 12 and 15 claims) (emphasis added) (quoting

*Olkey v. Hyperion,* 98 F.3d 2, 5 (2d Cir. 1996), *cert. denied,* 520 U.S. 1264

(1997)); *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429,

449 (S.D.N.Y. 2005) (dismissing claims in part because "[t]he Prospectus, when

read as a whole . . . contained sufficient cautionary language to warn investors of

the relevant risks"); *In re CIT Group*, 349 F. Supp. 2d at 691 (dismissing Section

11 and 12 claims where, taken in context, the alleged misstatements were "so

obviously unimportant . . . that reasonable minds could not differ on the question

of [their] importance"); *see also In re Bellsouth*, 355 F. Supp. 2d at 1365 ("[I]f no

reasonable investor could conclude public statements, taken together and in

context, were misleading, then the issue is appropriately resolved as a matter of

law.") (citations omitted).

In *CIT Group,* the court dismissed the claims even though the issuer had

increased its loss reserves by $200 million only three weeks after its initial public

offering.  349 F. Supp. 2d at 687.  The Court held that any alleged misstatements

were immaterial as a matter of law because of (1) the extensive cautionary

language that surrounded the statements regarding loss reserves, including

warnings regarding further deterioration in relevant markets; (2) statements that the

chosen level of reserves was a product of "estimates and significant judgment";

and (3) the relative unimportance of a charge to loss reserves of an additional

"$240 million in a company with over $27 billion in receivables." *Id.* at 691.

The same factors are present here. First, SunTrust included extensive

cautionary disclosures in the RS/P and the 2007 10-K, including warnings

regarding deterioration of, and SunTrust's concentration of credit risk in, the

residential real estate market, in general, and the market in the Southeast, in

particular. (2007 10-K at 5-6, 9, 16-17, 29-35, 59-60, 65, 68, 126; RS/P at S-iv

to -v.) Second, SunTrust explained that the chosen levels of the ALLL and the

Provision were the product of "estimates" that "require[d] a high degree of

management judgment," and further explained that the ALLL and the Provision

could increase in the future. (2007 10-K at 40-41, 31-34, 84.) Finally, the total

increase in the ALLL between year-end 2007 and year-end 2008 was $1.0685

billion, less than one percent (1.0%) of SunTrust's loans of over $125 billion.

(2008 10-K at 32.) Accordingly, as in *CIT Group,* the misleading statements

alleged by Plaintiff "would not have misled a reasonable investor about the

securities offered," and Plaintiff's claims should be dismissed. 349 F. Supp. 2d at

691.

**B.**    **The Alleged Misstatements and Omissions Are Protected by the Bespeaks Caution Doctrine and the PSLRA's Safe Harbor.**

Under the "bespeaks caution" doctrine, statements in an offering are immaterial as a matter of law if reasonable investors would not consider them important in light of adequate cautionary language in the relevant offering. *In re Donald J. Trump Casino*, 7 F.3d at 371-72, *adopted by Saltzberg v. TM Sterling/Austin Assocs., Ltd.,* 45 F.3d 399, 400 (11th Cir. 1995). Moreover, under the PSLRA's safe-harbor, there can be no liability based on forward-looking statements that are (1) identified as forward-looking and are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those forward-looking statements or (2) immaterial. 15 U.S.C. § 77z-2; *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). Even if a forward-looking statement has no cautionary language, it is actionable only if the plaintiff can show that the defendant made the statement with "actual knowledge" that it was "false or misleading." *Harris*, 182 F.3d at 803.

The Eleventh Circuit has held that "when the factors underlying a projection or economic forecast include both assumptions and statements of known fact . . . the entire list of factors is treated as a forward-looking statement," subject to the protection of the safe harbor. *Id.* at 807. Here, there is no dispute that the establishment of the ALLL necessarily requires SunTrust to "estimate[] credit

losses," based on, among other things, "management's current judgments about the credit quality of the loan portfolio" and "information available prior to the issuance of the financial statements."  (¶¶ 163-175.)

In the RS/P and the 2007 10-K, SunTrust made clear that "forward-looking statements" are indicated by terms such as "believes," "anticipates," "estimates," "probably," "projects," and "similar expressions."  (RS/P at S-iv.)  In the 2007 10-K, SunTrust explicitly identified the ALLL as, among other things, "our *estimate* of *probable* losses inherent in the existing loan portfolio."  (2007 10-K at 40 (emphasis added).)  Moreover, SunTrust stated that, "in these measurements, we use *assumptions* and methodologies that are relevant to *estimating* the level of impaired and unrealized losses" and that "our judgment and experience play a key role in enhancing the specific ALLL *estimates*."  (*Id.* (emphasis added).)

