UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| BELMONT HOLDINGS CORP., et al., Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>       vs.<br><br>SUNTRUST BANKS, INC., et al.,<br><br>                              Defendants. | Civil Action No. 1:09-cv-01185-WSD (**Consolidated**)<br><br>CLASS ACTION<br><br>DECLARATION OF DESIREE MONTY TORRES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO SUNTRUST DEFENDANTS' MOTION FOR RECONSIDERATION |

658668_1

I, DESIREE MONTY TORRES, declare as follows:

1.      I am an investigator for the investigation firm Worms & Hirsch, Inc. ("WHI").  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I earned an undergraduate degree in accounting in 1999 from the University of Phoenix, an MBA from the University of Phoenix in 2001, and a doctorate degree in high technology management from the University of Wollongong in Australia in 2004.

3.      I have been employed with WHI since March 2009.  Since May 2005, I have been actively engaged in securities fraud investigations pertaining to companies operating in a variety of industries.  I have been engaged in investigations related to cases against defendant companies operating in the banking, secondary mortgage market, pharmaceutical, wireless, and manufacturing sectors, among other industries. In the course of my career investigating securities fraud, I have investigated well over 50 publicly traded companies and have interviewed in excess of 1,000 witnesses.

658668_1

4.     In May 2009, WHI was hired by Robbins Geller Rudman & Dowd LLP ("Robbins Geller"),[1] as well as the Law Offices of Bernard M. Gross, P.C. (collectively, "Lead Counsel") to assist in the preparation of a securities class action lawsuit against SunTrust Banks, Inc. ("SunTrust") for violations of the federal securities laws based on a misleading prospectus and registration statement issued in February of 2008.

5.     I was provided a copy of the initial complaint in this matter and worked directly with Wolf Worms (principal of WHI) and Lead Plaintiff's counsel named above.

6.     WHI has strict protocols designed to ensure each and every one of our witness contacts complies with relevant legal and ethical rules (as discussed in more detail below).  I regularly review my disclosures with the principles of WHI, both of whom are attorneys, to ensure the disclosures comply with WHI protocol and relevant ethical rules.

7.     For example, based on our experience and understanding of ethical rules that apply to attorneys, WHI seeks to ensure we do not ever gather information from

---

[1]     At the time, Robbins Geller was known as Coughlin Stoia Geller Rudman & Robbins LLP.

current employees of the companies we investigate.  WHI has developed and implemented specific policies to ensure WHI does not gather information from any current employee of the Company we are investigating.

8.    Upon contacting a witness, if WHI has no reason to believe the witness is a current employee, WHI then offers to provide the witness with a brief overview of the nature of our inquiry and whether the witness would like to know more about the pending litigation.  If requested, WHI will provide a brief overview of the complaint allegations and WHI will provide the names and contact information for the attorneys that have retained our services.

9.    Once these disclosures have been completed, WHI asks whether the potential witness would like to participate in an informal interview.

10.    In the course of this investigation, WHI identified hundreds of potentially relevant witnesses through a review of a variety of publicly available databases and from speaking with former SunTrust employees.  I contacted or interviewed more than 40 former SunTrust employees. I strictly followed the WHI investigation protocols with respect to each former SunTrust employee that I interviewed in this matter.

11.    During the course of this investigation, I followed my standard practice of taking contemporaneous notes in the course of each interview I conducted.  Once an interview is complete, and if a witness provides relevant information, it is my

- 3 -

practice to prepare an interview memorandum in order to memorialize my interviews with witnesses as soon as practicable.  I provided detailed reports to counsel with respect to those interviews in which former employees provided information relevant to our investigation.

**Interviews With Mr. Trapani**

12.    In this particular matter, I prepared three interview summaries summarizing investigative interviews with Scott Trapani ("Trapani") that occurred on February 2, 2010, September 24, 2010, and October 11, 2011.  I prepared these interview summaries shortly after completing my interviews with this witness.

13.    I first contacted Mr. Trapani, a former SunTrust Banks Group Vice President of Risk Management, on July 27, 2009.  During this initial conversation, I confirmed that he was no longer a SunTrust employee and had a general discussion, wherein I advised him that I wanted to inquire into several areas relevant to this litigation.  I advised him that I was not looking for privileged, confidential or proprietary information.  Mr. Trapani said that he needed to look over his severance agreement, contact SunTrust and speak with his current employer, and that WHI should call back in a few days.

14.    On July 29, 2009, I spoke with Trapani again during which time Trapani conveyed that he had contacted SunTrust to alert the executive management team that

- 4 -

he had been contacted by an investigator for Lead Plaintiff and intended to speak further with her.  Mr. Trapani told me he had spoken with Raymond Fortin ("Fortin"), a Defendant herein and SunTrust's Executive Vice President and General Counsel, and that Fortin had warned Trapani against speaking with representatives of Lead Plaintiff. Trapani said that Fortin had contacted him on three different occasions, including threatening to "file something" on his CFA as well as leaving some "ranting" voice messages on Trapani's cell phone warning him not to assist with Lead Plaintiff's investigation.

15.   Mr. Trapani also informed me that he had a severance agreement with SunTrust, and wanted to look into hiring his own legal counsel to evaluate his rights and obligations.

16.   On August 19, 2009, WHI was contacted by Mr. Trapani's counsel who informed plaintiffs that Mr. Trapani had a severance agreement with SunTrust that expired on December 31, 2009.

A.   **The February 2, 2010 Interview**

17.   On February 2, 2010, WHI again attempted to interview Mr. Trapani by telephone, with his counsel present, as well as attorneys from the offices of Lead Counsel.  During this February 2, 2010 interview, which lasted 133 minutes, Mr. Trapani explained his banking regulatory background, which included working for the

FDIC as an examiner for approximately 10 years at KPMG, and then at General Electric Capital as the Chief Risk Officer.

