```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3   BELMONT HOLDINGS CORP., et al.      )
                                         )
 4               Plaintiffs,             )    CIVIL ACTION FILE
                                         )    NO. 1:09-CV-1185-WSD
 5   v.                                  )
                                         )    ATLANTA, GEORGIA
 6   SUNTRUST BANKS, INC., et al.        )
                                         )
 7               Defendants.             )
     _____)

 8

 9                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10                UNITED STATES DISTRICT JUDGE

11                 Tuesday, December 18, 2012

12

13   APPEARANCES OF COUNSEL:

14   For Belmont Holdings:        Andrew J. Brown
                                  Patrick J. Coughlin
15                                Deborah R. Gross
                                  Eric I. Niehaus
16
     For SunTrust Defendants:     Thomas B. Bosch
17                                J. Timothy Mast

18   For Underwriter Defendants:  Mark Edwin Grantham

19   For Ernst & Young:           John A. Chandler
                                  Cheri A. Grosvenor
20

21
            Proceedings recorded by mechanical stenography
22           and computer-aided transcript produced by
                   NICHOLAS A. MARRONE, RMR, CRR
23                    1714 U. S. Courthouse
                      75 Spring Street, S.W.
24                    Atlanta, GA  30303
                        (404) 215-1486
25
```

1                          I N D E X

2       *Witness*                                      *Page*

3       DESIREE TORRES
              Statement by Ms. Torres                  8
4             Examination by Mr. Coughlin              29