The RS/P and the 2007 10-K disclosed the precise risks that ultimately came to pass in 2008, and which led to the increase in SunTrust's ALLL and Provision. *See supra* "Statement of Facts" Part I.  These disclosures were sufficient.  Further, Plaintiff disclaims allegations of knowing or intentional wrongdoing.  (¶¶ 226, 237.)  Accordingly, the Court should dismiss Plaintiff's claims.

## V.    PLAINTIFF'S SECTION 12(A)(2) CLAIM FAILS TO STATE A CLAIM AGAINST THE SUNTRUST DEFENDANTS.

Liability under Section 12(a)(2) is limited to "sellers" of securities.  In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court held that a "seller" in the context of Section 12 includes (1) "the owner who passed title, or other interest in the security, to the buyer for value" and (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id.* at 642, 647; *see Ryder Int'l Corp. v. First Amer. Nat'l Bank,* 943 F.2d 1521, 1527 (11th Cir. 1991) (applying the *Pinter* definition of "seller" to claims under Section 12(a)(2)).

Here, the Securities were offered through a "firm commitment" underwriting whereby the underwriters purchased all of the Securities for resale to the public— *i.e.*, none of the SunTrust Defendants passed title of the Securities to the public. (RS/P at S-73-74); *see In re AirGate,* 389 F. Supp. 2d at 1367 (defining "firm commitment" underwriting).  Thus, in order to be considered "sellers," the SunTrust Defendants must have "solicited" the purchase of the Securities.  The Complaint's only allegations in this regard are that the SunTrust Defendants "assisted in the sale" of the Securities and that they participated in the preparation of or signed the RS/P.  (¶¶ 238, 245.)

It is well-settled that merely alleging that the issuer participated in the preparation of a registration statement/prospectus is insufficient to allege "seller" status under Section 12(a)(2).  *In re AirGate,* 389 F. Supp. 2d at 1368.  As the First Circuit stated in a leading case on this topic:

> neither involvement in preparation of a registration prospectus nor participation in "activities" relating to the sale of securities, standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status. . . .

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996); *see In re AirGate*, 389 F. Supp. 2d at 1367-68 (citing *Shaw* and dismissing Section 12(a)(2) claims as to issuer in firm commitment underwriting).  Consequently, Plaintiff's Section 12(a)(2) claim against the SunTrust Defendants must be dismissed.

## VI.    PLAINTIFF'S SECTION 15 CLAIM MUST BE DISMISSED.

Control person liability under Section 15 of the Securities Act is contingent upon a primary violation.  *In re Friedman's*, 385 F. Supp. 2d at 1357.  If a plaintiff does not establish a primary violation under the Securities Act, then the Section 15 claims must be dismissed as well.  *Id.*  Here, because Plaintiff has failed to state a claim against the SunTrust Defendants under Sections 11 and 12 of the Securities Act, Plaintiff's Section 15 claim against the SunTrust Defendants must be dismissed.

## CONCLUSION

For the foregoing reasons, the SunTrust Defendants respectfully request that the Court grant their motion and dismiss Plaintiff's claims against them.

Respectfully submitted, this 29th day of January, 2010.

*/s/ Thomas B. Bosch*
J. TIMOTHY MAST
Georgia Bar No. 476199
Email: tim.mast@troutmansanders.com
THOMAS B. BOSCH
Georgia Bar No. 068740
Email: tom.bosch@troutmansanders.com

TROUTMAN SANDERS LLP
600 Peachtree Street, Suite 5200
Atlanta, GA 30308
Tel: (404) 885-3591
Facsimile: (404) 962-2727

Attorneys for Defendants
SunTrust Banks, Inc.; SunTrust Capital
IX; James M. Wells, III; William H.
Rogers, Jr.; Raymond D. Fortin; L.
Phillip Humann; Mark A. Chancy;
Thomas E. Panther; Robert M. Beall, II;
J. Hyatt Brown; Alston D. Correll;
Jefferey C. Crowe; Thomas C.
Farnsworth, Jr.; Patricia C. Frist; Blake
P. Garrett, Jr.; David H. Hughes; E.
Neville Isdell; M. Douglas Ivester; J.
Hicks Lanier; G. Gilmer Minor, III;
Larry L. Prince; Frank S. Royal; Karen
Hastie Williams; and Phail Wynn, Jr.

## CERTIFICATE OF COMPLIANCE OF LOCAL RULE 7.1D

I hereby certify that the foregoing brief has been prepared in a Times New Roman 14 point font, one of the font and point selections approved by the Court in Local Rule 5.1B.

*/s/ Thomas B. Bosch*
Thomas B. Bosch
Georgia Bar No. 068740

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing MEMORANDUM OF

LAW IN SUPPORT OF THE SUNTRUST DEFENDANTS' MOTION TO

DISMISS was electronically filed with the Clerk of Court using the CM/ECF

system, which serves notification of such filing to all CM/ECF participants.

This 29th day of January, 2010.

*/s/ Thomas B. Bosch*
Thomas B. Bosch
Georgia Bar No. 068740