18.     Mr. Trapani explained that in 2005, he began working as the Group Vice President of Allowance for Loan and Lease Losses ("ALLL") at SunTrust and remained at this position until 2007.  He told me he was placed on administrative leave on August 28, 2007, but that his employment did not end until December 31, 2007.[2]

19.     Mr. Trapani explained that in this capacity he was responsible for preparing sections of the 2006 annual report and the 10-Qs that were published during his employment with the Company.  He was also tasked with rebuilding relationships with the regulators and rebuilding SunTrust's methodology for setting reserves.  Mr. Trapani told me that in approximately late calendar 2006 or early calendar 2007, he was also assigned responsibility for portfolio management.  Mr. Trapani explained that he reported to Chief Risk Officer Michael Fadil ("Fadil") beginning in May 2006, who worked closely with Chief Credit Officer Tom Freeman ("Freeman").

20.     Mr. Trapani explained that each quarter the Loan Loss Reserve Committee met to discuss reserves and the related underlying assumptions.  Members

---

[2]     His severance agreement expired exactly two years later, on December 31, 2009.

- 6 -

of the Loan Loss Reserve Committee included himself, Freeman, Fadil, and Senior Vice President of Credit Administration and Operation Risk, and Vice President and Controller Tom Panther ("Panther"), among others.  The quarterly meetings were held in "Freeman's board room" on the 30th floor of the SunTrust headquarters building in Atlanta, GA.  There were an estimated 15 to 20 members of the Reserve Working Group that attended the meetings as well.  The justification for assumptions was regularly discussed in quarterly meetings.

21.    Mr. Trapani explained that the Reserve Working Group, which he led, prepared a quarterly report on reserves that was presented and discussed at the Loan Loss Reserve Committee meetings.  These reports included current reserve data, as well as trend analyses.  There was a page or two in the reports that showed how the reserves were set and the current reserve levels.  The reports also contained period reserve data which was used to show changes in reserve levels from quarter to quarter.

22.    Mr. Trapani also explained that the reserve process included establishing allowances for losses under two accounting standards, including FAS 114 and FASB 5.  FAS 114 dictated the process for reserving for identified losses.  FASB 5 governed the process for reserving for unexpected losses – or "unspecified" losses.  While Mr. Trapani told me that he had a direct role in setting and presenting data on the FASB 5 reserves, one of his frustrations was that he was not allowed access to the assumptions

- 7 -

that went into setting the FAS 114 reserves, and as the Group Vice President of ALLL, he should have been allowed such access and to actively participate or oversee the FAS 114 reserve process.  Mr. Trapani explained that he got the FAS 114 reserve number from Fadil.

23.     Mr. Trapani represented to me that one of the key contributing factors to rising reserves in 2007 was the "serious deterioration" of assets in SunTrust's mortgage portfolio.  Mortgage loan losses began to increase at approximately the end of calendar 2006.  Mr. Trapani represented that by the time he departed from SunTrust a year later, the losses in the mortgage portfolio resembled a "hockey stick" and had begun a significant upward trend.

24.     Mr. Trapani also stated that SunTrust had both a Wholesale Mortgage group and a Retail Mortgage group.  The Wholesale mortgages were subprime mortgages of "substandard" credit.  Mr. Trapani told me that the losses that were escalating in the late-calendar 2007 timeframe were largely from the Wholesale Mortgage group.  Those losses required an "acceleration" in reserves on the FAS 114 "side."

25.     Mr. Trapani represented to me that there were "deep concerns" within SunTrust about the rising losses on mortgages in the Wholesale portfolio by the third quarter of 2007.  Those losses were mainly on home equity lines of credit ("HELOC")

- 8 -

loans that SunTrust had underwritten.  Mr. Trapani stated that "[e]veryone knew" about the escalating losses and represented that he had specific discussions with Freeman, Fadil, and Woody Woodring, Executive Vice President of Commercial Credit Risk, among others, about the burgeoning losses and the negative impact that the losses were having on reserves.  Mr. Trapani also represented that there was an obvious sense of "unease" among the senior executive team regarding the growing losses.  SunTrust was "ramping up reserves very quickly" and "everyone was very anxious" about how high the losses might climb.

26.     Mr. Trapani represented to me that SunTrust was under-reserved as a result of increasing loan losses and this was a well known issue by the August 2007 time frame.  Mr. Trapani stated that Freeman, Panther, and Mark Chancy ("Chancy"), the Chief Financial Officer ("CFO") of SunTrust, were all very aware that SunTrust was underfunding reserves as of at least August 2007.  Mr. Trapani explained that SunTrust was "carrying" approximately 80 to 85 basis points in the third quarter 2007 timeframe and was significantly under reserved at these levels.

27.     Mr. Trapani stated that it was undeniable that SunTrust was under-reserved.  He told me there were three key reasons why reserves were underfunded.  First, there was a lack of sufficient data to effectively identify what was in the loss pipeline.  Second, there was a "fear" of "what the pipeline was looking like" and

- 9 -

almost a paralysis in terms of how to handle the growing losses. And, finally, leadership was to blame for the Company's under-reserved position.

28.     Mr. Trapani also represented to me that reserves for losses were based on two factors – probability of default and the exposure levels. He explained that determining estimated losses required that one determine the likelihood of assets defaulting and the losses that would be incurred if the assets did "go bad." Determining the probability of default required sufficient data to evaluate the historic performance of similar assets. Mr. Trapani represented that SunTrust had "insufficient data" to assess the probability of default.