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    Tuesday Afternoon Session
2                        December 18, 2012
3                            2:04 p.m.
4                          -- -- --
5                    P R O C E E D I N G S
6                          -- -- --
7         (In open court:)
8         THE COURT:  Good afternoon, everybody.
9         This is a hearing pursuant to my order of October
10   4th of this year in Belmont Holdings Corporation v. SunTrust
11   Banks, which is Civil Action No. 09-1185.
12         Would counsel please announce their appearances?
13         MR. COUGHLIN:  Your Honor, Patrick Coughlin with
14   Eric Niehaus and Eric Brown on behalf of Belmont Holdings.
15         THE COURT:  Good afternoon.
16         MR. MAST:  Tim Mast, Your Honor, with Tom Bosch on
17   behalf of the SunTrust defendants.
18         MR. CHANDLER:  Your Honor, John Chandler with
19   Cheri Grosvenor for Ernst & Young.
20         MR. GRANTHAM:  Your Honor, Mark Grantham on behalf
21   of the six underwriter defendants.
22         MS. GROSS:  Deborah Gross of Law Offices of Bernard
23   M. Gross on behalf of Belmont Holdings.
24         THE COURT:  I'm sorry, I couldn't hear you.
25         MS. GROSS:  Deborah Gross on behalf of Law Offices
```

1    of Bernard M. Gross on behalf of Belmont Holdings.

2            THE COURT:  All right.  Thank you.

3            Well, there have been a number of filings in this

4    case, and I thought the place that we should start is with

5    why I'm holding this hearing and what the scope of the

6    hearing is.

7            On October 4th of this year, I did enter an order

8    in which I advised counsel for the parties that I had

9    received contact from Ms. Torres.  She had called our

10   chambers and wanted to provide information to the Court

11   based upon her having read particularly those portions of

12   the order that I had entered in this case on a substantive

13   motion to dismiss in which she wanted to provide context for

14   certain statements that were made about her and her conduct

15   and the plaintiffs' counsel and their conduct in this

16   matter.

17           As I said in the order and I will say again

18   today, that's extraordinary.  I have never had somebody

19   contact the Court except in one other instance in a criminal

20   case wanting to provide information to the Court for the

21   purposes of allowing the Court to understand what had

22   happened because they believe that that might have an impact

23   on the Court's interpretation and action that the Court had

24   taken.

25           I will say this.  I thought it took extraordinary

courage to do that.  We don't see enough of that in federal
court or state courts, and I thought that it required me to
respond to Ms. Torres in her request to provide information
to me.

        I determined that in order to do that, that it
would not be appropriate for me to listen privately to what
she said; that it was a matter that involved a case over
which I had presided, and, therefore, that if I was going to
hear from Ms. Torres -- and I was -- that the lawyers for the
case were entitled to attend.

        And, therefore, I stated that we would hold this
hearing and that I would allow Ms. Torres to speak to the
Court, and then I would also let counsel follow up with
questions of Ms. Torres, and Mr. Worms or Mr. Hirsch, for
whom Ms. Torres was working at the time, to provide any
information they thought would be helpful to my full
understanding of the investigation that was conducted by the
plaintiffs in this case.

        I stated then that I was providing this
opportunity, but that I had not reached any conclusions based
upon Ms. Torres' request to communicate with the Court, and
I reiterate now that I have not reached any conclusions.  But
I think it is the right and proper thing to do to hold this
hearing.

        Not long after that, on October 19th, we held a

1   telephone conference in which anybody who wanted to attend

2   could attend.  I think most everybody here did.  And the

3   purpose of that conference was to discuss the structure for

4   the hearing that we will hold today.

5            During that conference, I reiterated that the

6   purpose of the hearing was for me to provide to Ms. Torres

7   the opportunity to provide information to me based upon her

8   experience in the investigation, and, as I put it during the

9   telephone conference, I said that we would allow Ms. Torres

10  to walk through what happened and her participation in the

11  process, and that I would then allow counsel to follow up

12  with her.

13           If in the event that Mr. Worms or Mr. Hirsch wanted

14  to offer their recollection of the investigation, that I

15  would allow them to speak, and then would allow counsel to

16  follow up on anything that they might offer during the

17  hearing.

18           I said then and I'm going to reiterate now that the

19  purpose of this is to create an environment to let people

20  provide information to me, and that I insist that these

21  people that have asked to speak to the Court be treated with

22  dignity and respect.

23           Once I hear what they have to say, I will

24  deliberate on it and I will decide what, if anything, to

25  do.

1          Right now my purpose is only to understand the

2   process of the investigation and simply to hear beginning

3   with Ms. Torres what she has to say, to give you the

4   opportunity to ask some follow-up questions about what she

5   has offered, and then we should be concluded, although I do

6   have a couple of questions probably that will arise as a

7   result of this process.

8          Any questions about the process or the scope of the

9   hearing today?

10          MR. COUGHLIN:  No, Your Honor.

11          MR. MAST:  No, Your Honor.

12          THE COURT:  All right.  Ms. Torres, you are here

13   somewhere I know?

14          MS. TORRES:  I'm back here.

15          THE COURT:  If you will please come forward, why

16   don't you sit up here so that I can talk to you and so that

17   I get you out of this mix of all these lawyers.  That's why

18   I sit up here too.

19          MS. TORRES:  Right here?

20          THE COURT:  Yes, please.

21          All right.  Go ahead.

22          MS. TORRES:  I have a prepared statement, and I

23   have got a copy, if you would like a copy?

24          THE COURT:  Sure.

25          All right.  Thank you.

1          MS. TORRES:  Can you hear me okay?

2          THE COURT:  Yes.

3          MS. TORRES:  So I want to first start by

4     introducing myself.  I think I have introduced myself to most

5     people today, but my name is Desiree Torres.  I'm also

6     referred to in some of the documents as Desiree Monty.  I was

7     married in the course of the investigation.  I am a licensed

8     private investigator in California and a former employee

9     obviously of Worms & Hirsch.

10          Before I get started, I want to express my

11     appreciation to the Court for allowing me to come forward

12     today.  I knew that I wanted to come forward, but not being a

13     party to the case, I wasn't sure of my avenues to do so, and

14     I sincerely appreciate this opportunity today.

15          In preparation for sharing with the Court details

16     of the investigation, I reviewed e-mails, correspondence,

17     phone logs, and the interview memoranda.

18          The interview memoranda I think Wolf and --

19     Mr. Worms and Mr. Hirsch and I collectively agree are the

20     best record of the information that the witnesses provided

21     through the course of the investigation.

22          I brought with me today copies of the interview

23     summaries for Mr. Scott Trapani, Ms. Noelle Wilds, and a

24     summary of my contact with Mr. Ron Newkirk, which was

25     submitted to plaintiffs' counsel in an e-mail.  I have got

1     those available if the Court is interested in them.

2          I have read the Court's order obviously regarding

3     the boundaries of work product protection in this

4     matter.  I'm obviously not an attorney, and have one

5     additional question for the Court before I get started.

6          Some of the information I wish to share today is

7     information contained in e-mails from plaintiffs' counsel

8     that covers most notably information about plaintiffs'

9     counsel's contact with Mr. Tom Mauriello, who was counsel to

10    Mr. Scott Trapani in the case.

11         And I'm not sure if those are covered by work

12    product protection or not.  And perhaps when we get to that

13    point we can address that.

14         THE COURT:  By that description, there's probably

15    some of that which is not, and there might be some of it that

16    is, and I will rely upon plaintiffs' counsel if they believe

17    that the attorney-client privilege is implicated.

18         MR. COUGHLIN:  I will, I will listen and see if I

19    can determine before -- it's a little hard beforehand, but,

20    you know, most of that should not be privileged.  So we will

21    see.

22         THE COURT:  Thank you.

23         MS. TORRES:  I think it's probably best to real

24    quickly provide a brief overview of my professional

25    background.

1        I have an undergraduate degree in Accounting, I
2   have an M.B.A. and a Ph.D.
3        I began working as an investigator for L. R. Hodges
4   & Associates in May of 2005, and I joined Worms & Hirsch in
5   March of 2009.  I continued as an employee of Worms & Hirsch
6   until I resigned on September 20th of 2012.
7        And I will describe the events leading up to my
8   resignation as I wrap up the information that I present
9   today.  But for starters, let me point out that I was very
10  happily employed with Worms & Hirsch, and my decision to
11  resign was a very painful decision for me.
12       The August 28th, 2012, order concerned me on a
13  number of levels.  The issue that concerned me most about the
14  August 28th, 2012, order was that I believe the Court had
15  been denied accurate information in the Belmont v. SunTrust
16  case as I represented to Ms. Birnbaum when I spoke with her
17  on September 24th, 2012.
18       The order -- the August 28th, 2012, order was also
19  troubling to me because one of the few assets I have as an
20  investigator is my reputation, and I felt that it was
21  destroyed by the August 28th order.
22       I have worked extremely hard over the last seven
23  and a half years as an investigator predominantly on cases
24  for Robbins Geller Rudman & Dowd and their predecessor
25  companies.  To me, being a good investigator means that

1    I understand the facts as I gather them to the best of my

2    ability, that I obtain the facts ethically, and that I report

3    them accurately.

4            Having said all that, I will move on to a more

5    detailed narrative of the investigation, specifically as it

6    relates to Mr. Trapani, Ms. Wilds and Mr. Newkirk.

7            However, before I do, I want the Court, and

8    specifically Mr. Trapani, to know, if he ever reads the

9    transcript of this hearing, should one be made available,

10   that I am very grateful for his cooperation with the

11   investigation.  He was a great witness, and it was a pleasure

12   to have worked with him through the course of the

13   investigation.  I believe he definitely stuck his neck out to

14   assist with the case and was extremely professional

15   throughout the process.

16           The key points I want to share today and which I

17   will then further detail are that Mr. Trapani was responsible

18   for setting reserves at SunTrust until August 28th, 2007.

19           Mr. Trapani was adamant that SunTrust was

20   underreserved at the time he was placed on administrative

21   leave on August 28th, 2007, and that everyone was aware of

22   that fact.

23           Mr. Trapani also had a strong opinion that SunTrust

24   was underreserved after August 28th, 2007.  However,

25   Mr. Trapani did not have any discussions with defendants

1    about reserves after August 28th, 2007.

2         Mr. Trapani seemed to have received information

3    from Mr. Ron Newkirk about reserve-related processes after

4    August 28th, 2007, but at no time did Mr. Trapani say that he

5    or any other source he spoke with spoke with defendants on

6    the matter after August 28th, 2007, in order to discern that

7    defendants knew they were underreserved at the end of the

8    year.

9         I initially contacted Mr. Trapani as part of the

10   investigation on July 27th, 2009.  He heard about the

11   allegations in the case and opined that there were merits to

12   the allegations, but he said he had some concerns that needed

13   to be addressed before he could speak with me.

14        Mr. Trapani was concerned that his employer at the

15   time had an ongoing business relationship with SunTrust, and

16   he didn't want to do anything to jeopardize that

17   relationship.

18        Mr. Trapani also wanted to contact SunTrust to

19   alert SunTrust that he intended to cooperate with the

20   investigation.

21        And last, Mr. Trapani had a severance agreement and

22   desired counsel to advise him regarding whether he was able

23   to talk to me as a result of his severance agreement.

24        It is my understanding that Mr. Worms informed

25   Mr. Reise, a Robbins Geller Rudman & Dowd partner at the

1    Boca Raton, Florida, office, of my initial contact with

2    Mr. Trapani on July 28th, 2009.  Mr. Worms informed Mr. Reise

3    of Mr. Trapani's desire to have counsel review and advise him

4    of his severance agreement.

5            I was ultimately instructed to provide Mr. Trapani

6    with contact information for Mr. Tom Mauriello.  I worked

7    with Mr. Mauriello previously when he represented cooperating

8    witnesses on cases I investigated.  I provided contact

9    information for Mr. Mauriello to Mr. Trapani days later, on

10   July 29th, 2009.

11           At the end of January of 2010, Mr. Reise e-mailed

12   Mr. Worms to say that Mr. Reise had conversations with

13   Mr. Mauriello, and that we were back on track for an informal

14   interview with Mr. Trapani.

15           I was not the recipient of these e-mails from

16   Mr. Reise, but I have since reviewed them.  Those e-mails

17   contain information that Mr. Reise had agreed to terms with

18   Mr. Mauriello to secure Mr. Trapani's cooperation with the

19   investigation.

20           I learned in conversations with Mr. Worms in

21   January 2010 that these terms included the fact that

22   Mr. Reise had agreed to provide Mr. Trapani a copy of the

23   amended complaint in which Mr. Trapani would be cited so that

24   Mr. Trapani could review the information attributed to him

25   for accuracy before the amended complaint was filed.

1          The interview with Mr. Trapani was ultimately

2    rescheduled for February 2nd, 2010.

3          Prior to the start of that interview on February

4    2nd, 2010, I participated in a conference call with Mr. Worms

5    and plaintiffs' counsel about the strategy and process for

6    the scheduled interview with Mr. Trapani.  It was agreed that

7    I would conduct the interview and the other participants

8    would listen.

9          I conducted the February 2nd, 2010, interview,

10   which lasted 133 minutes.  The participants in that

11   February 2nd, 2010, interview were Mr. Mauriello,

12   Mr. Trapani, Mr. Reise, Mr. Astley, another partner from

13   the Robbins Geller Boca Raton, Florida, office, and

14   Mr. Worms.

15         During the interview, Mr. Trapani explained that

16   his employment officially ended on December 31st, 2007, but

17   he was placed on administrative leave, and his last day in

18   the office was August 28th, 2007.

19         Mr. Trapani explained that his being placed on

20   administrative leave followed discussions with members of the

21   SunTrust senior executive team regarding issues with the

22   reserves and related processes.

23         Mr. Trapani said that SunTrust was underreserved as

24   a result of increasing loan losses, and this was a well-known

25   issue by the time he stopped going to the office in August

1  2007.

2          And at the end of the February 2nd, 2010,

3  interview, Mr. Trapani asked whether he would be receiving a

4  copy of the complaint as agreed, to which Mr. Reise responded

5  in the affirmative.  It is my understanding that Mr. Trapani

6  never received a copy of the complaint.  I know that

7  Mr. Worms raised this as an issue with plaintiffs' counsel

8  prior to filing the amended complaint.

9          I prepared an eleven-page memorandum of my

10  interview with Mr. Trapani.  I submitted the completed

11  memorandum to Mr. Worms, and it's my understanding that he

12  e-mailed the report to attorneys at Robbins Geller Rudman &

13  Dowd on February 11th, 2010.

14          Approximately a week later, on February 18th, 2010,

15  I interviewed former vice president of credit risk

16  management, Noelle Wilds.  The only participants in the

17  interview with Ms. Wilds were Ms. Wilds and myself.

18          Ms. Wilds said that she had reported to Mr. Trapani

19  until he quit or was fired sometime during third quarter

20  2007.

21          She also said that the ALLL Committee altered the

22  reserves set by the Reserve Working Group in December 2007.

23  However, Mr. Wilds, the former vice president of credit risk

24  management, was unwilling to say whether the ALLL Committee

25  increased or decreased reserves in the December 2007 time

1    frame.

2            On February 23rd, 2010, I completed the interview

3    summary for Ms. Wilds and sent it to Mr. Worms for review and

4    submission to attorneys at Robbins Geller Rudman & Dowd.

5    Mr. Worms I'm sure can confirm the submission of the

6    interview summary for Ms. Wilds to plaintiffs.

7            After the Court granted leave to amend, efforts

8    were made to conduct a supplemental interview with

9    Mr. Trapani.  An interview with Mr. Trapani was scheduled for

10   September 24th, 2010.

11           During that interview, I asked Mr. Trapani whether

12   he was aware if the ALLL Committee altered the reserves set

13   by the working group for the fourth quarter 2007 time

14   frame.

15           Mr. Trapani responded by saying that he learned in

16   conversations with Mr. Newkirk that the ALLL Committee

17   lowered reserves for fourth quarter 2007.  However, in

18   answering the question, Mr. Trapani did not say that

19   Mr. Newkirk provided Mr. Trapani with any information about

20   the defendants' opinion about the adequacy of reserves for

21   fourth quarter 2007.

22           Mr. Trapani also did not say that he personally had

23   any discussions directly with defendants about reserves for

24   fourth quarter 2007.  In fact, in answering my question about

25   whether Mr. Trapani was aware that the ALLL Committee altered

1   reserves for fourth quarter 2007, he explained that he had

2   learned that they had lowered the reserves, but that

3   Mr. Ken Kientz had replaced Mr. Trapani as group vice

4   president by that time frame.

5           The participants in the September 24th, 2010,

6   interview included me, Mr. Worms, Mr. Mauriello, Mr. Trapani,

7   Mr. Reise, Mr. Niehaus, an associate at the Robbins Geller

8   office in San Diego, Mr. Sader, a forensic accountant with

9   Robbins Geller, and Ms. Gross of the Law Offices of Bernard

10  Gross.

11          I conducted the interview.  Mr. Worms and Mr. Sader

12  also asked questions during the interview.  The interview

13  lasted approximately 90 minutes.

14          During the September 24th, 2010, interview,

15  Mr. Trapani reiterated, as he had identified in the February

16  2nd, 2010, interview, that his last day of work was on August

17  28th, 2007.  Mr. Trapani provided more detail about his being

18  placed on administrative leave in the August 2007 time frame

19  during the interview.

20          For instance, he said that his August 28th, 2007,

21  departure followed an event in which Ernst & Young had

22  questioned the level of reserves he set for the home

23  equity line of credit portfolio.  Mr. Trapani explained

24  that Ernst & Young required support for the reserves

25  because he had pegged the reserves at the higher end of the

scale.

Mr. Trapani and his team were required to work over the Fourth of July weekend in 2007 in what he described as a fire drill to provide the necessary support for reserves to Ernst & Young.  Mr. Trapani and his team prepared a 300-page response to the inquiry from Ernst & Young regarding the support for the HELOC reserves.

I asked Mr. Trapani during the interview if his report satisfied Ernst & Young, but he said that he did not know the answer to that question because he was placed on administrative leave shortly thereafter.

The last ALLL Committee and last working group committee meetings he attended were in June 2007. Specifically, the last work group meeting Mr. Trapani attended was on June 23rd, 2007, and the last ALLL Committee meeting he attended was on June 29th or June 30th of 2007. He was unable to recall the exact date.

Trapani said that the topic of SunTrust being underreserved was a regular topic of discussion during his employment.  The topic was discussed with Mr. Michael Fadil, Mr. Tom Freeman, Mr. Jim Wells, Mr. Tom Panther, and Mr. Mark Chancy.  The latter three are defendants in this case.

Given that Mr. Trapani said he had discussions with defendants about the inadequacy of reserves, it was

1    imperative -- and would have been in any case that I was

2    working on -- to determine details about the discussions,

3    when they took place, any contexts, et cetera.

4            Mr. Trapani said he was unable to recall much

5    detail about discussions with Mr. Wells, including when they

6    took place or the context of such discussions, other than

7    they related to losses in the HELOC portfolio.

8            Mr. Trapani said that the discussions he had with

9    Mr. Trapani and Mr. Panther regarding reserves being

10   underfunded were in July and August of 2007.  He discussed

11   the matter with Mr. Panther in July and August 2007.  He

12   discussed the matter with Mr. Chancy on Trapani's last day of

13   work, which were words he used in answering my question about

14   when the conversations took place, on August 28th, 2007.

15           Mr. Trapani never said he had discussions with

16   defendants at any time about reserves after August 28th of

17   2007.  He also never said he discussed reserves with

18   Mr. Fortin at any time.

19           Mr. Trapani did say that Mr. Fortin was aware that

20   reserves were underfunded after Mr. Trapani's last day of

21   work on August 28th, 2007, but Mr. Trapani never said he

22   discussed this matter with Mr. Fortin or detailed how

23   Mr. Fortin knew that reserves were underfunded.

24           Mr. Trapani said that reserves were underfunded at

25   SunTrust at the time he departed from SunTrust in August 2007

1    when he was placed on administrative leave and at the end of

2    2007.

3            Mr. Trapani opined about the extent to which

4    reserves were underfunded at the end of 2007 based on a

5    comparison of the reserves reported publicly by SunTrust for

6    the period ending fourth quarter 2007 and the average level

7    of reserves being in the neighborhood of 1.5 percent in the

8    industry.

9            Mr. Trapani opined that SunTrust should have been

10   carrying reserves at 1.75 to 2 percent at the end of 2007,

11   but he never said he discussed this matter with defendants

12   any time after August 28th of 2007.

13           On September 24th, 2010, I completed an eleven-page

14   summary of the interview with Mr. Trapani and forwarded the

15   completed summary to Mr. Worms for review and submission to

16   attorneys on the case.

17           My understanding based on conversations with

18   Mr. Worms and e-mails that I have reviewed is that Mr. Worms

19   submitted the interview summary containing all the details

20   above to Mr. Reise, Mr. Brown, Mr. Niehaus and Ms. Gross on

21   September 27th, 2010.

22           Nearly a year later, on September 12th, 2011,

23   Mr. Brown e-mailed Mr. Worms, Ms. Gross and Mr. Reise

24   attaching a copy of the opinion and order on the motion to

25   dismiss.

On that same day, Mr. Worms and I discussed the fact that Mr. Ron Newkirk, a former employee of SunTrust, was no longer working at SunTrust according to efforts by Worms & Hirsch personnel to confirm the employment status of Mr. Newkirk.

On September 14th, 2011, I spoke with Mr. Newkirk, who said that he could confirm some of the numbers in the complaint and that he knew of a Post-it note that contained relevant reserve numbers for the fourth quarter 2007 time frame.

Mr. Newkirk said he was aware that the ALLL Committee lowered the reserves in the fourth quarter 2007 time frame, but never said that he knew or shared information with Mr. Trapani that this meant the defendants knew reserves were underfunded.  Mr. Newkirk also said -- never said how he knew that reserves were lowered by the ALLL Committee in this December 2007 time frame.

It is my understanding that Mr. Worms e-mailed an update on the preliminary conversation I had with Mr. Newkirk to attorneys on the case.

I spoke with Mr. Newkirk again on September 29th, 2011, who said that he was seeking representation for fear of damage to his career by SunTrust, and that he wanted the same deal that Mr. Scott Trapani got before he would agree to speak further about his knowledge of the issues on the

1    case.

2            On October 10th, 2011, Mr. Worms and I spoke with

3    Mr. Newkirk, who said at that time that he had decided not to

4    participate informally in the investigation until he found

5    another job.  Mr. Brown was apprised of Mr. Newkirk's

6    decision.  We never had the opportunity to interview

7    Mr. Newkirk.

8            On that same day, Mr. Brown indicated via

9    e-mail -- I was not copied on the e-mail but have

10   subsequently reviewed the e-mail -- that Mr. Brown had

11   spoken with Mr. Mauriello, who was again representing

12   Mr. Trapani, and that Mr. Trapani was available for a third

13   interview on October 11th, 2011.  Mr. Worms informed me that

14   I would not be conducting the interview, but I would be

15   listening to Mr. Brown conduct the interview and taking

16   notes.

17           On October 11th, 2011, a third interview with

18   Mr. Trapani took place.  Mr. Brown conducted the interview as

19   planned.

20           During this interview, Mr. Trapani reiterated for a

21   third time that he was placed on administrative leave on

22   August 28th, 2007.

23           Mr. Trapani provided additional information about

24   being placed on administrative leave, including that he was

25   placed on what he described as medical leave on his birthday,

1   on August 28th, 2007, which is why he remembered the starting

2   date of his leave so well.

3            The other call participants were Mr. Reise,

4   Ms. Gross, Mr. Worms, Mr. Mauriello and Mr. Trapani.  Neither

5   Mr. Worms nor myself asked any questions during this third

6   interview with Mr. Trapani.

7            I prepared a summary of the interview and completed

8   the summary on October 12th, 2011.  I submitted the summary

9   to Mr. Worms for review and submission to the attorneys on

10  the case.

11           In all three interviews with Mr. Trapani, the fact

12  that Mr. Trapani was placed on administrative leave on August

13  28th, 2007, was made clear and discussed in detail.

14           In my experience as an investigator, a witness

15  raising concerns on the very issue central to the case and

16  investigation is a great fact and one that I would always

17  explore in great detail as part of the investigation because

18  it can show defendants' awareness of important facts.

19           On Friday, October 14th, 2011, Mr. Brown e-mailed

20  me and Mr. Worms indicating that my declaration was being

21  drafted and that it was going to be lengthy.  Mr. Brown

22  inquired about my ability to review my declaration over the

23  weekend, because the declaration would need to be filed on

24  Monday, October 17th, 2011.

25           I received the first draft of my declaration from

1   Mr. Brown on Saturday, October 15th, 2011.  Mr. Brown

2   indicated that there may need to be edits to the draft

3   declaration to include a couple of things that Robbins Geller

4   had in their brief.

5          On Sunday, October 16th, 2011, I participated in a

6   conference call with Mr. Brown, Ms. Gross and Mr. Niehaus and

7   Mr. Worms regarding revisions to my declaration.  I agreed

8   and approved the revisions that were made.  I reviewed my

9   declaration a final time, and Fed Ex'ed the signature page to

10  Mr. Brown on October 17th, 2011.

11         On October 18th, 2011, Ms. Gross e-mailed my filed

12  declaration and the opposition to defendants' motion for

13  reconsideration to Mr. Brown, Mr. Worms, me, Mr. Reise and

14  Mr. Mauriello.

15         I did not see a copy of any of the complaints or

16  briefings filed by plaintiffs in this case before they were

17  filed.  At one point I reviewed the amended complaint in

18  which information was attributed to Mr. Trapani after it was

19  filed.

20         I was concerned that the complaint stated that

21  Mr. Trapani had discussions with defendants throughout 2007

22  about reserves.  I raised this concern in a telephone

23  discussion with Mr. Brown on September 12th, 2011, to which

24  Mr. Brown responded, I saw that.  Mr. Worms was on the call

25  in which I raised the concern to Mr. Brown.

1          I also did not review the briefings by plaintiffs

2   on the motions for reconsiderations and sanctions until after

3   I read the August 28th, 2012, order.  I received the August

4   28th, 2012, order as an attachment to an e-mail that

5   Mr. Brown sent to Mr. Worms with a statement, Not a nice

6   opinion.

7          Mr. Worms, Mr. Hirsch and I have discussed the

8   August 28th, 2012, order in countless conversations,

9   including how to resolve the issue that the Court had been

10  denied accurate information, and that my reputation and the

11  reputation of Worms & Hirsch had been damaged in the

12  process.

13         As part of efforts to resolve the issue, we brought

14  this matter to the attention of the highest levels at Robbins

15  Geller Rudman & Dowd.  For instance, Mr. Worms and Mr. Hirsch

16  had a conference call with Robbins Geller Rudman & Dowd named

17  partner Mike Dowd to explain the events in this case and

18  request that Robbins Geller resolve the matter to our

19  satisfaction.

20         In addition, on September 17th, 2012, I met with

21  Mr. Dowd, Mr. Worms, Mr. Hirsch and Mr. Niehaus to discuss

22  this matter.  During that meeting, Mr. Niehaus apologized for

23  what had happened to me.

24         Mr. Dowd said -- and I certainly say this with no

25  disrespect intended, I'm just repeating what was said to me

1    during the meeting -- that the Judge got it wrong.

2          We informed Mr. Dowd specifically that Paragraph 13

3    of the amended complaint was not factually accurate and was

4    misleading based on information that Mr. Trapani conveyed to

5    shareholders' counsel, Mr. Worms and me during multiple

6    interviews.

7          Mr. Worms, Mr. Hirsch and I did not have a

8    solution in mind when we went to meet with Mr. Dowd, but

9    Mr. Worms informed Mr. Dowd no less than ten times I would

10   estimate that if Robbins Geller did not resolve the matter,

11   we would be forced to go to the Court in an attempt to do

12   so.

13         I also personally specifically informed Mr. Dowd

14   that I intended to come forward to attempt to correct the

15   record if Robbins Geller was not inclined to do so.

16         Mr. Dowd explained that the Court likely pointed

17   the finger at me in this case because I was the target most

18   likely not to appeal a decision by the Court.  Moreover,

19   Mr. Dowd dissuaded me from going to the Court by playing down

20   the issue and explaining that expert witnesses are berated

21   all the time in court.

22         After the time to appeal expired and it became

23   clear to me that Robbins Geller decided not to take any

24   further action in this case, I decided to resign from

25   Worms & Hirsch.

1      I have tremendous respect for Mr. Worms and

2 Mr. Hirsch, and I knew that going to the Court could seem

3 adversarial to their largest client, and did not want to

4 negatively impact Worms & Hirsch by continuing as an employee

5 at the time I came forward.  On September 20th, 2012,

6 I resigned from Worms & Hirsch.

7      When it became apparent that shareholders' counsel

8 would not take any further action in this case, I contacted

9 Mr. Tim Mast from Troutman Sanders on September 21st, 2012,

10 and indicated that I had information to support a motion for

11 reconsideration, but that I was uncertain of my options for

12 proceeding.

13      I want to be absolutely clear that I did not

14 provide any information to Mr. Mast about the investigation.

15 I solely sought advice from Mr. Mast about my procedural

16 options.

17      Mr. Mast informed me that I could provide him with

18 the information to support a motion for reconsideration but

19 only if I was comfortable doing so, or I could contact the

20 Court directly.  He provided contact information for the

21 Court's chambers for Ms. Birnbaum.

22      I ultimately was not comfortable providing

23 information to Mr. Mast because of concerns of providing work

24 product, and ultimately decided that my best course of action

25 was to contact the Court directly.

1          On September 24th, 2012, I contacted Ms. Birnbaum.

2     I informed Ms. Birnbaum that I was concerned that the Court

3     had been denied accurate information in this case, as I have

4     discussed here today.

5          I sincerely appreciate the Court's willingness to

6     hear this information and allowing me, as I mentioned, the

7     opportunity to come forward today.

8          And I'm happy to answer any questions.

9          THE COURT:  Before I ask my questions, I will let

10    plaintiffs' counsel follow up.

11         MR. COUGHLIN:  Thank you, Your Honor.

12         THE COURT:  Can you remind me again who Mr. Dowd

13    is?

14         MR. COUGHLIN:  Mike Dowd is a named partner in

15    Robbins Geller Rudman & Dowd.

16         THE COURT:  You say he's a named partner or the

17    managing partner?

18         MR. COUGHLIN:  There is no managing partner.  There

19    is a committee.

20         He's a former Assistant U.S. Attorney who came to

21    work at the former firm that's now named Robbins Geller.  He

22    moved up through it, through the ranks.

23         And I think he has a good reputation, you know,

24    throughout the country.  He's tried a number of large

25    matters.

1          And I think that, you know, he thought some of the

2    information was in the record and didn't see what they could

3    do.  Whether that was the right or wrong decision, I don't

4    think it was malicious.  It certainly wasn't meant to hurt

5    either the Worms & Hirsch firm or Ms. Torres.

6          And so -- you know, I think if we go through,

7    I think you -- first of all, the firm takes responsibility

8    for the pleading and never put it on Ms. Torres.  And if it

9    appears that we did, you know, then that we apologize for.

10          And I think if we go through what we knew, when we

11   knew it, and why we pled the first amended complaint the way

12   we did -- you can look at it in hindsight and say, hey, maybe

13   that wasn't the right thing to do, but I don't think it was,

14   as Your Honor wanted to know, if it was careless or

15   clever.  I don't think it was either.

16          But if we go through, we can examine that, and

17   I think I could do it in a short enough time with

18   Ms. Torres.

19                         --  --  --

20                      DESIREE TORRES

21          after taking the stand, says as follows:

22                         --  --  --

23                       EXAMINATION

24   BY MR. COUGHLIN:

25   Q.   We have never met before, is that right, Ms. Torres?

1   A.   Correct.

2   Q.   We just met outside here.

3        You have worked with the firm on a number of big cases,

4   but I don't know -- or we can't recall ever working

5   together.  So this is our first real --

6   A.   Meeting.

7   Q.   -- discussion, meeting.

8        MR. COUGHLIN:  And so if I could just briefly go

9   over some of the topics that were covered by Ms. Torres?

10        THE COURT:  Go ahead.

11   BY MR. COUGHLIN:

12   Q.   Ms. Torres, in the October -- in the October 4th, 2012,

13   order, the Court says that you were concerned about the

14   accuracy of the information that we provided to the

15   Court.  Is that correct?

16   A.   Correct.

17   Q.   And also that you were concerned that her declaration --

18   that your declaration had been used to make it appear you

19   were responsible for the allegations that were included in

20   the complaint; is that correct?

21   A.   Correct.

22   Q.   And then there were two other things -- and I don't mean

23   to skip them, but I will get to them later -- including that

24   we were involved in the interviews with Mr. Trapani, and that

25   Mr. Trapani had made it clear that he did not have any

1  knowledge after August 2007 during those interviews.  Is that

2  correct?

3  A.   That's what the order says.

4  Q.   Yeah.  Is that -- was that -- is that your complaint

5  about --

6  A.   Not entirely correct.

7  Q.   We will go through it.  It's a little different with

8  what knowledge you had or didn't have after August; is that

9  right?

10 A.   Uh-huh.

11 Q.   Okay.  And since we haven't talked about what that

12 difference is, let me explore it.

13      You talked about you were concerned that your

14 declaration had made it, but earlier in your testimony here

15 you had talked about these investigative reports that were

16 prepared at or about the time of these interviews; is that

17 right?

18 A.   Correct.

19 Q.   And these were reports that were provided to counsel; is

20 that correct?

21 A.   Correct.

22 Q.   So I would like to talk about the report that was --

23 that is dated September 24th, 2010; okay?

24 A.   Okay.

25 Q.   That's the second lengthy report.  I think it was a

1    94-minute conversation.  I have a copy of that.

2              MR. COUGHLIN:  I have a copy for everybody in the

3    courtroom, Your Honor, and most importantly Your Honor.

4              Sorry.

5              THE COURT:  Thank you.

6    BY MR. COUGHLIN:

7    Q.    Did I give you a copy?

8    A.    I have got a copy.

9    Q.    You've got one?

10   A.    I brought my own.

11   Q.    Okay, you have got your own.

12         So this is the report that was -- this was the meeting,

13   if we can get the context, that was set up after the first

14   complaint was dismissed.  Is that right?

15   A.    Correct.

16   Q.    So this was the meeting to actually delve into both the

17   subjective and objective falsity that the Court had required

18   in dismissing the case, the original complaint, is that

19   right, or the consolidated complaint?

20   A.    I didn't get into the lawyering of it all.  I knew I was

21   in a meeting to interview Mr. Trapani, and that was the

22   extent of it.

23   Q.    Had you read the Court order that had dismissed the

24   complaint before this interview, do you recall?

25   A.    Not in a lot of detail.

1    Q.   But you read it?

2    A.   I probably skimmed through it and read small sections.

3    Q.   Okay.  And then this interview was set up, and on it was

4    Jack Reise from the Florida office, Andrew Brown and a few

5    from the San Diego office, and Brad Sader, the accountant

6    from the San Diego office; is that right?

7    A.   Correct.

8    Q.   And you noted that at the top, top of this report; is

9    that right?

10   A.   On the second page, correct.

11   Q.   You listed it to them, and you listed who was on -- who

12   was actually on the call on the second page?

13   A.   Correct.

14   Q.   And then in employment background, with those people on

15   the call, you said:

16                As noted in the initial Trapani interview

17           summary -- and that's the February 11, 2010

18           summary -- Trapani was employed at SunTrust from

19           2005 to December 2007.  However, his last day of

20           work with SunTrust was on August 28, 2007.

21        Is that right?

22   A.   Yes, that's correct.

23   Q.   Okay.  During this interview with these people on it

24   from the San Diego office, did you go over again or did you

25   just reference back to the old report about his employment

1    history and dates?

2    A.    I don't recall, to be honest.

3    Q.    Okay.  You don't recall, though, asking any question

4    again about how long he was employed and when his last day

5    was; right?

6    A.    That's typically what I asked during the course of the

7    investigations, so I probably did.

8    Q.    In the first interview?

9    A.    And the second one as well.

10   Q.    Did you reask it in the second one?

11   A.    I believe so.

12   Q.    You believe you reasked it in the second one?

13   A.    (Nods head.)

14   Q.    And why did you note back to the first one then?

15   A.    Because there was a critical fact in my mind that he

16   was placed on leave for having raised concern about

17   reserves.

18   Q.    Uh-huh.

19   A.    And so it was something that I thought we should at

20   least look at in whatever level of detail.

21   Q.    Okay.  And these -- and when you do these notes, you try

22   to be as accurate about what the person actually says versus

23   an inference that you might draw; is that right?

24   A.    I try to be.

25   Q.    Try to be.

1            And nowhere when you reasked this question at this time
2     did he say to you that he was completely cut off from any
3     contact with the company, did he?
4     A.   Did not.
5     Q.   He did not.  Did you ask him that?
6     A.   No.
7     Q.   Okay.  So you don't know if he had access to his e-mail,
8     you don't know if he was talking or to which individuals he
9     was talking to at the company?
10           You knew he was talking to some people because you had
11    already referenced Newkirk, and --
12    A.   We got -- I don't mean to interrupt you, but he did say
13    during the interview that he spoke to Newkirk.
14    Q.   Right.  So he was talking to some people at the company,
15    but you didn't ask him if he was cut off from his own access
16    to the financials of the company, did you?
17    A.   No.
18    Q.   Or his e-mail with the company; is that right?
19    A.   Correct.
20    Q.   So it's not noted here when you asked this question
21    about his last day?
22    A.   Correct.
23    Q.   Okay.  On the third page here, he notes that:
24                 The portfolio management function and the loss
25             reserves were kissing cousins.

1        Is that right?

2   A.   Yes.

3   Q.   And then he went on to talk about how the improvement of

4   the portfolio management never got off the ground, that it

5   was a wasted hundred million; is that right?

6   A.   The hundred million I think pertained to the data

7   warehouse that they were trying to build.

8   Q.   Okay.  And that didn't -- is that related to the

9   portfolio management?

10  A.   I'm not entirely sure.  It didn't seem like it.

11  Q.   Okay.  So the data that SunTrust had was just

12  abominable, that wasn't related to portfolio management?

13  A.   I think the data was required in order to -- the

14  function of portfolio management.

15  Q.   Right.  But portfolio management never got off the

16  ground, and then a hundred million was wasted trying to build

17  a database warehouse; is that right?

18  A.   Correct.

19  Q.   And that never occurred, at least during his employment;

20  is that right?

21  A.   The build-out of the data warehouse?

22  Q.   Yes.

23  A.   I don't know the answer to that.

24  Q.   Okay.  Did you follow up and ask him if it ever did?

25  A.   No.  I spoke to another witness about that, though.

1   Q.   And did that other witness say that it had been

2   completed?

3   A.   I believe he said it didn't, it hadn't been.

4   Q.   All right.  If we flip over to the fourth page, it talks

5   about what Trapani -- that he chaired the Reserve Working

6   Group; is that right?

7   A.   Correct.

8   Q.   Okay.  And then it talks about the ALLL, who is on the

9   ALLL Committee next; right?

10  A.   Correct.

11  Q.   And he lists who is on it.  He lists a couple of the

12  defendants in the bottom paragraph; is that right?

13  A.   That's correct.

14  Q.   Okay.  This is the paragraph I think on page five that

15  is referred to, that:

16              Trapani last attended the Reserve Working

17         Group meeting and ALLL Committee meeting in June

18         2007.

19      Is that right?

20  A.   Correct.

21  Q.   And you go through the various dates, and that his last

22  meeting was somewhere around June 29th or June 30th, 2007; is

23  that right?

24  A.   That's correct.

25  Q.   And then he talks about the ALLL Committee meeting