29.     Mr. Trapani explained to me that there were a number of issues with data during his employment with SunTrust. For example, data was unavailable to run reports that would provide insight about how many loans SunTrust held for borrowers with a specific FICO score. Reports could not be generated to show how many loans SunTrust held where customers had defaulted within the first thirty days of payments. At most other banking institutions, including General Electric Capital where Mr. Trapani had previously worked, these types of reports were standard and were required for an adequate understanding of credit-related risks. As such, it was difficult for SunTrust to "say what was on the books."

658668_1

30.     Mr. Trapani also explained that SunTrust had substantial resources invested in the development of an enterprise data warehouse ("EDW").  Mr. Trapani represented to me that during his employment with SunTrust, the data in the EDW was unreliable.  Mr. Trapani also told me that there were "daily discussions" in which he participated regarding concerns over the lack of data quality.  Data issues were the "number one, number two, and number three" problems that had to be overcome in improving the reserve methodology and related processes.  Mr. Trapani discussed the data issues with Freeman and a number of other individuals during his employment with SunTrust.

31.     During the February 2, 2010 interview, Mr. Trapani avoided providing extensive detail and stated that he was concerned that there could be possible retribution toward him if he cooperated voluntarily with Lead Plaintiff's investigation.  This concern was based on the warnings he received from Fortin, because of his ongoing employment in the financial industry, and the fact that his current employer and SunTrust have a business relationship.  However, Mr. Trapani indicated that if he were compelled to testify, he would testify truthfully and in much greater detail concerning the relevant issues, including SunTrust's process for valuing and setting loan loss reserves and the extent to which SunTrust was under-reserved.

- 11 -

**B.     The September 24, 2010 Interview**

32.     After the Court's decision on defendants' motion to dismiss, Mr. Trapani's counsel was provided a copy of the Opinion and Order and another request was made to interview Mr. Trapani.  A supplemental interview with Mr. Trapani, his counsel and Lead Counsel occurred on September 24, 2010, which lasted 94 minutes.

33.     During the September 24, 2010 telephone call, Mr. Trapani repeated his concern with providing extensive detail because of Fortin's warnings or threats prior to the February 2, 2010 interview.  Mr. Trapani explained that he was threatened by Fortin in response to his efforts to make Fortin aware that Trapani intended to cooperate with the investigation.  Mr. Trapani represented to me that Fortin threatened that he would "file something on Trapani's CFA" in retaliation for Mr. Trapani's cooperation with our case.  In addition, Fortin left Mr. Trapani at least one "ranting" voicemail on Mr. Trapani's cell phone, cautioning Mr. Trapani against assisting with the plaintiff's investigation.  Mr. Trapani told me that Fortin informed Mr. Trapani that he would be willing to "get on the stand" and tell everyone what Trapani did in response to issues at SunTrust in retaliation for his cooperation with the investigation.  Mr. Trapani said that he would have "no problem" with Fortin doing so, and that he was comfortable in trying to have directed his staff to do the "right" thing, as opposed to falling in line with coercion from his superiors at SunTrust.

- 12 -

34.     During the September 24, 2010 interview, Mr. Trapani explained that he and his team were tasked with taking the loss reserves, loss forecasting, utilizing the available data on the profitability of products, and evaluating risk adjusted returns in order to make better decisions on where the losses and risks in the portfolio lied.  The aim was to improve the pricing of products and better allocate the portfolio.

35.     Mr. Trapani stated that efforts to improve the portfolio management function "never got off the ground."  Mr. Trapani told me specifically that "[t]he data that SunTrust had was just abominable."   There were efforts to build a data warehouse, which were not effective.  SunTrust spent an estimated $100 million trying to build a data warehouse to remediate the data integrity issues.  However, the $100 million was "wasted."  "No one trusted" the data from the data warehouse and, instead, sought and used alternate sources of data.  The impact of using different sources of data was that "everyone had different data sets" that did not correspond with one another and "no one ever talked the same language" because of the data discrepancies.

36.     Mr. Trapani further explained that a lack of data coupled with data integrity issues prohibited the effective use of data.  "For a bank the size of SunTrust not to have a portfolio management" function because of the data-related issues was a

- 13 -

problem.  The correct use of accurate data in portfolio management was "supposed to have been an integral part of the business," but it was far from it at SunTrust.

37.     Mr. Trapani told me that the issues with the data included that SunTrust was "missing granular detail."  For instance, data such as demographics and delinquencies by vintage were not available for the mortgage book.  Mr. Trapani stated that "[i]t was pretty silly" and surprising how SunTrust got to the size it did because of the way it was managed – that is, the lack of data and data integrity issues that remained throughout his employment with SunTrust were astonishing given the size of the Company.

38.     Mr. Trapani explained that one particular problem at SunTrust was the PhD Quantitative Modelers who did not understand the business.  The Quantitative Modelers believed that they could fix issues with an equation, but did not take into account the concept of "garbage in, garbage out," meaning that if the data they used was inaccurate, the model output would be as well.  The Quantitative Modelers built models for which the underlying assumptions were wrong because of their lack of understanding about the business.  The models may have worked according to the script for the models, but that did not necessarily mean that the model output was accurate or reliable.  Mr. Trapani told me that the result was that SunTrust often did

- 14 -

not get a "proper probability of default," which was a major component of the FASB 5 reserve calculation.

39.    Mr. Trapani represented that the lack of available and reliable data spanned the entire Company and across the entire portfolio of assets. "What we had was bad, or we had it and it was wrong, or we did not know what to collect." Mr. Trapani represented that the data integrity issues were most acute in the retail portfolio, including for the HELOC, mortgage, and auto business lines. Mr. Trapani told me that the data integrity issues "clearly" negatively impacted the ability to accurately forecast reserves and contributed to the Company being under-reserved.