```
1    that was attended by Ernst & Young representatives; is that

2    right?

3    A.    That's correct.

4    Q.    Is that the July time frame, when the July -- you know,

5    over the Fourth of July fiasco?  Was that the meeting he's

6    referring to then, or do you know?

7    A.    I have somewhere in here, in one of these interviews

8    summaries, he talked about when the company switched from

9    KPMG to Ernst & Young and the time frame of that.

10   Q.    And didn't that lead to a question and then a big --

11   I don't know how else to say it -- hullabaloo in July

12   where --

13   A.    Correct.

14   Q.    -- a lot of workers had to come in over the weekend?

15   A.    Uh-huh.

16   Q.    Okay.  And he didn't know exactly when that meeting, the

17   last meeting with Ernst & Young, occurred?

18   A.    I would have to spend some time looking through the

19   interviews some.  I don't know the answer to that off the top

20   of my head.

21   Q.    Okay.  If we go over to six, you actually list there,

22   you talk about the conversation:

23               The ALLL Committee made adjustments to the

24          Reserve Working Group recommendations.

25          You say that in that paragraph?
```

```
1   A.   Yes.

2   Q.   That's what he said, that's what --

3   A.   That's what I introduced to him as something that

4   Ms. Wilds said to me, and I wanted to know if he was aware of

5   it.

6   Q.   And did he -- so you said that sentence to him?

7   A.   Uh-huh.

8   Q.   Did he confirm it?

9   A.   Yes.  He said he learned through Mr. Newkirk that that

10  was the case.  I -- my sentence to him was that they had

11  altered the reserves --

12  Q.   Right.

13  A.   -- and I was trying to get an answer as to whether they

14  increased or decreased the reserves and whether he knew about

15  it.

16       And his response was that he had learned from

17  Mr. Newkirk that they lowered the reserves.

18  Q.   Right.  My question is the first sentence, The ALLL

19  Committee made adjustments to the Reserve Working Group

20  recommendations, is that what he said to you, or did you say

21  that to him?

22  A.   That's what I said to him.

23  Q.   That's what you said to him, not -- okay, not altered,

24  but you used the word adjustments?