40.    Mr. Trapani explained that in addition to chairing the Reserve Working Group meetings, he participated in the ALLL Committee meetings, both of which took place on a quarterly basis. The Reserve Working Group meetings typically occurred one week before the ALLL committee meetings. Members of the Reserve Working Group included approximately eight to ten employees who were a "step down" in the hierarchy from the ALLL Committee members. For instance, the Reserve Working Group included members from the Commercial business unit, the Investments business unit, and from the Credit Risk Management organization. Mr. Trapani told me that in addition to himself, the members of the ALLL Committee included Freeman, Fadil, Chancy, Panther, the Retail Credit Officer, the Senior Vice

- 15 -

President and Head of Risk Analytics, Executive Vice President of Retail Credit Risk, and Executive Vice President of Commercial Credit Risk.

41.      Mr. Trapani also told me that he met with representatives of the business units prior to the quarterly Reserve Working Group meetings to "derive the estimates put into the models." He and the business unit representatives "hammered out" what the business unit heads believed the likely probability of defaults and exposures were for their respective business lines. Mr. Trapani explained that estimated losses were based on the probability of default and the exposure by book (or business line). The Loan Officers assigned ratings internally to the credits in their respective books on a scale of one to twenty. If a risk rating of 1 was assigned to a credit, there was a very low risk of loss. However, a risk rating of 20 meant that the credit was likely a given loss, or a foreclosure for the mortgage business. The reserves were also supposed to take into account how much SunTrust expected to lose for the high rated credits, or the exposure. At the Reserve Working Group meetings, the "numbers" were presented and discussed to arrive at a loss reserve recommendation. The "numbers" showed the probability of default for each book and the estimated losses for each book. Loss reserves were set using this information. Mr. Trapani represented that the reserves for probable losses (FASB 5) were set based on a range of modeled data.

42.     For instance, SunTrust used historical data at one end of the range and modeled data at the other end of the range.  The historical data was based on the eight previous quarters.  The range of data at SunTrust was premised on a concept of "through the cycle" loan loss grades.  This concept meant that the loss estimates could be at the low, "though the cycle," or high end of the range, depending on where in an economic cycle SunTrust was operating.  As such, the modeled data used to define a range in which reserves were positioned was typically higher or normal at the beginning of an economic cycle, and as the trends materialized in the historical data, the historical data was higher at the end or bottom of a cycle.  Mr. Trapani represented that Chancy and Panther were "happy when reserves were at the low end of the range and not as happy when they were at the high end of the range."  Mr. Trapani said that "[a] lot of the time, SunTrust was at the low end of the range."

43.     Mr. Trapani told me that he presented the reserve recommendations from the Reserve Working Group meetings at the ALLL Committee meetings.  The ALLL Committee used the Reserve Working Group recommendations to set the reserves that were ultimately published in the SunTrust SEC filings.

44.     Mr. Trapani explained that the ALLL Committee made adjustments to the Reserve Working Group's recommendations.  For instance, Mr. Trapani stated that he learned through discussions with a Business Analyst in the Risk Management

- 17 -

Group, after Trapani was on administrative leave, that the ALLL Committee lowered the reserves recommended by the Reserve Working Group in December 2007.

45.     Mr. Trapani also represented to me that there were two different types of HELOC lines at SunTrust during his employment – the prime book and the warehouse book.  The prime book consisted of HELOCs that SunTrust originated and sold in the secondary market.  The warehouse line consisted of subprime and ALT-A loans.  Mr. Trapani told me that the warehouse book amounted to "a giant pool of nothing" and SunTrust had no idea what was in it.  Mr. Trapani explained that there were also issues with the warehouse HELOCs, of which Freeman, among others, were aware. In essence, SunTrust was unable to capture data to fully conceptualize the potential of losses on the warehouse HELOC book.  There were "sizeable delinquencies" developing in the warehouse HELOC line.

46.     Mr. Trapani also explained that there were some issues with the prime HELOCs that SunTrust sold in the secondary market.  Trapani experienced some difficulty recalling the extent of the issues from the prime book, but SunTrust was made to buy back "a sizeable chunk" of the non-performing HELOCs that it originated and sold in the secondary market to players such as JP Morgan Chase.  Mr. Trapani told me that one of the issues with the HELOCs SunTrust sold on the secondary market resulted from the data integrity issues at the Company.  There was a

- 18 -

"big vintage" on which SunTrust "messed up" or the data was unreliable and SunTrust was ultimately left having to repurchase the loans from the investor.

47.     Mr. Trapani stated to me that "[a]nyone with a pulse" could see the losses developing and moving through the pipeline.  The losses in the 30 to 89 days past due category were building at an "enormous pace" in the late 2006 to early 2007 timeframe.  The losses were "jumping through" the categories from 30 to 89 days past due, to 90 or more days past due, and into non-accrual status.  Mr. Trapani stated that years of originating "garbage" in the warehouse HELOC line were "coming back to roost," as signified by the "uptick" in losses on the book.

48.     Mr. Trapani further explained that the growth in past due assets in the warehouse HELOC book began to occur at the end of 2006 or during the first quarter of 2007.  There was a "really dramatic increase" in past due loans that began to percolate by first quarter 2007.  The increase represented a "total trend reversal."  Mr. Trapani described the change in the percentage of delinquencies on the warehouse HELOC book during first quarter 2007 as at least a 45 degree angle on a line graph.

49.     Mr. Trapani told me that he discussed the burgeoning losses in the warehouse HELOC book with Freeman, Panther, Chancy, and Defendant and Chief Executive Officer James Wells ("Wells").  The losses in the HELOC book were part of Mr. Trapani's daily discussions with his superiors.  Mr. Trapani stated that he was

- 19 -

"redoing the loan loss reserve models" during 2007, so that the concept of "how to look at aspects" of the warehouse HELOC losses came into play and was a regular topic of discussion.  Mr. Trapani represented that he spoke to Wells about the issue once or twice during 2007, that he discussed the issue with Freeman at least once per week, and with Fadil nearly everyday during 2007.  Mr. Trapani also stated that he met quarterly with Panther on a one to one basis in Panther's office and discussed the rising losses in the warehouse HELOC book during these meetings.