25  A.   Correct.
```

1    Q.    Okay.  And then you say, For instance, Trapani

2    learned -- and that's where he gets the Newkirk, the

3    December, that they lowered -- that the ALLL Committee did

4    not accept the reserve group's recommendation?

5    A.    Yes.

6    Q.    In fact, they lowered the reserves from what that

7    recommendation was; right?

8    A.    That's correct.

9    Q.    Okay.  If we turn over to page eight, after he's talking

10   about, right above there, you know, Burgeoning Losses from

11   the Warehouse HELOC Product Line, what is the HELOC product

12   line?

13   A.    Home equity line of credit.

14   Q.    Okay.  And that was about somewhere between fifteen,

15   sixteen billion at the time in the company, do you remember?

16   A.    I have no idea.  I think I have a footnote somewhere

17   that might show that.

18   Q.    You have a chart on your third -- it may be your

19   third report that might have it, but we can get there in a

20   second.

21   A.    Okay.

22   Q.    And then down below you say:

23                Anyone with a pulse could see the losses

24           developing and moving through the pipeline.  The

25           losses in the 30 to 89 days past due category were

1          building at an enormous pace in the late 2006 to

2          early 2007 time frame.  The losses were jumping

3          through the categories from 30 to 89 days past due,

4          to 90 or more days past due, and into nonaccrual

5          status.

6     Correct?

7  A.  Correct.

8  Q.  So is that something that he was saying to you and you

9  were copying it down or taking notes --

10 A.  Absolutely.

11 Q.  -- as quick as you could?

12     Okay.  And then if we flip over to the next page, on

13 nine it talks about:

14          Trapani discussed the burgeoning losses in

15          the warehouse HELOC book with Freeman, Panther,

16          Chancy and defendant and Chief Executive Officer

17          James Wells.

18          The losses in the HELOC book were part of

19          Trapani's daily discussions with his superiors.

20          Trapani was redoing the loan loss reserve models

21          during 2007, so that the concept of how to

22          look at aspects of the warehouse HELOC losses

23          came into play and was a regular topic of

24          discussion.

25          He spoke to Wells about the issue once or

1          twice during 2007.  Trapani was unable to recall

2          particular details about his discussion with Wells

3          on the topic.

4     But he couldn't give you dates about when in 2007 he

5 spoke to him; is that right?

6 A.   That's correct.

7 Q.   Did you ask him if it was after August 28th, 2007?

8 A.   No.  It was clear to me that he was no longer at the

9 office at that date, so I didn't ask that question.

10 Q.   He was talking to the other people at the company,

11 though, after August 2007; right?

12 A.   Correct.

13 Q.   And he was also receiving e-mails from at least

14 Ms. Wilds; is that right?

15 A.   I didn't know that at this time.

16 Q.   Not at this time at this interview?

17 A.   Correct.

18 Q.   You knew he was talking to Newkirk?

19 A.   Correct.

20 Q.   You knew at least one person he was talking to?

21 A.   Yes.

22 Q.   You assumed he had not reached out and talked to Wells

23 or any of the other defendants; is that right?

24 A.   Based on his disposition, it seemed like he didn't.

25 Q.   Right.  But you didn't ask him?

1    A.    I did not ask him.

2    Q.    Okay.  So it wasn't said on this call?

3    A.    What wasn't said?

4    Q.    It wasn't said that he didn't talk to these defendants

5    after August 28th, 2007, on this call?

6    A.    Correct.  And it also wasn't said that he did.

7    Q.    Okay, fair enough.

8              He discussed the issue with Freeman at least

9         once per week, and with Fadil nearly every day

10        during 2007.

11        That's what he said?

12   A.    Yes.

13   Q.    Okay.  Did you ask him if that meant up until August

14   28th, the first eight months?

15   A.    I did not ask that, because Fadil was not a defendant.

16   Q.    Okay.

17   A.    And we -- just to provide context, we were limited in

18   the amount of time we had to speak to him.  Mr. Mauriello put

19   a limit on how much time we could speak to Mr. Trapani.

20   Q.    Right.  And he wouldn't -- he didn't want to provide the

21   detail; is that right?

22   A.    He was very limited in what he would say in response to

23   some of my questions.

24   Q.    He wanted to be deposed; is that right?

25   A.    That's correct.

1    Q.    And he asked to be deposed?

2    A.    That's correct.

3    Q.    And we moved to have him deposed; is that correct?

4    A.    That's correct.

5    Q.    Okay.

6                    Trapani met quarterly with Panther on a

7              one-to-one basis in Panther's office and discussed

8              the rising losses in the warehouse HELOC book

9              during these meetings with Panther in 2007.

10   Do you see that?

11   A.    Yes.

12   Q.    Did he say that he didn't meet him after August 28th,

13   2007?

14   A.    He never said that.

15   Q.    No.  Did he talk about when he went in and talked to

16   Mr. Fortin when I think it was August -- October 29th, 2007,

17   when he went in to sign the severance agreement?  Did he

18   tell you or ever talk to you about what he talked to Fortin

19   about?

20   A.    No.

21   Q.    But he talked to Mr. Fortin after he left August 28th,

22   2007; right?

23   A.    I recall him saying that Mr. Fortin was aware that the

24   company was underfunded for reserves but --

25   Q.    After he left; right?

1  A.    After Mr. Trapani left.  But he didn't detail how

2  Mr. Trapani knew that.

3  Q.    Mr. Trapani did not detail to you how he knew

4  Mr. Fortin --

5  A.    How Mr. Fortin -- yeah, how Mr. Fortin knew that.

6  Q.    -- was aware after August 28th, 2007, that they were

7  underreserved?

8  A.    Correct.

9  Q.    So he said after the date he leaves, that he knew

10 this defendant, Fortin, was -- that the company was

11 underfunded?

12 A.    Yes.

13 Q.    And you didn't get a chance to ask him, because he was

14 time-limited.  This was a 94-minute interview.

15 A.    Correct.

16 Q.    You ran out of time, and he had to leave; is that

17 right?

18 A.    That's correct.

19 Q.    If we go to page eleven, it says here:

20              Everybody was aware that SunTrust was

21          underreserved for the last year of Trapani's

22          employment with SunTrust.

23          Is that correct?

24 A.    Yes.

25 Q.    Okay.  He was employed until December 2007; is that

1    right?

2    A.   That's correct.

3    Q.   Okay.  So his statement that everybody was aware

4    throughout his employment, which ended December 2007, you

5    thought included December 2007; right?

6    A.   I wasn't sure and didn't delve into that.

7    Q.   He said employment; right?

8    A.   Yes.

9    Q.   He told you his employment ended December 2007; right?

10   A.   Yes.

11   Q.   Okay.

12            The issue of the company being underfunded for

13         reserves was a topic of discussion for the last

14         year of Trapani's employment --

15   Right?

16   A.   Correct.

17   Q.        -- including in discussions with Freeman, Fadil,

18         Panther, Chancy and Wells.

19   Correct?

20   A.   Correct.

21   Q.   That's a number of those defendants; right?

22   A.   Yes, three of them.

23   Q.   And he says throughout his employment; right?  He said

24   that on the phone -- he said that on the phone to you;

25   right?

1    A.    He said, yeah, for the last year of his employment.

2    Q.    Right?  Those were the words he used; right?

3    A.    For the last year, yes.  He didn't say throughout.

4    Q.    For the last year of his employment.  The last year of

5    his employment was 2007; right?

6    A.    Correct.

7    Q.    And that's what he told you his last year of employment

8    was; right?

9    A.    He said his employment ended in December, and he was

10   placed on administrative leave, his last day in the office

11   was August 28th, 2007.

12   Q.    His employment ended in December 2007; is that correct?

13   A.    Yes.

14   Q.    Okay.

15   A.    He stopped receiving a paycheck then.

16   Q.    And he had told you that; right?

17   A.    Yes.

18   Q.    And then you wrote down this statement that he had

19   talked -- you know, it was a topic of discussion for the last

20   year of Trapani's employment; right?  Okay.  That's what

21   everybody else on the phone call would have heard too;

22   right?

23   A.    Yes.

24   Q.    Okay.

25   A.    And I specifically asked him when did those

1    discussions took place, and that's when the next sentence

2    follows on.

3    Q.   Right.

4              Freeman knew, Chancy knew, Tom Panther knew,

5         and Fadil knew because the models were a fraud as a

6         result of the data issues?

7    A.   Correct.

8    Q.   Trapini discussed the fact that SunTrust was

9    underreserved with Chancy on Trapani's last day at work, and

10   he also -- that's what he says about Chancy, but he doesn't

11   reference the others; right?

12   A.   Correct.

13   Q.   He did not reference the others in that sentence;

14   right?

15   A.   Correct.

16   Q.   And then he says he also discussed the underfunded

17   reserves with Panther in July and August of 2007; right?

18   A.   Right.

19   Q.   He doesn't say he didn't talk to the others after that;

20   right?

21   A.   Correct.

22   Q.   You would have written that down; right?

23   A.   I would have.

24   Q.   Okay.  Then page twelve:

25              Fortin knew that SunTrust was underreserved in

1          2007 as well.

2       Is that correct?

3   A.   Yes.

4   Q.   Okay.  It doesn't say up until August 27th, 2008;

5   right?

6   A.   Correct.

7   Q.   Okay.

8               Particularly after Trapani's last day of

9            work in August 2007, Fortin became aware that

10           SunTrust was underreserved, which was part of

11           the reason for Trapani's departure from SunTrust

12           and his frustrations while employed with the

13           company.

14      Do you see that?

15  A.   Yes.

16  Q.   Okay.  So after he left, he knew that -- he knew

17  subjectively that Fortin had knowledge after he left before

18  the end of the year 2007; is that right?

19  A.   That's exactly right.

20  Q.   That's what he said.  And there was no follow-up about

21  the basis of his knowledge?

22  A.   No.

23  Q.   He didn't say anything at that time about talking to

24  Fortin October 29th, 2007, when he went in to sign his

25  severance?

1    A.   No, he didn't.

2         And this was a second interview, and I was prompted

3    to stop asking questions and let Mr. Sader ask some

4    questions.

5    Q.   Okay.  And Mr. Sader, the accountant, who is in the

6    courtroom here, he asked some questions?

7    A.   Yes.

8    Q.   You are not an accountant; right?

9    A.   I have an accounting degree.  I'm not an accountant.

10   Q.   Okay.  And then there is nothing else at the end of

11   this or any further on about that he didn't have any

12   discussions.  There is no mention in here that he didn't

13   have discussions with those defendants after August 28th;

14   is that right?

15   A.   That's correct.

16   Q.   He didn't say that on that phone call with counsel from

17   San Diego; is that right?

18   A.   He didn't say that he had discussions any time after

19   August 28th, 2007, and he didn't say that he did.

20   Q.   He just had discussions throughout his employment in

21   2007 with those defendants?

22   A.   Yes.

23   Q.   That's what he said?

24   A.   Yes.  And when I drilled down, he said the dates that he

25   had the discussions with Chancy and Panther.

1    Q.    Right.  But not the others?

2    A.    Correct.

3    Q.    Okay.  So after you did that interview, the amended

4    complaint was filed?

5    A.    Yes.

6    Q.    The first amended complaint.  And did you get a copy of

7    that complaint?

8    A.    Sometime maybe after it was filed.  I don't think we

9    were sent -- I don't know if we did.  I don't know the answer

10   to that.

11   Q.    Okay.  Do you go on the docket and look at what has been

12   filed?

13   A.    I don't, no.

14   Q.    You did not.  So you don't know if you got a copy?

15   A.    I eventually got a copy and read it, and I don't know

16   when that was or how I got it.

17   Q.    Okay.  Did you use that -- do you remember taking that

18   copy of that complaint and talking to Mr. Newkirk about the

19   complaint?

20   A.    I did not have a copy of the complaint in front of me

21   when I spoke with Mr. Newkirk.

22   Q.    I jumped out of order, which threw us off.  This is a

23   Wolf Worms September 15th e-mail.

24         And you said you had conducted your interviews and then

25   put it in e-mails to us; is that correct?

1   A.   This was based on a preliminary discussion I had with

2   Mr. Newkirk.

3   Q.   Okay.  And this is September 15.  It says:

4              Newkirk is able to verify information in the

5         complaint, including reserve numbers.

6        Did Mr. Newkirk tell you that?

7              MR. MAST:  Can I get a copy of that?

8              MR. COUGHLIN:  Yeah, I'm sorry.  I jumped out of

9   sequence, sorry.

10             MR. MAST:  All right.

11             MR. NIEHAUS:  What date was that?

12             MR. COUGHLIN:  September 15th, 2011.

13  BY MR. COUGHLIN:

14  Q.   Do you have a copy of this?

15  A.   Yes, I do.  I have the original e-mail that I sent to

16  Mr. Worms, but I'm sure it's virtually the same.

17  Q.   Okay.  Well, let's make sure it is the same and nobody

18  changed it.

19  A.   Okay.

20  Q.   I'm focused on the paragraph with the star.

21  A.   Okay.

22  Q.   Just read that.  I need it back, I don't have a copy,

23  but see if it is the same.

24             MR. NIEHAUS:  Your Honor, may I approach?

25  A.   Yes.

```
1              MR. NIEHAUS:  Do you have a copy?

2              MS. TORRES:  I need a copy, thank you.

3              THE COURT:  It's probably a good idea if we could

4   make these two documents part of the record.  Do you have an

5   extra blank copy?

6              MR. COUGHLIN:  Yes, and I will make sure the Court

7   Reporter --

8              THE COURT:  We will make the memorandum Exhibit 1

9   and this Exhibit 2.

10             MR. COUGHLIN:  I should have been doing that along

11  the way.  Sorry, Your Honor.  I didn't know where we were

12  going today.  Sorry.

13  BY MR. COUGHLIN:

14  Q.   We didn't talk about your testimony before we came

15  here?

16  A.   No.

17  Q.   If we take a look at this document, it talks about your

18  contact with Newkirk.

19       You couldn't have talked to him before we filed the

20  amended complaint, I think, because he was still employed

21  with the company?

22  A.   That's correct.

23  Q.   So you waited until after; right?

24  A.   Yes.

25  Q.   Okay.  And then the Court upheld the case in
```

```
 1   September two thousand and -- well, this is 2011.  As soon as
 2   you could talk to Newkirk, you reached out to him; is that
 3   right?  As soon as you felt you could talk to him?
 4   A.   I think we were put back on or updating the
 5   investigation was reinvigorated, so to speak, around that
 6   same time frame, and so we decided who it was possibly that
 7   we could speak to.
 8   Q.   Okay.  And that was the denial of the dismissal of the
 9   first amended complaint; is that right?
10   A.   I don't know.  I don't know those dates.
11   Q.   Do you remember seeing the order that denied the
12   dismissal, the September 7th, 2011?  The motion to dismiss
13   first amended complaint denied, did you see that?
14   A.   I saw the order that partially upheld some parts.
15   Q.   You saw that order?
16   A.   Yes.
17   Q.   And you saw that order.
18        And in that order the Court says that it's going to
19   examine moving forward whether Mr. Trapani had personal
20   knowledge after his departure on August 28th, 2007; is that
21   right?
22   A.   I saw that.
23   Q.   You saw that.  And so you were reaching out here to see
24   if you could find other people that Mr. Trapani had talked to
25   and other things to support his personal knowledge; is that
```

1    right?

2    A.    I was reaching out to Mr. Newkirk as a witness and to

3    talk to him to see what he might have told Mr. Trapani.

4    Q.    Because up until this time, he had never said he had not

5    had personal knowledge of the matters he talked to you about

6    on the phone before the amended complaint was filed; is that

7    right?

8         The September 24th interview doesn't say he doesn't

9    have personal knowledge, does it, the one we just went

10   through?

11   A.    Correct, it doesn't say that he did have it or didn't

12   have it.

13   Q.    Okay.  And Newkirk is able to verify information in the

14   complaint.

15        So you used the complaint when you were talking to

16   Mr. Newkirk; is that right?

17   A.    That was Mr. Newkirk's words.  He said -- I was asking

18   him, you know, what he might be able to provide, what he

19   might be able to help us with, and he said, I can verify some

20   of the numbers in the complaint.

21   Q.    I see.  So he had the complaint himself?  He had gotten

22   a complaint somehow?

23   A.    Seemed like it.

24   Q.    Okay.  Did you ask him if he had the first amended

25   complaint?

```
1    A.    No.  The conversation was pretty short.

2    Q.    Okay.

3               He knows that there were practices that were

4          not top notch and which lacked integrity.

5    Did he say that to you?

6    A.    Yes.

7    Q.               And Newkirk is aware that the reserve

8          recommended by the working group in December 2007

9          was lowered by the ALLL Committee.

10   Is that right?

11   A.    That's correct.

12   Q.    So that was confirmation of what Trapani had told you in

13   September?

14   A.    That's correct.

15   Q.    Okay.  And then:

16               There is a Post-it note with the number on it

17          regarding the reserves for December 2007, and

18          Newkirk knows who has the Post-it note.

19   Is that what he's saying?

20   A.    That's correct.

21   Q.    And that's information that he told you --

22   A.    Yes.

23   Q.    -- that verified what Trapani had told you about

24   information after August 28th, 2007; is that right?