50.     Mr. Trapani told me that he attended the quarterly regulatory meetings, along with Chancy.  At these meetings, Mr. Trapani presented the "numbers from the ALLL Committee" and discussed the numbers that were ultimately published in the 10-Qs and 10-Ks.  The regulatory meetings were held on the 29th or 30th floor of the SunTrust headquarter building in Atlanta, GA.  During the meetings and as part of the presentation on the "numbers" from the ALLL Committee meetings, Mr. Trapani discussed the mounting losses in the warehouse HELOC book.

51.     Mr. Trapani represented to me that "[e]veryone was aware there was an uptick" in losses in the warehouse HELOC book in 2007.  There was "concern about the numbers going extremely high" and "a lot of talk about the impact on reserves."  Mr. Trapani stated that despite the vast awareness of the burgeoning losses, the reserves for the warehouse HELOC losses were inaccurate.  The historical data for the

- 20 -

HELOCs did not show any potential for loss because the losses were just materializing during late 2006 and early 2007 and the probable and actual losses were "way above historical levels." The previous eight quarters of data for the HELOCs, which was the data presented by the historical models, was not reliable for predicting the current performance of the warehouse HELOC book.

52.     Mr. Trapani represented that the models built to predict losses were "more sensitive" than the historical data, but had weaknesses stemming from the fact that the modeled data was based on the Loan Officers timely and accurately adjusting the risk ratings for their respective credits. By "human nature" the loan officers did not timely or accurately adjust the risk ratings until the "blood was already showing" and just before the regulators came knocking. The models should have been a better barometer for the losses in the warehouse HELOC line and should have been able to pick up the deterioration which was not evident in the historical data, but this was not actually the case. Mr. Trapani represented to me that data integrity issues related to the warehouse HELOC portfolio, coupled with the inability of the historical data or models to accurately predict losses, meant that the reserves for the warehouse HELOC line were inaccurate and underfunded.

53.     Mr. Trapani explained that other factors that SunTrust had at its disposal for gauging the adequacy of reserves included the economic forecast presented by

First Vice President and Chief Economist Greg Miller ("Miller").  Beginning as far back as late 2006, Miller presented an economic forecast at one of the quarterly meetings in which he revealed "one of the most depressing economic forecasts" Trapani had ever heard.  Miller's forecast painted a very "bleak picture of gloom and doom."  Miller's forecast highlighted that the Company was operating in a time and space of "totally unchartered territory."   Mr. Trapani explained he was making changes to the reserve models in 2007 to include an "economic barometer" based on Miller's data.  Miller's forecasts were also used to support changes to reserves that went outside the scope of the models.

54.     Mr. Trapani told me that he believed that the reserves to total loan ratio in the July to August 2007 timeframe was approximately 85 basis points.  Based on his review of SunTrust's public filings, Mr. Trapani stated that SunTrust reserves to total loans ratio was 0.97 at the end of 2007, 1.79 at the end of 2008, and 2.63 in 2009.  The industry norm in 2007 was 1.22.  Mr. Trapani represented to me that SunTrust was under-reserved at 85 basis points and at the end of 2007 at 97 basis points and that "[r]eserves needed to be a lot higher."  Mr. Trapani explained that in the pre-Enron days, reserves were typically one percent of the book of business.   In the 2007 timeframe, reserves, on average, were adequate at the 1.5 percent range.  Given the extent of losses at SunTrust that were building beginning in at least the beginning of

- 22 -

2007, and particularly the losses in the warehouse HELOC line, SunTrust was under-reserved at the reserve to total loans ratio by at least 75 basis points. SunTrust needed to be carrying reserves in the range of 1.75 to 2 percent at the end of 2007 to be adequately reserved for probable and identified losses.

55.     Mr. Trapani told me that there were two main factors contributing to SunTrust being under-reserved in 2007 – the HELOC book and the commercial real estate line. The HELOC losses were "off the chart," as described above. SunTrust "did not verify the data" for the product line, so that "no one knew they were subprime." Mr. Trapani stated that the commercial real estate book was "shaky" in the 2007 timeframe as well.

56.     Mr. Trapani represented to me that SunTrust was under-reserved at the probable (FASB 5) and specified (FAS 114) levels loss in "late 2007."

57.     Mr. Trapani also explained that there was an argument that the FASB 5 model was constraining and did not allow SunTrust to increase reserves to the requisite level to absorb probable losses. However, Trapani "did not buy" this argument because the FASB 5 reserves "could have been bumped up to the highest level," which they were not. Moreover, there was a category in which additional reserves could be input into the FASB 5 model, as long as they were justifiable. The increase in reserves could have been easily supported given the burgeoning losses in

- 23 -

the retail portfolio (*i.e.*, the warehouse HELOC line). Instead of increasing the FASB 5 reserves to their highest level and utilizing the additional reserve feature of the model, SunTrust "went with the model" and did not make necessary adjustments to increase reserves to adequately absorb losses because the defendants "did not have the stamina" to argue for the increase in reserves with the auditors and regulators.

58. Mr. Trapani told me that "everybody was aware" that SunTrust was under-reserved for the last year of his employment with SunTrust. The issue of the Company being underfunded for reserves was a "topic of discussion" for the last year of Mr. Trapani's employment, including in discussions with Freeman, Fadil, Panther, Chancy, and Wells. "Freeman knew, Chancy knew, Tom Panther knew, and Fadil knew because the models were a fraud as a result of the data issues." Mr. Trapani discussed the fact that SunTrust was under-reserved with Chancy on Trapani's last day in the office on August 28, 2007. He also discussed the under-funded reserves with Panther in July and August 2007.