25   A.    Correct.
```

1  Q.   Okay.  In the Court's October 4th order, it says that

2  you were concerned -- the order says that you were concerned

3  that your declaration had been used to make it appear --

4  that's a declaration you submitted in the reconsideration

5  motion?

6  A.   Yes.

7  Q.   Okay.  Do you have a copy of that declaration?

8  A.   I do, but it's back there with Mr. Hirsch and

9  Mr. Worms.

10  Q.   I have got copies.

11  A.   Okay.

12      I think the exact language I used to the Court when

13  I called was not that I was concerned that I had been used in

14  that regard, but if I had been privy to the motion -- to the

15  briefing on the motion for reconsideration before my

16  declaration was filed, I would have demanded that more

17  information be included in my declaration.

18  Q.   So you did -- the order is incorrect?

19  A.   I think it paraphrases what I said.

20  Q.   So let me hand to you a copy of your declaration.

21          MR. COUGHLIN:  I will give the Court a copy.

22          This could be Exhibit No. 3, Your Honor.  It's

23  already in the record, but --

24  BY MR. COUGHLIN:

25  Q.   So at this time, you are asked -- there has been a filed

1   motion for reconsideration, and you are asked to do a

2   declaration; is that right?

3   A.   Correct.  I wasn't aware that there was going to be a

4   briefing filed on the motion for reconsideration at the same

5   time my declaration was.

6   Q.   Okay.  You didn't know that when you did the declaration

7   of Desiree Monty Torres in support of plaintiffs' opposition

8   to SunTrust's motion, that there was going to be a motion

9   filed, motion in opposition by plaintiffs?

10  A.   Not at the same time as my declaration, no.

11  Q.   You didn't realize that?

12  A.   Yes.

13  Q.   Okay.  But you know now today that there was one?

14  A.   Yes.

15  Q.   Okay.  Now, if we could just go briefly through that,

16  this basically -- this declaration pretty much goes through

17  and stays true to your interview notes; is that right?

18  A.   There is some information in my interviews that isn't --

19  that's omitted from my declaration, but otherwise it is

20  basically true.

21  Q.   It's accurate; right?

22  A.   It's accurate.

23  Q.   Okay.  So -- and you thought it was accurate and not

24  misleading, didn't leave out -- those details that are left

25  out or that there is more details, it didn't make this

1    inaccurate, what you submitted, did it?

2    A.    I think the information I submitted is all factually

3    accurate.

4    Q.    Okay.  And you signed the declaration?

5    A.    I did.

6    Q.    Okay.  So at first you go through the February 2nd

7    interview; is that correct?

8    A.    Yes.

9    Q.    Okay.  And in that, on page five, you talk about:

10                   During this February 2nd, 2010, interview,

11             which lasted 133 minutes, Mr. Trapani explained his

12             banking regulatory background.

13   Do you see that?

14   A.    Yes.

15   Q.    Up above that, it talks about that you interviewed him,

16   as well as attorneys from the offices of the lead

17   counsel.  That's right?

18   A.    Yes.

19   Q.    That's this firm right here?

20   A.    That's correct.

21   Q.    Okay.  So they were on the phone call?

22   A.    Yes.

23   Q.    And this was submitted to the Court --

24   A.    Yes.

25   Q.    -- that they were there?

1    A.    Yes.

2    Q.    Okay.  And you specifically say about his remaining in

3    his position until 2007, and he told me he was placed on

4    administrative leave August 28th.

5         You specifically reference that on the next page, page

6    six; right?

7    A.    Yes.

8    Q.    Now let's go to the -- in that interview, he was also --

9    he ended that saying he was concerned about providing

10   details; is that right?

11   A.    That's correct.

12   Q.    Okay.  So then we get to the September 24th interview.

13   A.    What page is that on?

14   Q.    Page twelve.

15   A.    Okay.

16   Q.    And this was the interview before the amended complaint

17   was filed.

18   A.    Yes.

19   Q.    Correct?

20   A.    That's correct.

21   Q.    And this is the one where a supplemental review with

22   Mr. Trapani and his counsel, lead counsel, occurred on

23   September 24th, 2010, which lasted 94 minutes; right?

24   A.    That's correct.

25   Q.    So lead counsel was again on that call; is that right?

1    A.    That's correct.

2    Q.    And you conducted that interview mainly, and then

3    Mr. Sader jumped in; is that right?

4    A.    That's correct.

5    Q.    Okay.  Now, if we could flip to page 19, on page 19 it

6    says:

7                    Mr. Trapani told me that he discussed the

8              burgeoning losses in the warehouse HELOC book with

9              Freeman, Panther, Chancy, and defendant and Chief

10             Executive Officer James Wells.

11        Is that right?

12   A.    That's correct.

13   Q.    And that:

14                  The losses in the HELOC book were part of

15             Mr. Trapani's daily discussions with his

16             superiors.

17        Right?

18   A.    Correct.

19   Q.                  Mr. Trapani stated that he was redoing the

20             loan loss reserve models during 2007.

21        Right?

22   A.    Correct.

23   Q.    And that's what he said he was doing; right?

24   A.    Yes.

25   Q.    Again he repeats that:

1          Mr. Trapani represented that he spoke to Wells

2          about the issue once or twice during 2007 --

3      But he didn't give a day.  Is that right?

4  A.   That's correct.

5  Q.   And he didn't say to you on that phone call that he

6  didn't speak to him after he left in August; right?

7  A.   That's correct.

8  Q.   Okay.  And then he says that he talked --

9          -- that he discussed the issue with Freeman at

10         least once per week, and with Fadil nearly every

11         day during 2007.

12 A.   That's correct.

13 Q.   So he didn't qualify and say during every day until

14 August 28th, 2007, did he?

15 A.   He did not say that.

16 Q.   Okay.  And you didn't say it in your declaration

17 submitted under oath to the Court; right?

18 A.   Correct.

19 Q.   Okay.  Now, in Paragraph 51 you say:

20         Mr. Trapani represented to me that everyone

21         was aware there was an uptick in losses in the

22         warehouse HELOC book in 2007.

23      Right?

24 A.   Uh-huh.

25 Q.   He didn't say up till August 28th, 2007, did he?

```
 1    A.    No, he did not.

 2    Q.    If you go to page 22, it says:

 3                    Mr. Trapani represented to me that SunTrust

 4               was underreserved at 85 basis points and at the end

 5               of 2007 at 97 basis points and that reserves needed

 6               to be a lot higher.

 7          That is just a flat-out statement by him?

 8    A.    Where are you, I'm sorry?

 9    Q.    Page 22 --

10    A.    Paragraph 54?

11    Q.    -- Paragraph 54.  The whole sentence says:

12                    Mr. Trapani represented to me --

13          That's you; right?

14    A.    Yes.

15    Q.          -- that SunTrust was underreserved at 85 basis

16               points and at the end of 2007 at 97 basis points

17               and that reserves needed to be a lot higher.

18          Is that correct?

19    A.    That's correct.

20    Q.    And that's what you wrote; correct?

21    A.    Yes.

22    Q.    And that was on that phone call that these other

23    gentlemen were on; is that right?

24    A.    I believe it was during the September 24th, 2010,

25    interview.
```

```
1    Q.   Right.  If you go over to the next page, page 23, it

2    says:

3                   SunTrust needed to be carrying reserves in the

4              range of 1.75 to 2 percent at the end of 2007 to be

5              adequately reserved for probable and identified

6              losses.

7         Do you see that?

8    A.   That's correct.

9    Q.   Okay.  He didn't tell you the basis of his knowledge

10   when he said that, did he?

11   A.   He compared the reserves to the industry levels at that

12   point in time.

13   Q.   He was looking at some documents.  Were you with him?

14   A.   No.

15   Q.   Do you know what documents he was looking at, aside from

16   a Federal Reserve report?

17   A.   No.

18   Q.   You don't know what he had in front of him; right?

19   A.   Correct.

20   Q.   Did he appear knowledgeable about the numbers at the

21   company?

22   A.   Very knowledgeable.

23   Q.   He didn't hesitate to say they were underreserved at the

24   end of 2007, did he?

25   A.   No.
```

1    Q.    On Paragraph 58 you say:

2              Mr. Trapani told me that everybody was aware

3          that SunTrust was underreserved for the last year

4          of his employment with SunTrust.

5    A.    Correct.

6    Q.    The entire year.  He left in December of 2007; right?

7    A.    Correct.

8    Q.    He didn't qualify it, did he?

9    A.    He did not.

10   Q.    You would have put that in here if he had qualified

11   it?

12   A.    Yes.

13   Q.    He didn't qualify it to you?

14   A.    Correct.

15   Q.    The October 11, 2011, interview, that is an interview --

16   on page 25 that starts.  That's an interview that is done

17   after he submits his couple of declarations, after the

18   amended complaint was filed, after the Court makes a ruling;

19   is that correct?

20   A.    That's correct.

21   Q.    Okay.  So that's after this pleading was already filed

22   that you have taken issue with about him talking to people

23   throughout 2007 and his knowledge of year-end numbers 2007;

24   right?

25   A.    Correct.

1    Q.    And that, that first amended consolidated complaint,

2    that was filed after this February 24th, two thousand --

3    A.    That's correct.

4    Q.    Thank you.

5          Okay.  Then he files some declarations that you did not

6    feel were accurate with what he said to you; right?

7    A.    There were some inconsistencies, yes.

8    Q.    And you pointed those out to the Court; right?

9    A.    Yes.

10   Q.    And if we go to page -- first of all, on Paragraph 72,

11   Mr. Trapani declared that he had several phone conferences

12   with private investigators in 2009 and 2010, but he had never

13   met with any investigators, is that correct, at Coughlin

14   Stoia?

15   A.    That's what it says, yeah.

16   Q.    That's what he -- that's what he said in that

17   declaration; right?

18   A.    I don't have it in front of me, but I believe so.

19   Q.    Okay.  But you put it into yours as a quote from his;

20   right?

21   A.    Right.

22   Q.    And then you said:

23               While Mr. Trapani may not have had any

24          in-person meetings with lead plaintiffs' counsel,

25          lead plaintiffs' counsel did participate in both

```
 1              the February 2nd, 2010, and September 24, 2010,

 2              interviews detailed above.

 3         Right?

 4    A.   Correct.

 5    Q.   You were telling the Court that; right?

 6    A.   Correct.

 7    Q.   That we were involved, that the firm was involved?

 8    A.   Correct.

 9    Q.   You weren't trying to hide that fact, were you?

10    A.   No.

11    Q.   Okay.  On page 31 -- and this is after that amended

12    complaint had been filed -- in the sixth paragraph of the

13    September 26th declaration filed by Mr. Trapani with Mr. Mast

14    here:

15              I never told plaintiffs' investigator that

16         SunTrust was inadequately reserved as of December

17         31st, 2007.

18         Do you see that statement?

19    A.   Yes.

20              THE COURT:  I'm sorry, where are you reading?

21              MR. COUGHLIN:  Paragraph -- page 31, Paragraph (c),

22    Paragraph 72 (c).

23              THE COURT:  Mine only goes to 29.

24              MR. COUGHLIN:  Sorry, Your Honor.

25              THE COURT:  That's okay.
```

```
 1   BY MR. COUGHLIN:
 2   Q.   Page 31, in this paragraph in the October 11, 2011,
 3   interview to you, Mr. Trapani had explained that, in fact, he
 4   did recall comments made to plaintiffs' investigators -- that
 5   would have been during the September 24th call; right?
 6   A.   Correct.
 7   Q.   -- regarding the adequacy of reserves after August 2007;
 8   right?
 9   A.   Correct.
10   Q.   And we went through ten of those statements just now;
11   right?
12   A.   Correct.
13   Q.   So he said now in the subsequent interview with you,
14   after he filed these declarations denying that, he recalled
15   that he did remember that; right?
16   A.   Correct.
17   Q.   So those declarations were at least inaccurate on that
18   point; is that correct?
19   A.   That's what I have here, yes.
20   Q.   All right.  Then he explained the basis that he had made
21   those comments; is that right?
22   A.   Yes.
23   Q.   And he explained that:
24             These comments were based on data that
25          Mr. Trapani saw before he left August 2007, his
```