59. Mr. Trapani also represented that Fortin knew that SunTrust was under-reserved in 2007. Particularly after Mr. Trapani's last day in the office in August 2007, Fortin became aware that SunTrust was under-reserved, which was part of the reason for Mr. Trapani's departure from SunTrust and his frustrations while employed with the Company. Mr. Trapani explained that he had "personal conversations" with

- 24 -

Freeman and Fadil that included details about SunTrust being under-reserved." Mr. Trapani stated that it was widely known that SunTrust was under-reserved, and this sentiment was shared by even Freeman. Mr. Trapani and Freeman discussed the fact that SunTrust was under-reserved "day to day," and Freeman told him "point blank" that SunTrust was under-reserved. Mr. Trapani stated that he was "trying to do the best" he could regarding reserves, but was constrained by the circumstances under which he worked.

60. Additionally, Mr. Trapani told me that he was advised that Fortin had ordered a search of company e-mails to see if they could find a "smoking gun" against Mr. Trapani. This search purportedly encompassed several days.

### C.   The October 11, 2011 Interview

61. On September 28, 2011, defendants filed their motions for reconsideration and submitted two declarations of Mr. Trapani in support: (1) the Declaration of Scott A. Trapani, CFA executed by Mr. Trapani on September 20, 2011 (the "September 20th Decl."); and (2) the Supplemental Declaration of Scott A. Trapani, CFA executed by Mr. Trapani on September 26, 2011 (the "September 26th Decl.") (collectively, the "Trapani Declarations").

62. On October 11, 2011, WHI participated in a follow-up interview with Mr. Trapani, his counsel and Lead Counsel, in which he explained the circumstances

- 25 -

surrounding his execution of the Trapani Declarations and discussed other aspects of the case.  This interview lasted 78 minutes.

**1.      Trapani's Contact with Defendants' Counsel, Tim Mast, and Process Surrounding Draft Declarations for Mr. Trapani**

63.      During the October 11, 2011 interview, Mr. Trapani explained the circumstances surrounding his execution of the Trapani Declarations.  Mr. Trapani first received a call from Tim Mast ("Mast"), a partner with the law firm of Troutman Sanders LLP, on or about September 18, 2011.  On the call, Mr. Mast provided context to him regarding the case, informed Mr. Trapani that the claims the plaintiffs made were based on statements attributed to Mr. Trapani, which resulted in Mr. Trapani being the "center of attention in the Plaintiffs' suit."  In addition, Mr. Mast detailed the "legal ramifications" of Mr. Trapani's involvement in the case.

64.      Mr. Trapani explained that Mr. Mast inquired into whether Mr. Trapani was represented by counsel.  Mr. Trapani informed Mr. Mast he was not sure whether he was currently represented.  Mr. Mast then told Mr. Trapani that legal representation is a "pretty clear agreement," that "you either are or are not represented," and that "people usually know when they are represented."

65.      Mr. Trapani explained that Mr. Mast informed Mr. Trapani that he would draft something that clarified statements in the pleadings Mr. Trapani reviewed.  Mr.

- 26 -

Mast then sent Mr. Trapani the first declaration to sign, which he signed on September 20, 2011.   At that time, Mr. Trapani believed that there would be no other declarations.

66.     However, Mr. Trapani explained that shortly thereafter, Mr. Mast came back with a second request and presented a longer declaration to Mr. Trapani.   Mr. Mast explained to Mr. Trapani that he "rethought certain aspects" of the first declaration and sought to create a second declaration for further clarification.   Mr. Trapani acknowledged that Mr. Mast framed the questions for him in a closed-ended leading manner.

67.     Mr. Trapani further stated that after he signed the declarations prepared by Mr. Mast, Mr. Mast re-contacted Mr. Trapani and they had a one-on-one meeting to go over certain documents.   During the meeting, Mr. Mast presented Mr. Trapani with the "entire SunTrust ALLL loan loss package."   Mr. Trapani also stated that Mr. Mast "took out the part for second quarter 2007" and began reviewing "every document in the package" with Mr. Trapani.   In particular, Mr. Mast focused on the Sarbanes Oxley testimony in the package and questioned Mr. Trapani about his signature on the documents.

68.     Mr. Trapani recounted that Mr. Mast inquired into whether Mr. Trapani believed that the reserves at SunTrust were adequate when he signed the documents

- 27 -

that Mr. Mast presented to him.  Mr. Trapani informed Mr. Mast that he did sign the documents, but that the reserves were "categorically not" adequate and that Freeman and others at SunTrust were aware that the reserves were inadequate.  Mr. Trapani explained to Mr. Mast that the "process and methodology" was such at SunTrust that Mr. Trapani was able to sign the documents with a "clear conscience," even though Mr. Trapani knew that the reserves were inadequate.

69.     Mr. Trapani stated that Mr. Mast suggested and intimated that there was legal liability for Mr. Trapani based on the fact that he signed the Sarbanes Oxley certifications even though Mr. Trapani believed the reserves were inadequate.  Mr. Trapani explained that Mr. Mast told him point blank that "this could be a problem for you."  Mr. Trapani ended the interview with Mr. Mast at that point because he "knew where Mast was headed."

70.     Mr. Trapani also explained that Mr. Mast's suggestion and intimation that he faced legal liability was evident in Mr. Mast having "went through each page of the attestations 15 times" with him.  Mr. Mast also noted to Mr. Trapani that Mr. Trapani was a CFA, a former regulator, and had a 25 year career on the line.  Mr. Trapani spent a lot of time explaining to Mr. Mast how his signature on the attestations was "valid and appropriate" and what he was facing in the reserve process.