```
 1              experience and expertise in that area --
 2         He had 25 years, right, in the accounting field; right?
 3  A.   Yes.
 4  Q.         -- and was an estimation knowing that the
 5              locomotive could not turn so quickly to have
 6              corrected the underreserved position between the
 7              beginning of September 2007 and the end of December
 8              2007.
 9         Is that right?
10  A.   That's correct.
11  Q.   He gave you the basis of why he had said that; right?
12  A.   Yes.
13  Q.   He did not provide that basis when you talked to him on
14  September 24th the year before; is that right?
15  A.   Correct.  All he said at that point in time was that he
16  gave the specific reserve numbers and said what the industry
17  average was.
18  Q.   And he said that they -- that the company was
19  underreserved?
20  A.   Yes.
21  Q.   And he said it ten times.  We just went through them.
22  A.   Yes.
23  Q.   Okay.  But here you ask him what the basis was, because
24  now he's filed these declarations saying he has no basis for
25  anything after August 28th; right?
```

1    A.    Mr. Brown asked him.  I didn't.

2    Q.    Okay.  And he provides the basis; right?

3    A.    Yes.

4    Q.    And this is the first time Mr. Brown was asking

5    questions; right?

6    A.    Correct.

7    Q.    And that was after the first amended complaint had been

8    filed; right?

9    A.    Correct.

10   Q.    And in conjunction with the reconsideration motions?

11   A.    Correct.

12   Q.    Okay.  He went on the next -- on the next page, page 32,

13   at Paragraph 75, he goes on to say that:

14              For the reserves at the end of calendar 2007

15         to be adequate, there would have had to have been a

16         reversal in delinquencies, large payoffs on

17         specific reserves, a huge amount of loans had to

18         have been sold off of the books, real estate assets

19         would have had to have been sold -- but such sales

20         would not have improved FAS 5 reserves -- and

21         securitization would have helped.

22       Do you see that?

23   A.    Yes.

24   Q.    And he was looking at some documents at the time, and

25   actually you had done a chart where none of that occurred;

1    right?

2    A.    Correct.

3    Q.    Okay.  So he knew that's what had to happen, and he

4    said it didn't happen, because he was looking at the

5    numbers?

6    A.    Correct.

7    Q.    And that's why he said he was sure they were

8    underreserved at year end 2007; right?

9    A.    Correct.

10   Q.    That's the first time he gave the basis of his

11   knowledge --

12   A.    Correct.

13   Q.    -- was then; right?

14   A.    Correct.

15   Q.    And we submitted that to the Court in the form of your

16   declaration; right?

17   A.    Correct.

18   Q.    And, yeah, I think your declaration ends about

19   discussion with Wilds and Newkirk and some of that contact on

20   page 33 and 34; is that right?

21   A.    That's correct.

22   Q.    Now, in this declaration -- and this was after the Court

23   upheld the complaints and you had to have personal knowledge

24   after -- on that stub time from September through December of

25   2007, and this was the motion for reconsideration, so you

1    knew the issues, okay, nowhere in this declaration do you

2    say, hey, he didn't tell us that he had any knowledge after

3    August 28, 2007; right?

4    A.    Correct.

5    Q.    Okay.  And you thought this was accurate and complete

6    when you submitted it to the Court; right?

7    A.    At the time.

8    Q.    Right.  Now you feel something different; is that

9    right?

10   A.    Correct.

11   Q.    Okay.  But at the time you did this, you signed it --

12   and you are a good investigator, you have been doing it for

13   years -- you thought this provided the Court with full and

14   accurate information; right?

15   A.    I believe this is only my first or second declaration.

16   I have been investigating for a long time.  I haven't filed

17   very many declarations, though.

18   Q.    But you wouldn't give the Court inaccurate information,

19   would you?

20   A.    Not willingly, knowingly, no.

21   Q.    And you didn't here; right?

22   A.    I feel like there was some information that was omitted

23   that should have been included in hindsight.

24   Q.    Now you do?

25   A.    Yes.

1    Q.    Okay.  It's not information that Mr. Trapani told you in
2    that September 24th, 2007, interview, is it?
3    A.    Say that again, I'm sorry?
4    Q.    It's not any information that he provided when the
5    attorneys were on the phone on that September 24th, 2011,
6    interview, is it?
7    A.    The September 24th, 2010, interview?
8    Q.    2010, yes.
9    A.    Yes.  I believe that there was some information that
10   should have been included in my declaration.
11   Q.    That was in that report --
12   A.    Yes.
13   Q.    -- about his lack of knowledge between September and
14   December?
15   A.    Yes.
16   Q.    Okay.  We didn't see that when we just went through it
17   and I asked you if it was in there and you said it was not.
18   A.    I can point out what I would have hoped would have been
19   in there in hindsight.
20   Q.    Okay.  I will give you a chance to do that with the
21   Court in a minute; okay?
22   A.    Okay.
23   Q.    When we went through it, though, ten times he said
24   throughout his employment in 2007 they were underreserved;
25   right?

1    A.    Yes.

2    Q.    What you are referring to is some specific

3    conversations with certain people as he led up to his last

4    days; right?

5    A.    Yes.

6    Q.    Okay.  But that again doesn't say he didn't have

7    conversations with the other people towards the end of 2007;

8    right?

9    A.    Correct.

10   Q.    And in fact, he had conversations after he left or knew

11   or said he knew that Fortin had knowledge after he left;

12   right?

13   A.    He never said he had conversations with Mr. Fortin.  He

14   said that he knew, Mr. Fortin knew, but never said he spoke

15   to him.

16   Q.    He said -- he made a flat out statement that Fortin

17   knew; right?

18   A.    That's correct.

19   Q.    Okay.  He just didn't give you the basis of his

20   knowledge how Fortin knew; right?

21   A.    That's correct.

22   Q.    And before you filed that declaration, you reviewed it,

23   and you sent an e-mail to Andrew Brown here, you said:

24              The declaration looks perfect.  I will sign

25          and send the signature page below.

1    A.    Correct.

2    Q.    Is that correct?

3          Those were your words, perfect?

4    A.    That's correct.

5          THE COURT:  This will be Exhibit 4.

6    BY MR. COUGHLIN:

7    Q.    Now, we had a discussion that you said you had looked at

8    some e-mails to Mr. Mauriello?

9    A.    Yes.

10   Q.    And you referenced earlier about Trapini asking that the

11   complaint be provided with him?

12   A.    Correct.

13   Q.    You don't know whether the complaint was provided to

14   Mr. Trapani or not, do you?

15   A.    All I know is what I read in Mr. Trapani's declaration,

16   that he didn't receive a copy of it.

17   Q.    Right.  But you took issue with ten other statements,

18   you said they were inaccurate or wrong, if not false, when

19   you went through your declaration; right?

20   A.    That's correct.

21   Q.    Okay.  So you didn't know -- or did you see this e-mail

22   from Jack Reise?  It may have only been about seven hours

23   before the complaint was filed, and you never saw this

24   e-mail; right?

25   A.    I never saw that e-mail.

```
1    Q.    That the complaint was sent to Trapani's lawyer?
2    A.    I have never seen this.
3    Q.    And says Jack Reise, Tom Mauriello, SunTrust, Compare
4    Consolidated Complaint and First Amended Complaints.doc;
5    right?
6    A.    That's exactly what it says.
7    Q.    And you have never seen it?
8    A.    No.
9    Q.    So you did not know this happened?
10   A.    No.
11         I was apprised when we met with Mr. Dowd, Mr. Niehaus
12   said that an effort was made to send the complaint, and
13   Mr. Mauriello couldn't find the e-mail.
14   Q.    Mr. Mauriello said he couldn't confirm what he did with
15   it; right?
16   A.    Correct.
17   Q.    But we have the e-mail where we sent it to him; right?
18   A.    That's what this says here.
19   Q.    Right.
20         Now, when we were talking -- when we were talking about
21   your declaration, you made a reference --
22         MR. COUGHLIN:  And so I'm going to leap to it --
23   I'm going to surmise something, Your Honor, and leap to a
24   conclusion.
25         Could I take a look at the Plaintiffs' Opposition
```

1    to SunTrust Defendants Motion for Reconsideration?

2          Your Honor, these are part of the record pleadings,

3    but I'm going to just refer to them, so I'm going to pass

4    them out.

5          THE COURT:  This is Exhibit 6.

6    BY MR. COUGHLIN:

7    Q.   Now, this is the reconsideration motion.  I will make

8    that representation to you; okay?

9        And now you know that you submitted your declaration,

10   and in each of those interviews you list out that lead

11   plaintiff was on that call; right?

12   A.   Correct.

13   Q.   And in fact, didn't you, on the fourth time you take

14   issue with Trapani's assertion that he never met lead

15   plaintiffs, but -- and you actually explain but at least he

16   did talk to them, they were on the calls; right?

17   A.   Correct.

18   Q.   Okay.  And you point that out in your declaration filed

19   with this motion for reconsideration; right?

20   A.   That's correct.

21   Q.   Okay.  And in this motion for reconsideration, let's say

22   you take a look at page one; okay?  It says:

23              The allegations attributed to Trapani are

24          the result of statements made by Trapani to

25          plaintiffs.

```
1          Okay?

2    A.    Correct.

3    Q.    Okay.  It doesn't say plaintiffs' investigator; right?

4    A.    Right.

5    Q.    It doesn't limit it just to you; right?

6    A.    Correct.

7    Q.    It says to plaintiffs; right?

8          And in fact, there are nine other instances where we

9    talk about Trapani's -- if you flip to page two, top of the

10   page:  However Trapani previously told plaintiffs -- do you

11   see that?

12   A.    Yes.

13   Q.    It doesn't limit it to you, does it?

14   A.    Correct.

15   Q.    Provided information -- on page four, provided

16   information to plaintiffs.  Do you see that on page four at

17   the top, three lines down?

18   A.    Yes.

19   Q.    Okay.  On page six, it talks about plaintiffs were able

20   to interview Trapani, and says Trapani advised

21   plaintiffs.  Do you see those at page six?

22   A.    Yes.

23   Q.    Okay.  On page nine it talks about what Trapani did tell

24   plaintiffs; right?

25   A.    Yes.
```

1    Q.    And each of these references is to your declaration;

2    right?

3    A.    Yes.

4    Q.    Where you had told the Court that lead counsel was on

5    those calls; is that right?

6    A.    Correct.

7    Q.    Okay.  And on page thirteen it even makes it more

8    clear.  It says numerous interviews performed by plaintiffs'

9    investigator and counsel.  Do you see that?

10   A.    Yes.

11   Q.    Okay.  So there was no attempt so far to hide the

12   involvement of counsel; is that right?

13   A.    So far.

14   Q.    Okay.  You take issue with the paragraph on page 16; is

15   that correct?  If you would flip to 16?

16   A.    I'm not entirely sure that's the one I take issue with.

17   The ones that I have issue with are where they say that

18   plaintiffs' counsel relied -- I would have to spend some time

19   going through this to find that.

20   Q.    We are going to get to that.

21   A.    Okay.

22   Q.    That's in the -- that's in the next motion.

23   A.    Okay.

24   Q.    Okay.  Let's deal with this one first.

25         Because as I understand it, it's a paragraph that either

1   Mr. Worms or yourself pointed to in a meeting we Mr. Dowd;

2   okay?

3                Defendants argue that plaintiffs' counsel's

4           failure to personally meet with the witness somehow

5           reflects poorly on counsel's investigation.

6        And this is where it says:

7                But those who interview witnesses may

8           ultimately have to testify about what was said if a

9           witness does recant, providing a good reason for

10          counsel to avoid relying on personal contact with a

11          witness.

12       Do you see that?

13  A.   Yes.

14  Q.   Indeed, tradition -- and it talks about -- and right

15  here you know that they made the assertion that we never

16  met with them and failed -- they knew we had been on the

17  interviews, but they argued that we never personally met,

18  and somehow that was a failure.

19       Did you know that was the assertion?

20  A.   I'm not entirely sure if I did or not.

21  Q.   I mean, we had said it here fifteen times that we

22  had been on the interviews, so it was just a question of

23  whether we personally met.  Did you know that was the

24  issue?

25  A.   No.

1   Q.   Okay.  You knew the issue was -- and I think Mr. Worms

2   brought it up to you -- you knew the issue that you had with

3   what Mr. Mast did was that he met with this witness without

4   an investigator; isn't that correct?

5   A.   I do not have an opinion on that.

6   Q.   You didn't have an opinion whether he could do that or

7   not, whether an attorney can do that or not?

8   A.   Correct.

9   Q.   Whether he might make himself a witness?

10  A.   Correct.

11  Q.   And did you talk to Mr. Dowd about how, you know, as an

12  Assistant U.S. Attorney, you have a 302, you have an FBI

13  agent there so you never become a witness?

14  A.   I don't recall that.

15  Q.   Did you talk to Mr. Dowd --

16  A.   I don't recall that in our discussion.

17  Q.   Okay.  But so far, you had no complaints about that

18  paragraph then; is that right?

19  A.   Correct.

20  Q.   Okay.  And then it goes on, and several more times,

21  there is I think three or four more references, like page

22  seventeen, certain statements made to plaintiffs.

23       So this brief you didn't really have a problem with; is

24  that right?

25  A.   I would have to spend some time going through it to

1   answer that accurately.

2   Q.   Okay.  You made a reference to you didn't know that a

3   brief was going to be filed with your declaration, like

4   somehow there was a falsity in the brief that

5   mischaracterized your declaration.

6        Is there anything that you have seen in this that does

7   that?  I mean, you must have something in mind to make that

8   statement?

9   A.   There were points in here, and I would have to again go

10  through it, that say -- I can find them real quickly if you

11  give me a moment.

12       I think that the exception that I had begins on page

13  fifteen.

14  Q.   Okay.

15  A.           One of those realities is that attorneys often

16           must rely on the assistance of investigators and

17           other agents in the compilation of materials in

18           preparation for trial.

19  Q.   You had a problem with the statement that we -- where

20  are you right now?

21  A.   At the bottom of page fifteen.

22  Q.   Right.

23  A.   You are quoting --

24  Q.           One of these realities is that attorneys often

25           must rely on the assistance of investigators and

1          other agents.

2      That's the problem you have with that?

3  A.   Correct.

4  Q.   Okay.  You don't think that we should be able to rely on

5  your reports?

6  A.   I think you should be able to rely on my reports, but

7  not when the attorneys from your firm are on the phone to

8  hear exactly what the witness says.

9  Q.   Right, so that both of you have it.

10      Now, you are taking notes, contemporaneous notes so that

11  you have a full record of the report; is that right?

12  A.   Correct.

13  Q.   And then you send it so they can use it; right?

14  A.   Correct.

15  Q.   I mean, that's what you are getting paid for is to take

16  those notes, take them accurately, and pass them on to the

17  attorneys?

18  A.   That's correct.

19  Q.   And you don't think that they should be able to rely on

20  those?

21      I'm not saying they didn't check and weren't on the

22  phone.  They were.  You can put a forensic accountant on the

23  phone.  But you are saying they shouldn't be able to rely on

24  your summaries?

25  A.   They should be able to rely on my summaries, yes,

1    but not entirely and not solely if they are also on the

2    phone.

3        For instance, they could have made edits to my summaries

4    if there was something that they saw in the memos or

5    something different they heard on the phone, if there were

6    discrepancies there.

7    Q.   You think the attorneys can make edits to your -- to

8    your notes?

9    A.   To the interview summaries, yes.

10   Q.   And change what you said you thought you heard the

11   witness say?

12   A.   It happened for the October 2011 interview,

13   yes.  Ms. Gross and I'm not sure who else made edits to that

14   interview summary.

15   Q.   You say that they made edits and changed the meaning?

16   A.   I'm not -- I don't recall what the edits were.

17   Q.   Well, you didn't disagree with the edits; right?

18   A.   I don't know that I ever saw them.  I know that

19   Mr. Worms told me that the edits had to be made and that he

20   had a telephone discussion with I believe Ms. Gross and I

21   don't know if Mr. Brown was on the phone, but that they had

22   edits that they needed to make.

23   Q.   And you have reviewed your October memo; right?

24   A.   Yes.

25   Q.   And then you recounted it throughout your declaration;

1  right?

2  A.    Yes.

3  Q.    And there was nothing inaccurate about it; right?

4  A.    Correct.

5       I just said that as an example of they don't solely rely

6  on me if they are the phone.

7  Q.    Right, they have their own -- they are listening, they

8  have an opinion.  They are responsible for doing the

9  complaint and not you; is that right?

10 A.    That's correct.

11 Q.    Right.  And so then they do the complaint and they file

12 it with the Court in reliance in part on you.  And sometimes

13 they are not on the phone with you; is that right?

14 A.    That's correct.

15 Q.    Okay.  So they might have to entirely rely on you and

16 your report; right?

17 A.    That's correct.

18 Q.    And when they are on the phone, they can do both?

19 A.    Correct.

20 Q.    Rely on your report; right?

21 A.    That's correct.

22 Q.    Okay.  You are not saying they are prohibited from

23 relying on you; right?

24 A.    That's correct.

25 Q.    Okay.  And after the brief -- and you are copied on this

1    e-mail that I just handed up, and we will make this Exhibit

2    No. 7, Your Honor?

3    A.   Yes.

4          THE COURT:  I think this is 6, isn't it?  Is this

5    the one you just gave me?

6          MR. COUGHLIN:  Yes.  Oh, did you already call out 6

7    and I am just jumping ahead now?

8          THE COURT:  Yes.

9    BY MR. COUGHLIN:

10   Q.   And it says Andrew -- and this is from Wolf Worms,

11   right, and you are copied on it?

12   A.   Correct.

13   Q.   And this is about this reconsideration brief, and this

14   is the day after that was filed.  That was filed I guess

15   October 17th, if I'm correct, and this is October 18th:  The

16   the brief looks great.

17        Do you see that?

18   A.   Yes.

19   Q.   And then you -- then somebody at your shop takes issue

20   from Mast in this case about the proper conduct for

21   contacting witnesses?

22   A.   That's not me taking issue.  The e-mail is not from me.

23   Q.   Did you disagree with the "brief looks great" comment by

24   Mr. Worms?

25   A.   I hadn't read it at that point in time.

1   Q.   All right.  So you got this e-mail, you hadn't read the

2   brief.  But you knew then that a brief was submitted with

3   your declaration; right?

4   A.   That's correct.

5   Q.   Okay.  You didn't review it until later?

6   A.   Until after the August order, August 28th order.

7   Q.   August 28th order?

8   A.   Yes.

9   Q.   And then you looked at it and you found the problems you

10  just identified?

11  A.   Yes.

12  Q.   Up until that time you never mentioned a problem with

13  it, right, to anybody?

14  A.   Correct.

15  Q.   And then we have the second brief in the plaintiffs'

16  opposition to defendants' motion for sanctions.

17          MR. COUGHLIN:  This is 7.  Thank you, Your Honor.*

18  BY MR. COUGHLIN:

19  Q.   This is the brief you said you had problems with also;

20  is that right?

21  A.   That's correct.

22  Q.   Okay.  And it's not a problem, if I understand it, about

23  counsel participating in the interviews; right?

24  _____
    * The exhibit is referred to as 7 here, but the correct
25  exhibit as marked and admitted is Exhibit 8.