- 28 -

71.     Moreover, before Mr. Trapani ended the interview with Mr. Mast, Mr. Mast informed Mr. Trapani that SunTrust increased reserves by $300 million during the fourth quarter 2007.  Mr. Mast also acknowledged to Mr. Trapani that the ALLL Committee rejected the reserves proposed by the Reserve Working Group for fourth quarter 2007, and opined that it demonstrated the ALLL Committees "independence."

### 2.     Mr. Trapani's Declarations

72.     I have carefully reviewed the Trapani Declarations.  His declarations do not accurately reflect what he said during his interviews.  For example, in ¶2 of the September 26th Decl., Mr. Trapani stated that he "had several telephone conferences with private investigators in 2009 and 2010 who told [him] that they worked for Plaintiffs' Counsel, Coughlin Stoia" but that he "never met with any investigators or any lawyers from Coughlin Stoia."  While Mr. Trapani may not have had any in-person meetings with Lead Plaintiff's Counsel, Lead Plaintiff's Counsel did participate in both the February 2, 2010 and September 24, 2010 interviews detailed above.  There are many other inconsistencies.  For example:

(a)     In ¶3 of the September 20th Decl., Mr. Trapani stated that "[a]lthough I met Jim Wells on a few occasions, I do not recall any specific discussions with him, and do not believe that I ever discussed the ALLL reserve or process with him."  However, as detailed above, during the September 24, 2010

- 29 -

interview with Mr. Trapani, he represented that the issue of the Company being underfunded for reserves was a topic of discussion during his last year of employment, including in discussions with Mr. Wells.   Additionally, Mr. Trapani had several discussions with Defendants Panther, Chancy, and Wells, concerning the "sizable delinquencies" and resulting large losses in the warehouse HELOC book;

(b)     In ¶5 of the September 26th Decl., Mr. Trapani states that he "never told plaintiff's investigators that 'flawed data' made it impossible to accurately determine the appropriate reserves."  Mr. Trapani further states in ¶5 of the September 26th Decl. that "[w]hile there were issues with the EDW [enterprise data warehouse], my group relied on data from other sources and I was comfortable that the source data was reliable and provided the essential information necessary to estimate the reserves."  In all of his interviews, Mr. Trapani represented more than once that during his employment with SunTrust, the EDW data was unreliable, there was a lack of available and reliable data which spanned the entire Company, and that data integrity issues negatively impacted the ability to accurately forecast reserves and contributed to the Company being under-reserved.   In the October 11, 2011 interview, Mr. Trapani also represented that "the EDW system "was a mess" and that "no one trusted" the data in the EDW at SunTrust."  Mr. Trapani also represented that the lack

- 30 -

658668_1

of valid data in the EDW made it difficult to perform reserve analyses and related functions; and

    (c)    In ¶6 of the September 26th Decl., Mr. Trapani states that "I never told plaintiff's investigator that SunTrust was inadequately reserved as of December 31, 2007." In the October 11, 2011 interview, Mr. Trapani explained that he recalled comments made to plaintiffs' investigators regarding the adequacy of reserves at SunTrust after August 2007. Mr. Trapani explained that these comments were based on data that Mr. Trapani saw before he left in August 2007, his experience and expertise in that area, and was an estimation knowing that the "locomotive could not turn" so quickly to have corrected the under-reserved position between the beginning of September 2007 and the end of December 2007. Mr. Trapani explained that he informed Mr. Mast during his discussions with him that SunTrust was likely under-reserved through the fourth quarter of 2007 because the delinquencies were rising so fast and SunTrust was so under-reserved as of the third quarter 2007 (*i.e.*, as of August 28, 2007), that there would have had to have been a significant trend reversal or an obvious significant increase in reserves for the reserves to be deemed adequate.

73.    Mr. Trapani also represented that there was a study conducted internally at SunTrust in approximately mid- 2007 to assess the adequacy of reserves. Freeman asked Fadil to conduct the study to estimate what SunTrust should have in reserves

- 31 -

based on the credit quality of assets witnessed at the time. Fadil reported the results to Freeman. Based on the credit quality and a "peer group analysis," SunTrust needed to have "double" the reserves it carried in mid-calendar 2007 to be adequately reserved. Based on the study that Fadil conducted, adequate reserves would have been approximately $2 billion in mid-calendar 2007. However, Mr. Trapani represented that he and others used the "$2 billion" mark as the basis for "where SunTrust would be comfortable" regarding reserves and "where SunTrust would be comfortable getting to" to ensure that the Company was adequately reserved.

74. Mr. Trapani also explained that in order for the reserves at the end of calendar 2007 to be adequate there would have had to have been a reversal in delinquencies, large payoffs on specific reserves, a "huge amount" of loans had to have been sold off of the books, real estate assets would have had to have been sold (but such sales would not have improved FAS 5 reserves), and securitization would have "helped." Mr. Trapani explained that without such events, the reserves were (based on what Mr. Trapani knew about the loan quality – or lack thereof, the status of reserves as of August 28, 2007, and the reserves reported publicly for fourth quarter 2007) under-funded.

75. In ¶4 of the September 26th Decl., Mr. Trapani states that he has "no knowledge from any source regarding SunTrust's ALLL, reserves, provision, or any

- 32 -

other aspect of SunTrust's operations or financial affairs after August 28, 2007." Likewise, in ¶6 of the September 26th Decl., he stated that he has "no knowledge from any source regarding SunTrust's ALLL, reserves, provision, or any other aspect of SunTrust's operations or financial affairs as of December 31, 2007, or at any other time after August 28, 2007." However, in our September 24, 2010 interview, Mr. Trapani represented that he learned of certain decisions made by the ALLL committee regarding lowering the reserves recommended by the Reserve Working Group in December 2007 from an individual who still worked at SunTrust as a Business Analyst.