```
 1    A.    Correct.

 2    Q.    Okay.  It's a counsel -- it's a problem about reliance

 3    on you; right?

 4    A.    That's correct.

 5    Q.    And if I am right, if we turn to page -- because

 6    throughout the brief it says plaintiffs and their

 7    investigator.  Do you see that?

 8    A.    Yes.

 9    Q.    Let's take page three?

10    A.    Yes.

11    Q.    It says plaintiffs and their investigator, you know.

12          And then at the top of seven, it says plaintiffs'

13    investigators and counsel.  Do you see that?

14    A.    Yes.

15    Q.    Okay.  So there was no attempt to hide the fact that we

16    were on the phone in the interview; right?

17    A.    Not at that point in the briefing, no.

18    Q.    I mean, how many times have we said it now in your

19    count?  About seventeen?

20    A.    I haven't been counting.

21    Q.    Okay.  At least over fifteen, right, that we were on the

22    phone?

23    A.    I haven't been counting.

24    Q.    You said it four times in your declaration; right?

25    A.    I think I said it once.
```

1    Q.   Well, you said at the beginning of each -- at the

2    beginning of each summary you said lead counsel's on the

3    phone with you, and at times you said -- you said more, and

4    then you challenged Mr. Trapani.

5         You said it after the first interview in February, after

6    the second interview in September, and you said it after the

7    third interview in October, and then at the back you

8    challenged Mr. Trapani's statement.  You said it four times

9    that we were one the phone call.

10   A.   Okay.  I agree.

11   Q.   Okay.  So if we take a look at page fifteen, if

12   I understand what you took issue with, you took issue with at

13   least footnote number seven; is that right?

14   A.   Partially.  I think the main area I took issue with was

15   on page 21.

16   Q.   Okay.  But you were taking issue -- as I understood

17   the meaning, you took issue with this, and this had to do

18   with meeting witnesses personally and in response to what

19   the defendants have raised.  Do you remember that or not?

20   A.   Yes.

21   Q.   And now you took issue with -- on page 21?

22   A.   Yes.

23   Q.   And the thing that you took issue with is that *United*

24   *States v. Nobles* case which deals with:

25                    It was reasonable for plaintiffs to rely on

```
 1                  their investigator for many of the allegations in
 2                  the FAC.
 3       A.   Correct.
 4       Q.   Is that right?
 5       A.   That's correct.
 6       Q.   Okay.  Now, many of those interviews that you took, you
 7       were the only one on the interview; right?
 8       A.   That's correct.
 9       Q.   Okay.  And except -- and on the interviews they were on,
10       you provided a summary; right?
11       A.   That's correct.
12       Q.   As accurate as you could provide it?
13       A.   That's correct.
14       Q.   And you say sometimes you even got a push-back from them
15       saying, hey, I didn't think this was accurate, right, on the
16       third one?
17       A.   I don't know that I would say a push-back, but they made
18       some edits.  I don't recall what the edits were.
19       Q.   Okay.  And you're -- what you are upset with is that
20       it was reasonable for plaintiffs to rely on their
21       investigator for many of the allegations in the complaint?
22       A.   Yes.
23       Q.   Is that right?
24       A.   That's correct.
25       Q.   You didn't believe they could use your summary as they
```

1  drafted the complaint?

2  A.   If I could elaborate?  The concern I have is that the

3  complaint says Mr. Trapani had discussions with defendants

4  throughout 2007, and that's nowhere in my summaries.

5  Q.   Well --

6  A.   And this imports that I may -- I could have been relied

7  on for that information when that's not correct.

8  Q.   Well, actually, Mr. Trapani said -- and we went through

9  the report -- he said it ten times throughout his employment

10  he had discussions with defendants.

11      His employment ended December 2007; right?

12  A.   Correct.

13  Q.   These guys are responsible for drafting the complaint,

14  and they said throughout 2007?

15  A.   Yes.

16  Q.   Which was the term of his employment; right?

17  A.   Correct.

18  Q.   So technically everything was correct; right?

19  A.   Except for that the complaint omits that he left in

20  August of 2007, which makes it appear that I could have

21  omitted that from my interview summariess.

22  Q.   But that was never an issue.  Defendants brought that up

23  immediately.  It didn't impact whether he had personal

24  knowledge after that time or not; right?

25  A.   I can't -- I can't answer that question.

1    Q.    The Court noted it in its order that he left after

2    August 28th, 2007, because the defendants pointed it out

3    right away and that was going to be an issue, and he allowed

4    certain discovery as to four defendants to go forward to see

5    the basis of their subjective knowledge after that date and

6    whether they had actually had contact with Trapani.   Do you

7    remember that?

8    A.    Yes.

9    Q.    Okay.   So it wasn't like it was a secret in the

10   litigation; right?

11   A.    Not after the complaint was filed, no.

12   Q.    Right.   And it was litigated, and the Court had it in

13   its order that it was well aware of that; right?

14   A.    I believe so.

15   Q.    And he had told us that they were underreserved at

16   the end of his employment in 2007.   Those were his words;

17   right?

18   A.    Yes.

19         MR. COUGHLIN:   Your Honor, I can keep going or if

20   you want to take a little break?   I feel -- I have got about

21   seven or eight more documents.

22         THE COURT:   Let's keep going.

23         MR. COUGHLIN:   Okay.

24         If I could have the August 28th opinion and order,

25   *(Exhibit 9).*

```
 1              MS. TORRES:  Thank you.

 2              MR. COUGHLIN:  Thank you, Your Honor.

 3              Your Honor, if I might just get a little water?

 4              Your Honor, I can't ever remember taking an order

 5     from a district court judge and going through it in his

 6     courtroom with him, so it's with all due respect that,

 7     as I take parts of this order and question this witness, I'm

 8     not -- it has nothing to do -- I don't know, I'm not calling

 9     into question anything about the process or what the Court

10     did or not.  I'm just questioning her about what she saw and

11     her complaints to us.

12              THE COURT:  All right.

13              MR. COUGHLIN:  Thank you.  In other words, I mean

14     no disrespect moving forward here.

15     BY MR. COUGHLIN:

16     Q.   You have a copy of the order?

17     A.   Yes, you gave one to me.

18     Q.   Okay.  You know, I think I'm just going to -- let's go

19     to page twelve.  It says:

20              The Court noted that plaintiffs' amended

21              complaint alleged subjective falsity against the

22              SunTrust defendants based on its claim that

23              Trapani's statements show senior SunTrust

24              executives knew the data upon which the loan losses

25              and ALLL were based were materially deficient and
```

1          unreliable, and thus SunTrust knew it had

2          understated its loan losses and misrepresented its

3          ALLL in the December 2007 10-K and February 2008

4          RS/P -- the prospectus.

5      Right?

6   A.   Correct.

7   Q.   Which incorporated the 10-K; right?

8      Didn't Trapani tell us about seven or eight times on

9   that phone call or tell the firm that he believed throughout

10  his employment they were underreserved, and at the end of

11  2007 the company was underreserved?

12  A.   He said that.

13  Q.   He said they were underreserved by a specific number, 85

14  basis points, above 97; is that right?

15  A.   That's correct.

16  Q.   Okay.  We worked that out mathematically, and I think

17  you checked on some of it, it was like over a billion

18  dollars?

19  A.   Correct.

20  Q.   And that was the information that he had provided to us;

21  right?

22  A.   That's correct.

23  Q.   At the time the first amended complaint was filed,

24  he hadn't clarified the basis of his knowledge; is that

25  correct?

1    A.   That's correct.

2    Q.   And when he did clarify it, we put it in a declaration

3    and submitted it to the Court; is that right?

4    A.   That's correct.

5    Q.   So the Court knew the basis of his knowledge of what he

6    provided to us, why we had pled the complaint that way, that

7    we had been involved in phone calls and interviews with you

8    and what Trapani had said; right?

9    A.   I can't say what the Court did or didn't know.

10   Q.   Okay.  You saw the documents that were submitted in the

11   reconsideration and motion for sanctions; right?

12   A.   The briefings?

13   Q.   Yes.

14   A.   After I read the August order I did.

15   Q.   Okay.  And you also saw your declaration, which you

16   believed accurate at the time you submitted it; right?

17   A.   Correct.

18   Q.   It didn't call into question that, your number stuff,

19   did it?

20   A.   No.

21   Q.   On page 42, it says:

22                The Court reaffirms that it was led to believe

23          by plaintiffs' counsel that Trapani had knowledge

24          of defendants' actual review of data upon which the

25          ALLL and provision were determined in late 2007 and

1              as represented in public disclosures in February

2              2008.

3      It talks about plaintiffs' counsel being careless or

4 clever.  Do you see that?

5 A.    I see it.

6 Q.    Okay.  But at the time we filed that complaint,

7 Trapani told us they were underreserved at the year end

8 2007; right?

9 A.    That's correct.

10 Q.    Okay.  He just hadn't given us his basis for it; is that

11 right?

12 A.    That's correct.

13 Q.    You would have gotten that basis if you could have

14 gotten it and had time and he was willing to give you the

15 detail at that time; is that right?

16 A.    That's correct.

17 Q.    But you didn't; right?

18 A.    That's correct.

19 Q.    Okay.  And then we asked for his deposition so we could

20 drill down on that issue when we filed the amended complaint;

21 is that right?

22 A.    I believe so.

23 Q.    And your partner put in a declaration to that effect;

24 right?

25 A.    My partner?

1   Q.   Mr. Worms.

2   A.   Oh, Mr. Worms put in it?  He filed a declaration, yes.

3   Q.   Okay.  Do you know if in Mr. Worms' declaration he said

4   anything about Mr. Trapani not having knowledge after August

5   28th, 2007?

6   A.   I don't know what his declaration says.

7   Q.   Okay.  Did you look at it?

8   A.   At one time or another, yes.

9   Q.   Okay.  On page 43 at the bottom of the page, the Court

10  says:

11             It appears here that no lawyer representing

12         plaintiff ever met with or interviewed Trapani

13         about what he knew, whether he was credible, or

14         even how long he actually worked for SunTrust and

15         the currency of his knowledge.

16      Do you see that?

17  A.   Yes.

18  Q.   Now, we know the defendants have raised an issue about

19  actually meeting with him, and Trapani had said he never met

20  with them, and you clarified in your declaration that we

21  actually met with him every time?

22  A.   Correct.

23  Q.   Okay.  And you put that in your declarations to be

24  submitted to the Court; right?

25  A.   Correct.

1    Q.   And in both the -- in both the papers, the motions that

2    we looked at, the reconsideration and the sanctions motion,

3    we specifically said that it was you, plaintiffs'

4    investigator, and counsel at those interviews; right?

5    A.   Something along those lines.

6    Q.   Okay.  So the Court, in your words earlier, got it

7    wrong?

8    A.   I never said that.  That's what Mr. Dowd said to me.

9    Q.   Mr. Dowd said that to you?

10   A.   Correct.

11   Q.   Okay.  And is that wrong?  We were involved in the

12   interviews.  Is this wrong?

13   A.   I believe that there is information in the briefings

14   that says plaintiffs' counsel relied on me, from which the

15   Court can draw an inference that I may have misled you.

16   Q.   You think that's the basis of the Court's conclusion

17   that you misled us?

18   A.   Yes.

19   Q.   Okay.

20   A.   The briefings don't cite to my declaration at all to say

21   that plaintiffs' counsel was on the phone.

22   Q.   It doesn't mention that in this order, that we were on

23   the phone and involved in the interviews, does it?

24   A.   I don't see it.

25   Q.   It doesn't talk about Mr. Brown asking questions, does

1    it?

2    A.    No.

3    Q.    Okay.  And then on page 44, it says:

4              Having closely examined the Torres

5         declaration, it appears Torres did not include in

6         her report to plaintiffs' counsel information that

7         made clear that Trapani had no personal knowledge

8         of events at SunTrust after he was placed on

9         administrative leave in August 2007.

10        Right?

11   A.    Correct.

12   Q.    Okay.  And in fact, your declaration doesn't make it

13   clear that he didn't have personal knowledge after 2007;

14   right?

15   A.    Correct.

16   Q.    Because Trapani never said to you that he didn't have

17   personal knowledge, did he?

18   A.    Correct.

19   Q.    Okay.

20             Rather, the Torres declaration supports a

21        conclusion that plaintiffs' counsel relied upon

22        the information -- and this is the reliance part

23        we are talking about -- relied upon the

24        information Torres misleadingly reported as

25        factual support for the claims that were made by

1          plaintiffs in the original complaint and subsequent

2          pleadings.

3      And that's why we are here today; right?

4  A.   Correct.

5  Q.   Because you are upset about that.  And who wouldn't be;

6  right?

7  A.   And I don't want to continue to work in a profession

8  where it's possible that parties can infer and use language

9  that I believe is misleading based on what witnesses have

10  said to me.

11  Q.   Okay.  But it's without a doubt that we put in front

12  of the Court that we were involved in the interviews;

13  right?

14  A.   Correct.

15  Q.   Okay.  And it's without a doubt that Trapani said he had

16  knowledge of the underreserves that at the end of 2007;

17  right?

18  A.   He opined that they were underreserved.

19  Q.   He didn't say "it's my opinion."  He said the company

20  is underreseerved by 85 basis points, over 97 at year end

21  2007 at the end of my employment.  Isn't that what he

22  said?

23  A.   I would have to look at the interview summary again to

24  say whether -- if I used the word "opined" or not.

25  Q.   Yes, take a look at the September 24th summary, which is

```
1     the one before the complaint.  And if you could show me the

2     word, where he's opining?

3     A.   That's correct, he did not -- and I don't say in my

4     interview summary that he opined.  He says -- gives the level

5     of reserves and compares them to industry averages.

6     Q.   And says they are underreserved?

7     A.   Yes.

8     Q.   So it didn't say it was his opinion.  He said they were

9     underreserved.

10    A.   Yes.

11    Q.   Okay.

12            MR. COUGHLIN:  Your Honor, I don't have any more

13    questions at this time, but I would reserve depending on what

14    the Court asks or what defense counsel asks.

15            THE COURT:  All right.  Thank you.

16            MR. MAST:  Your Honor, can we take just a quick

17    break?

18            THE COURT:  How quick?

19            MR. MAST:  Very quick.

20            THE COURT:  All right.  Let's take a five-minute

21    recess.