76.     In addition, on February 18, 2010, I interviewed the former VP of Credit Risk Management who was employed with SunTrust from September 2003 to January 31, 2008, and was a member of Reserve Working Group and attended ALLL committee meetings through the end of 2007.  The VP of Credit Risk Management also confirmed that the ALLL committee adjusted the reserve figures developed by the Reserve Working Group in December of 2007.   The VP of Credit Risk Management also explained to me that in the fourth quarter 2007 timeframe, there were members of the Credit Risk organization who said that SunTrust was "under-reserved for commercial real estate."  Moreover, the VP of Credit Risk Management told me that non-accruals were a central topic of discussion during the December 2007

ALLL Committee meeting and that Chancy "had a lot of say at the December 2007 [ALLL Committee] meeting," particularly in relation to the escalating issue of non-accruals. The VP of Credit Risk Management explained to me that the issue with non-accruals resulted from the number of non-accruing assets having "gone through the roof" in the late calendar 2007 timeframe. The key contributing factors to the escalating number of non-accruing assets were "scratch and dent" loans and HELOCs. The "scratch and dent" assets included loans from SunTrust's mortgage business that were retained and later sold to investors at reduced prices (or marked for sell at reduced prices) because of issues with how the loans were underwritten or other performance indicators associated with the assets.

77.     In the October 11, 2011 interview, Mr. Trapani explained that after August 28, 2007, he continued to speak with a personal friend, who continued to be employed by SunTrust until 2010. I spoke with this individual regarding this case on September 14, 2011. He represented to me that Scott Trapani is one of his best friends, that he speaks with Mr. Trapani on a regular basis, and that he worked with Mr. Trapani at GE prior to joining SunTrust.

78.     From my conversation with this individual, I learned that he worked at SunTrust from February 20, 2006 to October 10, 2010, at which time he left the Company on his own accord. As a Business Analyst at SunTrust in the Risk

- 34 -

Management group, his responsibilities included reporting for several lines of business, preparing ALLL reports for Committee meetings, and FDCIA reporting. He also prepared reports for the leasing, commercial, and commercial real estate lines of business. The FDCIA reports that he prepared were "rolled up to the Feds" and contained details about loan to value ratios in the real estate portfolios. This witness told me that after Trapani was placed on administrative leave, this witness continued to speak with Trapani frequently, as often as "3 or 4 times per week."

79.    During the conversation, this witness represented that he was a member of the SunTrust Risk organization and worked "downstream" from Chief Risk Officer Freeman.

80.    This witness represented to me that he is able to verify information in plaintiffs' complaint, including reserve numbers. He represented that he knows that there were practices at SunTrust that were "not top notch" and which lacked integrity. Moreover, the witness represented that he is aware that the reserve recommended by the Working Group in December 2007 was lowered by the ALLL Committee. He would not provide more detail at this point in time because of his fear of SunTrust's response.

81.    This witness also represented to me that there were "significant inaccuracies" with the loan-to-value ratios that SunTrust reported publicly and that

- 35 -

SunTrust created a process related to the loan to value ratios that the witness described as a "cover your ass process." He represented that he has a copy of the process, and can explain in more detail where the inaccuracies exist and how SunTrust tried to "cover its own ass" with the process that was created.

82.     While the former Business Analyst represented to me that he had information helpful to the case and the above topics, he was unwilling to provide further detail at this time because he represented that SunTrust has already tried to harm him "professionally" and damage his career. He represented that he would be willing to provide further detail when his employment status changes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 17 day of October, 2011 at Indio , California.

DESIREE MONTY TORRES

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 17, 2011.

s/ Andrew J. Brown
ANDREW J. BROWN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        andrewb@rgrdlaw.com

## Mailing Information for a Case 1:09-cv-01185-WSD

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David Andrew Bain**
  dbain@bain-law.com

- **Thomas B. Bosch**
  tom.bosch@troutmansanders.com,kelley.wade@troutmansanders.com

- **Thomas C. Bright**
  tbright@gbcslaw.com

- **Andrew J. Brown**
  andrewb@rgrdlaw.com

- **Ann Marie Byrd**
  ann.byrd@dlapiper.com,jennifer.burr@dlapiper.com

- **Solomon B. Cera**
  scera@gbcslaw.com,keg@gbcslaw.com

- **John A. Chandler**
  jchandler@kslaw.com,madams@kslaw.com

- **John J. Clarke , Jr**
  john.clarke@dlapiper.com

- **Mark Edwin Grantham**
  Mark.Grantham@dlapiper.com,john.clarke@dlapiper.com,betty.richards@dlapiper.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **Cheri A. Grosvenor**
  cgrosvenor@kslaw.com

- **John C. Herman**
  jherman@rgrdlaw.com,hectorm@rgrdlaw.com,garmstrong@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert Ware Killorin**
  rkillorin@chitwoodlaw.com

- **J. Timothy Mast**
  tim.mast@troutmansanders.com,kelley.wade@troutmansanders.com

- **Paul Monnin**
  paul.monnin@dlapiper.com,jennifer.burr@dlapiper.com,kimberly.layton@dlapiper.com,jennifer.edgar@dlapiper.com,betty.richards@dlapiper.com

- **Eric I. Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lucas F. Olts**
  lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jack Reise**
  jreise@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com

- **Christopher D. Stewart**
  cstewart@rgrdlaw.com

- **David Ashcraft Terry**
  dterry@huffpowellbailey.com,mhart@huffpowellbailey.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Matthew P. Montgomery**
Robbins Geller Rudman & Dowd, LLP - SD
655 W. Broadway
Suite 1900
San Diego, CA 92101

**Casey M. Preston**
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365