22            MR. MAST:  Thank you.

23            MR. GRANTHAM:  Your Honor?

24            THE COURT:  Yes.

25            MR. GRANTHAM:  May we have a copy of the written
```

1    prepared remarks used by Ms. Torres?

2              THE COURT:  Yes.

3              Do you have an extra copy, Ms. Torres?  Do you have

4    a clean copy that we can copy?

5              MS. TORRES:  I believe I have one copy, yes.

6              THE COURT:  Jessica, can you make some copies of

7    that?

8              THE CLERK:  Yes.

9                   (A recess is taken at 3:47 p.m.)

10                           --   --   --

11                   (In open court at 3:56 p.m.:)

12             THE COURT:  All right.  Let's continue.

13             Go ahead.

14             MR. MAST:  Your Honor.

15             First, I would like, Ms. Torres, to take the

16   opportunity to thank you for coming forward.  I know this was

17   a difficult thing for you.

18             MS. TORRES:  Thank you.

19             MR. MAST:  And as the Court said at the beginning,

20   it took a lot of courage, and it is very much appreciated.

21             Your Honor, I think that Ms. Torres' statements so

22   far cover the issues from the defendants' perspective.  And

23   although the Court may have some additional questions, we

24   don't have any additional questions at this time.

25             THE COURT:  All right.  Thank you.

```
 1              MR. CHANDLER:  We have no questions, Your Honor.

 2              MR. GRANTHAM:  No questions, Judge.

 3              THE COURT:  All right.  Thank you.

 4              MR. COUGHLIN:  And, Your Honor, you may have some

 5    questions, but I didn't want to miss the opportunity, I would

 6    like to say something at the end, you know, about me and

 7    about what's in the order, you know, and about the reference

 8    to the investigators, if I might?

 9              THE COURT:  No, I have heard and I think I fully

10    understand what happened.  I don't have any questions.

11              So you may say whatever you would like to say.

12              MR. COUGHLIN:  Your Honor, I didn't meet

13    Ms. Torres, you know, before today, and, you know, although

14    she worked when I was running the firm for the firm for a

15    long time, I'm no longer in that position.

16              You know, I think, frankly, the attorneys didn't

17    know what to do.  You know, they felt bad for her, they

18    didn't know what to do or what with the information they

19    thought was before the Court or not.

20              Ms. Torres thought it could be clearer.

21    I certainly understand that.

22              You know, I guess if there is a possible remedy --

23    I don't think we were careless, I don't think the firm was

24    careless, you know, or clever; okay?  Inartful in some of the

25    places, like Your Honor dropped that footnote and talked
```

1    about U.S. Attorneys and how they would do interviews with,

2    you know, FBI agents, to do a 302, and that's exactly what

3    I think we had here.  But they could have made it clearer and

4    expanded, you know, upon that.

5            But I don't think there was any deliberate

6    attempt to mislead about our involvement -- about the

7    firm's involvement in the interviews, and certainly

8    everybody felt terrible, as Mr. Niehaus expressed to

9    Ms. Torres, about the reference to her in that she somehow

10   misled us, you know.

11           If there is any blame, then blame the firm and not

12   the investigator.  Because now you see what the

13   investigator's note said and how it was, and I think that it

14   becomes a little more clear sometimes when we are dealing

15   with confidential witnesses, you know, what the basis is or

16   what we try to get to the basis and how sometimes with the

17   limited abilities we have under the Reform Act what we can

18   get to or not.

19           Which is I think why the firm asked for the

20   discovery when it filed the first amended complaint of just

21   Mr. Trapani to, you know, explore all the facts that he knew

22   or didn't know.  It wasn't to, you know, to get allegations

23   that weren't in the complaint or find other stuff out.  Those

24   things already were, you know.

25           And I truly think that Mr. Dowd and the others --

1    you asked about him.  You know, I have known him for more

2    than twenty years.  He was -- he worked with me at the U.S.

3    Attorney's Office.  I think he just didn't know if there was

4    any avenue if you weren't going to appeal the Court's order,

5    and they didn't feel there was a basis to file a

6    reconsideration or go forward with the appeal.

7              This was certainly an unusual move.  You know,

8    frankly, I think I'm glad we got here and explored, you know,

9    what went wrong, when and how we got to this position.

10             And if we -- I don't think it was careless or

11   clever, but if we inadvertently misled the Court, we

12   apologize.

13             THE COURT:  Is there anything else anybody would

14   like to say before we -- I assume, Mr. Worms and Mr. Hirsch,

15   that you prefer to sit back there rather than come and sit up

16   here?

17             MR. WORMS:  Unless I can corroborate I think what

18   Ms. Torres said, validate what she said, I think I'm okay.

19             MR. HIRSH:  I am available for questions, but don't

20   feel a burning need to sit up there.

21             THE COURT:  We can accommodate you if you really

22   do.

23             Ms. Torres, again I want to thank you for

24   contacting us, I want to thank you for your willingness to go

25   through this.

1          And I really do applaud your -- I mean, you made a

2    decision based upon your moral compass, and there are few

3    people that do that these days.  The people that do it the

4    least often sometimes are lawyers, and that's regrettable.

5    But maybe you can stand as an example for all of us, and

6    I appreciate that.

7          And thank you for coming today.

8          MS. TORRES:  Thank you.

9          THE COURT:  You can go back and sit there so you

10   don't have to answer any more questions.

11         MS. TORRES:  Okay.

12         THE COURT:  Before we conclude and I deliberate

13   over what I heard today, I do want to make a couple

14   comments.

15         Public confidence in courts is eroded when the

16   integrity of the process is attacked.  And there are rules

17   that you have to live by under the act, and there are rules

18   the defense has to live by under the act, and there are rules

19   I have to live by under the rules.  And it's when those are

20   not -- especially in a case like this, it's when those are

21   not observed to the highest level that problems like this are

22   created.

23         I will say one of the reasons why we had this

24   hearing to begin with and my reaction from the very beginning

25   to this case was this.  That you knew in my first order that

1   I had interpreted what you told me in a certain way, and not

2   once did anybody from your firm correct that.

3            And that's when the process began to break down and

4   I began wondering about the integrity of the actions of the

5   lawyers in this case.

6            I argued a case in the Eleventh Circuit once,

7   and you know what it's like during an oral argument when

8   you are being peppered with questions, and I wasn't sure

9   whether I had or had not misstated something, and within

10  twenty-four hours I sent a letter to the court stating that

11  I may have, stating what I could say, and asking for them to

12  take what I could say and that I was sure of into

13  consideration.

14           Not once did your firm contact us -- contact me to

15  tell me that a very specific, that you know was critical to

16  my decision, did you provide all of this information, which

17  I now know was available and available to you and never

18  communicated to the Court.

19           And I think lawyers ought to follow Ms. Torres'

20  lead that when they see something that's not complete or not

21  right or misinterpreted -- if I misinterpreted it, I rely

22  upon you as participants in the system to let me

23  know.  Instead you sat silent, and that's what led us to

24  where we are today.

25           And I have had a chance now to see the manner in

1   which your firm has decided to respond to this, and that

2   tells me a lot about you too.  But this system of justice

3   will never be or continue to be the hallmark of the world

4   unless we begin seeing this as a professional undertaking and

5   not a business.

6          It's not about winning.  It's about justice.  And

7   between those two things are advocacy that allows you to

8   reach just results, but honest ones.

9          And so long as I am entrusted with this privilege,

10  I will do my best to make sure that the system and the

11  integrity of it are upheld.  And when there are times when

12  people ought to tell me what happened and explain their

13  conduct, I am going to do that.

14         It would have been a lot easier for me not to have

15  had this hearing, and I could have just let this go.  I'm not

16  going to do that, because I would hope that you would agree

17  with me that this system is too important when there are

18  either inadvertentness or cleverness or carelessness for us

19  not to talk about that and correct it so that I can figure it

20  out, as the one ultimately responsible for the system, to

21  make sure that it's maintained at its highest levels.  That's

22  why we are here.

23         Ms. Torres, thank you.  We would never have had

24  this discussion, we would never have had this proceeding.

25  There are people watching this, members of the public that

1    are here today, and hopefully they will all agree that all of

2    us, defense lawyers and plaintiffs' lawyers and the Court,

3    that when things like this come up, that we have the courage

4    to address it and respond to it to make sure that this system

5    is upheld.  That's my goal.

6            So I have got a lot to think about.  I appreciate

7    you coming.  This was a little longer than I expected,

8    but --

9            MR. COUGHLIN:  Your Honor, if I can just say one

10   more thing?

11           I agree, and I understand what you are saying.

12   When you sent out that order and you dropped the two

13   footnotes and said we have got to explore whether he has

14   personal knowledge or not, and I understand that.

15           And I think that the circumstances and what I was

16   trying to get at here, when we reach out to these witnesses

17   that don't want to provide the detail and we can't depose

18   them, you know, at that time when we filed the complaint, and

19   he told us at least ten times that he had knowledge to the

20   end of 2007, throughout his employment, okay, you are right

21   he didn't tell the basis of his knowledge.  And I'm not

22   saying we couldn't have handled it better or different.

23   That's not what I'm standing up here to say.

24           THE COURT:  I would hope not, because any lawyer --

25   if I was litigating the case, the first thing I would have

1  said is we need to find that out.

2           MR. COUGHLIN:  You know what, we didn't say it in

3  the right way.  We moved to get his deposition.  We didn't

4  say it.

5           I'm not excusing it; okay?  That's not what I'm

6  standing here to say.  What I'm saying is what they did was

7  they reached out again and furthered the investigation to

8  Newkirk and others.

9           There was no effort -- there was no deliberate

10  effort or even clever effort to hide the ball.  If you want

11  to characterize it as something else, I understand.

12           Maybe, you know, under different circumstances

13  somebody would have thought they could reach out to the Court

14  and do something differently.  You know, within days the

15  motion for reconsideration was on file, and a week later the

16  reconsideration.  Immediately we put in Ms. Torres'

17  declaration, which we tried to be as accurate as possible,

18  and she tried to be as accurate as possible at the time, and

19  we felt that was fair and accurate also.

20           So it's no excuse for why we are here today.  And

21  why we are here today is because somebody's reputation -- and

22  that's not all right -- you know, felt that their reputation

23  was impugned and it didn't have to be.

24           Now, the basis for that was not that we somehow

25  now misrepresented his knowledge to the end of 2007 or that

 1   we were on the phone calls, but the fact that we relied on

 2   her.

 3          And, Your Honor, we do rely on the investigators,

 4   just like when I was an Assistant for seven years and

 5   relied on the FBI agents' 302s and turned them over.

 6   That's no excuse for not letting the Court know as quickly

 7   as possible when we find something is not quite as

 8   represented.

 9          And when did that happen?  When we got two Trapani

10   declarations, okay, that disavowed knowledge after that time

11   period; okay?

12          It's no excuse.  We scrambled to see what the

13   actual evidence was or what we could support it with after he

14   said that, and it didn't jibe even according to Ms. Torres

15   what he had told her before.  And she has ten paragraphs

16   about how that differs from what he told us.

17          THE COURT:  I know that, but -- we must have been

18   in two different departments of justice, but I would never

19   make a submission to the court in the form of a declaration

20   without sitting down and evaluating the credibility and

21   talking to the witness myself.

22          MR. COUGHLIN:  They did talk to the witness,

23   Your Honor.  They talked to the witness.  Every one of those

24   interviews -- not only did they talk to the witness,

25   Your Honor, but they had a forensic accountant to evaluate

1  what he was saying from EY, who used to work at EY, to

2  evaluate what he said; okay?

3          I never put on a witness that I didn't talk to

4  either by, you know, the phone or something.  I just didn't

5  throw a witness up there.

6          I was at the U.S. Attorney's Office in D.C.

7  I started at the Department of Justice Appellate Section,

8  the Honors program.  I went to the U.S. Attorney's Office in

9  D.C. for years.  I tried the biggest RICO case, I tried the

10  first murder-for-hire case.  I understand the process,

11  Your Honor, and I understand it needs to have integrity;

12  okay?

13          Things went wrong here, and for that I apologize.

14  And to Ms. Torres I apologize, you know.  And people said

15  that to her at the time, you know.

16          We could have maybe handled it different, done

17  something a little different, and I apologize to the Court

18  for not doing so.

19          THE COURT:  Thank you.

20          MR. CHANDLER:  Your Honor, my I raise a procedural

21  issue?

22          THE COURT:  Yes.

23          MR. CHANDLER:  Your Honor, John Chandler on behalf

24  of Ernst & Young.

25          The Court entered an order dismissing the complaint

1   with prejudice, and judgment was entered and the time

2   expired.

3          The Court has indicated that it is thinking about

4   taking further action.

5          THE COURT:  No, that's not what I have said.

6          MR. CHANDLER:  I'm sorry, I didn't mean to imply.

7          If the Court does anything, we would ask that the

8   Court not reopen the judgment.  Because the great tragedy

9   here from the defendants' standpoint would be going through

10  all of this and having a new final judgment that would then

11  make everything appealable.

12         So I would ask the Court, if the Court considers

13  doing anything else, that it be something other than amending

14  the judgment that's previously been entered.

15         THE COURT:  The great tragedy here isn't that.  The

16  great tragedy is that woman back there doesn't have a job

17  anymore.

18         MR. CHANDLER:  I understand that, Your Honor.

19         I am suggesting that from the standpoint of the

20  defendants, to have it reopened would be difficult.

21         Thank you, Your Honor.

22         THE COURT:  You are welcome.

23         Any other comments?

24         MR. MAST:  No, Your Honor.  Thank you.

25         THE COURT:  All right.  Thank you for coming.  We

1    will be in recess.

2              MR. HIRSCH:  Your Honor, before we do, my name is

3    David Hirsch.

4              I'm not sure if I can approach the podium?

5              THE COURT:  Come on up.

6              MR. HIRSCH:  I recognize it's unusual.  I

7    apologize, Your Honor.

8              THE COURT:  There is a lot of unusual things in

9    this, so join the club.

10             MR. HIRSCH:  Thank you.

11             The only thing that I would ask for, as long as

12   people are asking for things, is that should there be any

13   further action from the Court, that it include a full and

14   complete vindication of Ms. Torres.

15             She did not mislead her client, and a finding that

16   she did is going to negatively impact her future professional

17   career greatly.

18             THE COURT:  I understand that.

19             MR. HIRSCH:  Thank you, Your Honor.

20             THE COURT:  All right.  Thank you, all.  We will be

21   in recess.

22                  (Proceedings adjourn at 4:12 p.m.)

23

24

25

1                          C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA        :
                                      :
4    NORTHERN DISTRICT OF GEORGIA   :

5

6            I, Nicholas A. Marrone, RMR, CRR, Official Court

     Reporter of the United States District Court for the Northern
7
     District of Georgia, do hereby certify that the foregoing 115
8
     pages constitute a true transcript of proceedings had before
9
     the said Court, held in the city of Atlanta, Georgia, in the
10
     matter therein stated.
11
             In testimony whereof, I hereunto set my hand on
12
     this, the 20th day of December, 2012.
13

14

15

16
                         /s/ Nicholas A. Marrone
17                       _____
                         NICHOLAS A. MARRONE, RMR, CRR
18                       Registered Merit Reporter
                         Certified Realtime Reporter
19                       Official Court Reporter
                         Northern District of Georgia
20

21

22

23

24

25